Case No. 13-3681

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

**FREE SPEECH COALITION, INC.**, *et al.,*

Plaintiffs - Appellants,

– vs –

**ATTORNEY GENERAL OF THE UNITED STATES**,

Defendant-Appellee.

On Appeal from the United States District Court for the
Eastern District of Pennsylvania

# APPELLANTS' BRIEF

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DEVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113
Telephone: 216-781-5245
Fax: 216-781-8207

Counsel for Plaintiffs-Appellants

## United States Court of Appeals for the Third Circuit

### Corporate Disclosure Statement and
### Statement of Financial Interest

No. _13-3681_

Free Speech Coalition, Inc., et. al.

v.

Attorney General of the United States

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, **Free Speech Coalition, Inc.** makes the
following disclosure:

_____
(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations:

None

      2) For non-governmental corporate parties please list all publicly held companies
that hold 10% or more of the party's stock:

None

      3) If there is a publicly held corporation which is not a party to the proceeding
before this Court but which has as a financial interest in the outcome of the proceeding, please
identify all such parties and specify the nature of the financial interest or interests:

Not applicable

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy
estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors'
committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is
active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the
appeal, this information must be provided by appellant.

Not applicable

/s/ Lorraine R. Baumgardner
_____
(Signature of Counsel or Party)

Dated: 09-16-13
_____

(Page 2 of 2)

*rev: 11/2008*

## United States Court of Appeals for the Third Circuit

### Corporate Disclosure Statement and
### Statement of Financial Interest

No. ___13-3681___

Free Speech Coalition, Inc., et. al.

v.

Attorney General of the United States

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest.  This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings.  If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list.  LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first.  A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed.  Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, American Society of Media Photographers, Inc. makes the following disclosure:

(Name of Party)

        1) For non-governmental corporate parties please list all parent corporations:

None

        2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None

        3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

Not applicable

        4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable

/s/ Lorraine R. Baumgardner
_____
(Signature of Counsel or Party)

Dated: 09-16-13
_____

(Page 2 of 2)

*rev: 11/2008*

**United States Court of Appeals for the Third Circuit**

**Corporate Disclosure Statement and**
**Statement of Financial Interest**

No. ___13-3681___

Free Speech Coalition, Inc., et. al.

v.

Attorney General of the United States

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest.  This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings.  If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list.  LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first.  A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed.  Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, __Townsend Enterprises dba Sinclair Institute__ makes the following disclosure:

(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations:

None

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

None

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

Not applicable

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable

/s/ Lorraine R. Baumgardner

(Signature of Counsel or Party)

Dated: __09-16-13__

(Page 2 of 2)

*rev: 11/2008*

# **TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

JURISDICTIONAL STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW. . . . . . . . . . . . . . 2

STATEMENT OF RELATED CASES AND PROCEEDINGS. . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.      THE STATUTES AND THEIR IMPLEMENTING REGULATIONS
        ARE UNCONSTITUTIONAL UNDER THE FIRST AMENDMENT
        BECAUSE THEY ARE NOT NARROWLY TAILORED, AS
        REQUIRED BY INTERMEDIATE SCRUTINY. . . . . . . . . . . . . . . . . . . 10

        A.      The Statutes Are Not Narrowly Tailored. . . . . . . . . . . . . . . . . . . 10

                1.      The majority of expression produced by members of the
                        adult film industry depicts performers who could not
                        reasonably be confused as minors. . . . . . . . . . . . . . . . . . . . . 10

                2.      The majority of expression produced by the individual
                        Plaintiffs depicts persons who could not reasonably be
                        confused as minors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                3.      The statutes are not narrowly tailored to advance their
                        actual, legitimate goal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        B.      The Burdens Unnecessarily Imposed on Plaintiffs' Speech Are
                Severe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

i

## TABLE OF CONTENTS (cont'd)

Page

1. Creating, maintaining, and organizing the records. . . . . . . . 31

2. Affixing the statement describing where the records are located to their expression. . . . . . . . . . . . . . . . . . . . . . . . . . . 34

3. The record inspections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

II. THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD. . . . 37

A. The Statutes Burden a Substantial Amount of Private Expression . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

1. Expression created by husbands and wives in the privacy of their homes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

2. Sexting. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

3. Adult social networking websites. . . . . . . . . . . . . . . . . . . . 48

4. Artistic, educational, and journalistic expression. . . . . . . . . 49

B. The Statutes Unconstitutionally Burden a Substantial Amount of Expression in Which the Persons Depicted Are Obviously Adults . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

III. THE STATUTES AND THEIR IMPLEMENTING REGULATIONS ARE UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

A. The Statutes and Regulations Authorize Unconstitutional Warrantless Searches and Seizures Without Probable Cause. . . . . . 52

B. The Administrative Search Exception Does Not Apply. . . . . . . . . . 55

ii

# **TABLE OF CONTENTS (cont'd)**

<u>Page</u>

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE WITH RULES 32 (a) (7)(B),
     FEDERAL RULES OF APPELLATE PROCEDURE AND
     RULES 28.3 AND 31.1 3RD CIRCUIT LOCAL APPELLATE
     RULES AND SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

ADDENDUM

18 U.S.C.A. § 2257. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADDENDUM 1

18 U.S.C.A. § 2257A.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADDENDUM 4

28 CFR PART 75. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ADDENDUM 8

# TABLE OF AUTHORITIES

Page

## CASES

*Allinder v. State of Ohio*, 808 F.2d 1180 (6th Cir. 1987). . . . . . . . . . . . . . 55-56, 59

*Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181 (3d Cir. 2008). . . . . . . . . . . . 9

*Amer. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C.Cir. 1992). . . . . . . . . . . . . . . . . . 4

*Amer. Lib. Ass'n v. Reno*, 33 F.3rd 78 (D.C. Cir. 1994). . . . . . . . . . . . . . . . . . . . 32

*Amer. Lib. Ass'n v. Thornburgh,* 713 F.Supp. 469 (D.D.C. 1989). . . . . . . . . . . 4, 29

*Annex Books, Inc. v. City of Indianapolis*, 333 F. Supp. 2d 773
    (S.D. Ind. 2004) *reversed on other grounds,*
    581 F.3d 460 (7th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Bose Corp. v. Consumers Union of United States, Inc.*,
    466 U.S. 485 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Brown v. Entertainment Merchants Ass'n*,
    131 S.Ct. 2729 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Camara v. Mun. Court*, 387 U.S. 523 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*Deja Vu v. Union Township*, 326 F.3d 791 (6th Cir. 2003)
    *reheard en banc*, 411 F.3d  777 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . 57

*Donovan v. Dewey,* 452 U.S. 594 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56, 59

*Donovan v. Lone Steer, Inc.,* 464 U.S. 408 (1984). . . . . . . . . . . . . . . . . . . . . . . . 60

*Educational Media Co. at Virginia Tech., Inc. v.*
    *Insley*, 731 F.3d 291 (4th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES (cont'd)

Page

*Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989). . . . . . . . . . . . . . . . . . . . . 29

*Free Speech Coalition v. Ashcroft*, 535 U.S. 234 (2002). . . . . . . . . . . . . . . . . . . 39

*Free Speech Coalition, Inc. v. Attorney Gen. of U.S.*,
  677 F.3d 519 (3rd Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Free Speech Coalition, Inc. v. Holder*,
  729 F. Supp. 2d 691 (E.D. Pa. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Free Speech Coalition, Inc. v. Holder*,
  957 F. Supp. 2d 564 (E.D. Pa. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Heffner v. Murphy*, 745 F.3d 56 (3rd Cir. 2014). . . . . . . . . . . . . . . . . . . . 56, 58, 61

*Hodgins v. United States Dept. of Agriculture*,
  238 F.3d 421 (6th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*J.L. Spoons v. City of Brunswick*,
  49 F. Supp. 2d 1032 (N.D. Ohio 1999). . . . . . . . . . . . . . . . . . . . . . . . . . 57

*Katz v. United States,* 389 U.S. 347 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Lawrence v. Texas*, 539 U.S. 558 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978). . . . . . . . . . . . . . . . . . . . . . . 55

*McCauley v. University of the Virgin Islands*,
  618 F.3d 232 (3rd Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*McCutcheon v. F.E.C.*, 134 S.Ct. 1434 (2014). . . . . . . . . . . . . . . . . . . . . . . 27-31

*Michigan v. Tyler*, 436 U.S. 499 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## **TABLE OF AUTHORITIES (cont'd)**

Page

*New York Times Co. v. Sullivan*, 376U.S. 254 (1964). . . . . . . . . . . . . . . . . . . . . . . 9

*New York v. Burger*, 482 U.S. 691 (1987). . . . . . . . . . . . . . . . . . . . . . . . . 56-58

*Patel v. City of Los Angeles*, 738 F.3d 1058 (9th Cir. 2013) (en banc). . . . . 55, 60

*Pitt News v. Pappert*, 379 F.3d 96 (3rd Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 26

*Simon & Schuster, Inc. v. Members of the N.Y.
    State Crime Bd.*, 502 U.S. 105 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Smith v. Maryland*, 442 U.S. 735 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Stanley v. Georgia*, 394 U.S. 557 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Herrold*, 962 F.2d 1131 (3rd Cir. 1992). . . . . . . . . . . . . . . . . . . 56

*United States v. Jones*, 132 S. Ct. 945 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Knox*, 32 F.3d 733 (3rd Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Mitchell*, 652 F.3d 387 (3rd Cir. 2011). . . . . . . . . . . . . . . . . . . . . 9

*United States v. Scarfo*, 263 F.3d 80 (3d Cir.2001). . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Stevens*, 533 F.3d 218 (3rd Cir. 2008)
    (en banc) *aff'd* 559 U.S. 460 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Stevens*, 559 U.S. 460 (2010). . . . . . . . . . . . . . . . . . . . . . . 38, 51

*United States v. Various Articles of Merch.,
    Schedule No. 287*, 230 F.3d 649 (3d Cir. 2000). . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES (cont'd)

Page

*United States v. Williams*, 553 U.S. 285 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Windsor,* 133 S.Ct. 2675 (2013). . . . . . . . . . . . . . . . . . . . . . . . . 42

**CONSTITUTIONAL PROVISIONS**

United States Const., amend. I. . . . . . . . . . . . . . . . . 1, 2, 5, 7-10, 28, 29, 32, 57, 61

United States Const., amend. IV. . . . . . . . . . . . . . . . . 1, 2, 5-9, 51, 52, 55, 56, 61

**STATUTES, RULES AND REGULATIONS**

Child Protection and Obscenity Enforcement Act, § 7513, as
     amended by the Protect Act, § 511a and the Adam Walsh
     Child Protection and Safety Act of 2006, §§ 502(a), 503. . . . . . . . . . . . . 1

8 U.S.C. § 1324a (b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

8 U.S.C. § 1324a (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 2257. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2257 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18 U.S.C. § 2257 (f)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 2257 (f)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 60

18 U.S.C. § 2257A.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2257A (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

18 U.S.C. § 2257A (f)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

# TABLE OF AUTHORITIES (cont'd)

Page

18 U.S.C. § 2257A (f)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 60

18 U.S.C. § 2257A (h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1331. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1346 (a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 2201. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

63 Pa. Stat. Ann. § 479. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

63 Pa. Stat. Ann. § 479.16(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

Me. Rev. Stat. tit. 22, § 1555-B. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Me. Rev. Stat. tit. 28-A, § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

N.Y. Pub. Health Law § 1399-cc (McKinney). . . . . . . . . . . . . . . . . . . . . 19

21 C.F.R. § 1140.14. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

28 C.F.R. § 75.1, *et seq.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3

28 C.F.R. § 75.1 (o). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 C.F.R. § 75.2 (a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

28 C.F.R. § 75.5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 60

28 C.F.R. § 75.5 (c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF AUTHORITIES (cont'd)

Page

28 C.F.R. § 75.6 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

28 C.F.R. § 75.8 (f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

28 C.F.R. § 75.9.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Oregon Administrative Rule 845-006-0335. . . . . . . . . . . . . . . . . . . . . . . . 19

## MISCELLANEOUS

73 Fed. Reg. 77436. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

73 Fed. Reg. 77440. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

M. Drouin, et al., "Texting, sexting, attachment, and
    intimacy in college students' romantic relationships,"
    28 *Computers in Human Behavior* 444 (2012). . . . . . . . . . . . . . . . . . . . . 42

M. Drouin, et al., "Let's talk about sexting, baby:
    Computer-mediated sexual behaviors among
    young adults," *Computers in Human Behavior* (2013). . . . . . . . . . . . 41, 42

D. Gordon-Messer, et al., "Sexting among young adults,"
    *Journal of Adolescent Medicine* (2012). . . . . . . . . . . . . . . . . . . . . . . . . . 42

H. Ladov, *For the Kids: How Congress Stripped Porn
    Producers of Their Fourth Amendment Rights*,
    15 Rutgers J. L. & Religion 72 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Reference Manual on Scientific
    Evidence, 2d Ed. (Federal Judicial Center 2000). . . . . . . . . . . . . . . . 45, 47

## JURISDICTIONAL STATEMENT

Plaintiffs filed this action in the United States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1331, 1346 (a)(3), 2201, seeking a judgment declaring the Child Protection and Obscenity Enforcement Act, § 7513, as amended by the Protect Act, § 511a and the Adam Walsh Child Protection and Safety Act of 2006, §§ 502(a), 503, 18 U.S.C. §§ 2257, 2257A (2006), and their implementing regulations, 28 C.F.R. § 75.1 *et seq.,*(2008), unconstitutional and for injunctive relief against Defendant, the Attorney General of the United States. App. at XX. The district court granted Defendant's Motion to Dismiss and entered judgment in Defendant's favor. *Free Speech Coalition, Inc. v. Holder,* 729 F. Supp. 2d 691, 757 (E.D. Pa. 2012).

Plaintiffs appealed, and this Court vacated the district court's dismissal of Plaintiffs' First and Fourth Amendment claims and remanded for further proceedings. *Free Speech Coalition, Inc. v. Attorney Gen. of U.S.*, 677 F.3d 519, 545 (3rd Cir. 2012).

On July 18, 2013, after a bench trial, the district court entered judgment in favor of Defendant on all but one issue. App. at XX. *Free Speech Coalition, Inc. v. Holder*, 957 F. Supp. 2d 564, 609 (E.D. Pa. 2013). With regard to that issue, the district court found in favor of Plaintiffs, but declined to grant Plaintiffs' request for injunctive relief. App. at XX.  Plaintiffs filed a timely notice of appeal on September

6, 2013. App. at XX. This Court has jurisdiction to review the judgment entered by the district court under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether 18 U.S.C. §§ 2257, 2257A and their implementing regulations are unconstitutional under the First Amendment because they are not narrowly tailored to advance the government's interest in protecting children from sexual exploitation, as intermediate scrutiny requires, and consequently burden substantially more of Plaintiffs' constitutionally protected speech than necessary. App. at XX.

2.      Whether 18 U.S.C. §§ 2257, 2257A and their implementing regulations are facially unconstitutional under the First Amendment because they are overbroad. App. at XX.

3.      Whether 18 U.S.C. §§ 2257, 2257A and their implementing regulations are unconstitutional under the Fourth Amendment because they authorize warrantless searches without probable cause and do not satisfy the requirements of the administrative search exception. App. at XX.

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case was previously before this Court on appeal from the district court's dismissal of Plaintiffs' claims. *Free Speech Coalition v. Attorney General*, No. 10-4085. There are no pending cases or other proceedings related to this case.

2

## STATEMENT OF THE CASE

At issue is the constitutionality of two criminal statutes, 18 U.S.C. §§ 2257, 2257A and their implementing regulations, 28 C.F.R. 75.1 *et seq.,* that impose criminal recordkeeping and other requirements on those who produce visual depictions with sexual imagery.[1] While Congress enacted 18 U.S.C. §§ 2257, 2257A to "protect[] children from sexual exploitation," the statutes apply to "more than those producers" who prey on children and "mandate compliance by '[w]hoever produces' sexually explicit depictions regardless of the performers' actual or apparent ages." *Free Speech Coalition*, 677 F.3d at 538.

The statutes impose "three basic requirements" on all producers of sexually explicit images: (1) they must create records that include copies of government-issued photo identification and other personal information for all persons depicted in their expression; (2) they must affix a statement describing where these records are located on their expression; and (3) they must maintain these records on their premises and make them available for inspection by the Attorney General at all reasonable times. *Id.* at 526. In addition, neither the producer nor anyone else, including wholesalers and retailers, may sell or transfer expression depicting sexual conduct without the

---

[1] The statutes and their implementing regulations are reproduced in the Addendum to this Brief.

3

requisite statement affixed.  18 U.S.C. §§ 2257 (f)(4); 2257A (f)(4).

The regulations implementing the statutes specify how the records must be kept and organized, set forth particular requirements for the statement that must be affixed to the expression, and establish the regime for record inspections.  *Id.* at 528.

A person who violates 18 U.S.C. § 2257 faces a term of imprisonment of up to five years, a fine, or both, *id.* at 526; violations of 18 U.S.C. 2257A are punishable by a term of imprisonment of up to one year, a fine, or both. *Id.* at 527.

The statutes regulate a robust body of sexual imagery. Title18 U.S.C. § 2257 covers expression that depicts actual sexual acts, bestiality, masturbation, sadistic or masochistic abuse, or the lascivious exhibition of the genitals or pubic area. *Id.* This latter category has been interpreted to include "any frontal nude image of a person in what might otherwise be called an 'erotic' pose." *Amer. Lib. Ass'n v. Thornburgh,* 713 F.Supp. 469, 474 (D.D.C. 1989), *vacated sub nom., Amer. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C.Cir. 1992).  It even includes certain non-nude images. *United States v. Knox*, 32 F.3d 733, 737(3rd Cir. 1994); 73 Fed. Reg. 77440.

Title18 U.S.C. § 2257A covers depictions of *simulated* sexual conduct, defined to mean "conduct engaged in by performers in a visual depiction that is intended to appear as if the performers are engaged in actual sexually explicit conduct, and does

so appear to a reasonable viewer." 28 C.F.R. § 75.1 (o).[2] However, 18 U.S.C. § 2257A exempts commercial producers of Hollywood films containing depictions of simulated sexually explicit conduct and lascivious exhibition of the genitals or pubic area from its requirements, and instead, allows them simply to certify to the Attorney General that they keep records containing their performers' names, addresses, and birth dates in the ordinary course of business.  18 U.S.C. § 2257A (h); 28 C.F.R. § 75.9.

Plaintiffs brought suit, contending, among other things, that the statutes are unconstitutional under the First Amendment because they are not narrowly tailored and unnecessarily burden a substantial amount of expression and because they are overbroad.  Plaintiffs asserted that the statutes are also unconstitutional under the Fourth Amendment because they authorize warrantless searches without probable cause.  The district court dismissed their claims, and Plaintiffs appealed to this Court.

In the first appeal, this Court vacated the district court's dismissal and remanded for development of an evidentiary record; in particular, it asked the parties to develop the following evidence:

1.    Evidence of the amount of Plaintiffs' constitutionally protected speech

---

[2]   The Department of Justice has rejected the notion that simulated sexual images must include nudity; rather, they include "simulated sexually explicit conduct even if no nudity is present." 73 Fed. Reg. 77436.

not implicating the government's interest in protecting children (e.g., speech involving performers who are obviously adults) in comparison to the amount of Plaintiffs' speech implicating the government's interest (e.g., speech involving performers who are not obviously adults), *Free Speech Coalition*, 677 F.3d at 537;

2.    Evidence of the number of legitimate statutory applications (e.g., depictions of performers who reasonably could be minors based on their apparent ages) versus the number of "problematic" applications (e.g., depictions of performers who are obviously adults), *id.* at 538;

3.    Evidence of the amount of private, noncommercially-produced depictions of sexual images burdened by the statutes, *id.*; and

4.    Evidence providing the "factual context" of the record inspections to allow assessment of whether they violated the Fourth Amendment and whether the administrative search exception could apply. *Id.* at 544-45.

Over the course of a two-week trial, the parties presented evidence on these issues. Toward the end of the trial, the district court offered its observations on the witnesses and evidence. App. at XX. It found that Plaintiff Free Speech Coalition was an organization dedicated to providing education to its members, including on laws affecting the adult industry, and held sincere beliefs about what it does, what its members do, and why it's important. App. at XX.  The court continued:

6

> I want to say that I was very impressed with the sincerity of all of the plaintiffs' fact witnesses and their desire to express themselves in matters of sex, and that they are clearly exercising and expressing their views and their practices in conformance with the First Amendment. And this aspect of their lives and their livelihoods deserves great weight.

App. at XX. *See also* App. at XX-XX (discussing the credibility of each of the Plaintiffs).[3]

The district court found, nonetheless, that the statutes were narrowly tailored and not overbroad, and that the warrantless record inspections they authorized were, with the one exception previously noted, justified under the administrative search exception to the Fourth Amendment. App. at XX.

## SUMMARY OF ARGUMENT

Title 18 U.S.C. §§ 2257, 2257A and their implementing regulations impose their recordkeeping and other obligations on producers of expression depicting sexual conduct as a means to assure that minors are not used in the production of that expression. Under intermediate scrutiny, the government must demonstrate that the laws further that interest in a narrowly tailored way and do not burden substantially more speech than necessary. Under this Court's earlier opinion, that showing depends upon a comparison of the quantity of speech that implicates the

---

[3]    In contrast, the court found that Gail Dines, one of the Government's experts, "was very biased" against the adult film industry and said it would take that into account in evaluating her testimony. App. at XX.

government's interest (e.g., depictions of performers who are not obviously adults) with the quantity of speech that does not (e.g., depictions of performers who are obviously adults). *Free Speech Coalition*, 677 F.3d at 537. The evidence in this case demonstrates that a substantial majority of Plaintiffs' expression depicts persons who are obviously adults and could not reasonably be confused as minors. The statutes and regulations, accordingly, are not narrowly tailored to the government's interest in protecting children from "sexual exploitation by pornographers," and burden substantially more speech than is necessary. Moreover, the effect of the statutory scheme is to improperly reverse the constitutional presumption of protection conferred by the First Amendment and shift the burden to the producer to prove that his images are not child pornography. The statutes, therefore, fail to pass constitutional muster under intermediate scrutiny.

The statutes and regulations are also unconstitutionally overbroad because their impermissible applications to protected speech depicting adults who could not reasonably be confused as minors and to personal, non-commercial expression shared between married couples and other mature adults far exceeds their applications to speech that implicates the government's interest in protecting minors from sexual exploitation.

Lastly, the statutes are unconstitutional under the Fourth Amendment because

they authorize entry onto private property and intrusions into areas in which there is a reasonable expectation of privacy without a warrant or probable cause and without justification under the administrative search exception. The inspection regime does not target a closely regulated industry, but to the contrary, authorizes record searches of all producers of sexual expression–in their homes, their studios, and private offices. Nor are warrantless searches justified by any need to conduct random, unannounced inspections without any opportunity for prior judicial review.

## ARGUMENT

### Standard of Review

Plaintiffs' challenges to the constitutionality of 18 U.S.C. §§ 2257, 2257A under the First and Fourth Amendments are reviewed de novo. *Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 186-87 (3d Cir. 2008); *United States v. Mitchell*, 652 F.3d 387, 391 (3rd Cir. 2011).

"In the First Amendment context, reviewing courts have a duty to engage in a searching, independent factual review of the full record." *Mukasey*, 534 F.3d at 186, *quoting United States v. Scarfo*, 263 F.3d 80, 91 (3d Cir.2001). *See also Bose Corp. v. Consumers Union of United States, Inc*., 466 U.S. 485, 499 (1984) (quoting *New York Times Co. v. Sullivan*, 376U.S. 254, 284-86 (1964)).

**I.    THE STATUTES AND THEIR IMPLEMENTING REGULATIONS ARE UNCONSTITUTIONAL UNDER THE FIRST AMENDMENT BECAUSE THEY ARE NOT NARROWLY TAILORED, AS REQUIRED BY INTERMEDIATE SCRUTINY.**

To determine whether the statutes meet intermediate scrutiny's requirement that they be narrowly tailored to advance the interest they serve, this Court explained that evidence must be presented allowing it to compare the amount of Plaintiffs' speech that does not implicate the government's interest in protecting children with the amount of Plaintiffs' speech that does. *Free Speech Coalition,* 677 F.3d at 537.

The record now allows that comparison and demonstrates that the statutes burden a sizeable majority of Plaintiffs' expression that lies far beyond the government's interest in protecting children because it depicts mature adults "who could not reasonably be confused as minors." *Id.*

**A.    The Statutes Are Not Narrowly Tailored.**

1.    The majority of expression produced by members of the adult film industry depicts performers who could not reasonably be confused as minors.

Jeffrey Douglas, the Chair of the Board of Directors of the Free Speech Coalition, whom the district court credited as an attorney with "a lot of expertise in the background of the [adult entertainment] industry," App. at XX, explained that the Free Speech Coalition and its members universally condemn child pornography. App. at XX. They are dedicated to its eradication, have encouraged enforcement of the

10

laws against the use of minors, and have offered rewards for tips used in successfully prosecuting it. App. at XX.

Even before the enactment of the statutes, Douglas explained, adult film producers checked identification documents and secured model releases from their performers, as a matter of industry practice. App. at XX. Plaintiff Marie Levine, who has been a performer in adult movies since 1982, confirmed that checking performers' IDs has been a standard industry practice since the 1980s. App. at XX, XX.

In thirty years of involvement with the industry, Douglas testified that he knew of only a handful of cases in which underage performers had appeared in sexually explicit productions. App. at XX. In each instance, the underage performer gained access to the production by use of a real, but nonetheless, fraudulent identification document. App. at XX.

Douglas explained that using a minor in a movie has devastating consequences for a producer. Use of an underage performer exposes the producer to criminal prosecution under the child pornography laws and requires it to recall all the material in which an underage performer appears and to destroy it, to notify everyone to whom it was sold that it is contraband, to follow the procedures for recalling contraband, and to provide credit for the material to all to whom it was sold. App. at XX. It

eliminates good will between the producer and its customers and gives a leg up to the producer's competitors. App. at XX. Therefore, commercial producers have "enormous disincentives" to use underage performers–without 18 U.S.C. §§ 2257, 2257A. App. at XX. Douglas testified that it would be "utterly mindless" for a person in the business of producing sexually explicit expression to use a performer who had not yet reached 18 years of age. App. at XX.

Congress, therefore, enacted a solution in search of a problem. Adult film producers simply did not use–nor did they wish to use–underage performers in the production of their films. And they independently took measures to assure that they did not.

In contrast to the common sense practices that the adult industry employed to assure that minors were not depicted in its films, the statutes impose prodigious and counterproductive burdens. Again, Jeffrey Douglas of the Free Speech Coalition explained.

Douglas testified that under 18 U.S.C. §§ 2257, 2257A, "perfection is the minimum standard to avoid committing a felony." App. at XX. In contrast to other regulatory schemes, here, a minor paperwork violation constitutes a felony. *See e.g.*, 8 U.S.C. § 1324a (b)(6), 8 U.S.C. § 1324a (e) (immigration recordkeeping provisions). App. at XX-XX. For instance, not having the records properly

12

alphabetized or having photo identification placed in the wrong file are felonies. *Id.*[4]

Douglas catalogued the particular burdens. He described the cross-referencing and indexing of records that pose particularly impossible demands for wholesalers or retailers who wish to promote the material in their stores by use of a website. App. at XX-XX. Douglas also testified about the redundancy of requiring producers to demand photo identification over and over from performers who have appeared in a producer's films for many years. App. at XX. He outlined the problems created for retailers who are saddled with the responsibility of assuring that all of their materials contain a proper label that is compliant with the regulations' requirements on print and digital materials. App. at XX-XX. And Douglas explained the difficulties imposed by the requirement that the producer be available at least 20-hours per week for an inspection of his or her records on one-person operations, like Plaintiff Tom

---

[4] Among the violations that the FBI reported to the Department of Justice and the U.S. Attorney's office for potential prosecution as a result of its record inspections were: (1) failure to maintain an adequate or up-to-date cross-reference system; (2) failure to maintain the records in alphabetical order; (3) failure to maintain an identification document of sufficient legibility; (4) failure to maintain an identification document on which the date of birth was readily determined (document used Buddhist calendar); (5) failure to display the 2257 compliance statement on a website for a sufficient duration to be read by an average viewer; (6) failure to list the apartment number of the producer's condominium in the address listed in the 2257 compliance statement; and (7) failure to give notice of the hours when the records were available for inspection when the producer did not maintain at least 20 normal business hours. Plaintiffs' Ex. 1-30.

Hymes, who operates a website, or performers who offer live webcam shows, like Plaintiff Marie Levine, and identified the reasons why the third-party recordkeeping option provides no relief from that requirement. App. at XX-XX.

Many of the same burdens and difficulties imposed on the adult industry confront and affect hundreds of the 7,000 members of Plaintiff American Society of Media Photographers, who create sexually explicit imagery and who also, as a matter of practice, require proof of age to assure that their model releases are enforceable. App. at XX-XX, XX.

Given the weight and extent of the statutory burdens, the question becomes: do these burdens apply to substantially more speech than is necessary?

The Government claims they do not and supports that contention by pointing to the quantity of adult material depicting youthful-looking performers–particularly the genre labeled "teen porn." On this point, the Government presented the testimony of Dr. Gail Dines–whom the district court found to be "very biased " against the adult industry. App. at XX. Dines, at the Government's request, conducted a "qualitative content analysis" of various websites, App. at XX, XX, and analyzed the popularity of several search terms on Google using various analytics. App. at XX. Dines's research showed that in the United States, "teen porn" was a popular search

term closely ranked in popularity with "gay porn." App. at XX.[5] From this, the Government argues, the popularity of this body of expression depicting youthful-looking adults justifies the statutes' restrictions and burdens.

But simply demonstrating the popularity of "teen porn" does not answer the question posed by this Court as to how the quantity of expression encompassed by that genre *compares* to the quantity of expression that does not implicate the government's interest. *Free Speech Coalition,* 677 F.3d at 537. On that subject, the evidence showed that the quantity of expression depicting youthful-looking performers who were *not* obviously adults was far less than the quantity of material depicting performers who *were* obviously adults.

Dines herself acknowledged that the portion of expression depicting performers who might be confused as minors was substantially outweighed by the amount of expression depicting performers about whom there was no confusion. She testified that based on the data available to her–that being data gathered from the "top-rated porn sites"–her "best estimate as to the percentage of that material that depicts adults who are youthful looking enough to be confused as possibly minors is

_____

[5]    Both of these terms, however, were eclipsed in popularity by "MILF"–a genre associated with older performers like Plaintiff Levine App. at XX–which was twice as popular as "teen porn." App. at XX. Dines testified that the "MILF" genre used younger-looking performers in addition to the featured older performers. App. at XX.

approximately one-third." App. at XX-XX.  In other words, Dines concluded that the amount of constitutionally protected expression depicting adults who could not be confused as minors was approximately 67 percent of the sexually explicit expression posted on the most trafficked commercial pornography websites, or *twice* the amount of the expression depicting youthful-looking performers who, based on their apparent ages, were not obviously adults. *See also* Government's Ex. 314A (showing nearly 60 percent of persons depicted in a sample of DVDs produced by Vivid Video, a major adult film producer, were 26 years of age or older). App. at XX.

Plaintiffs presented the testimony of Daniel Linz, Ph.D., who has studied and researched sexually explicit expression for more than 30 years, App. at XX, and whom the Government's expert acknowledged is a recognized authority on the subject of the primary effects of sexually explicit media. App. at XX.   Linz was asked to examine the quantity of commercially produced sexually explicit expression and to estimate the quantity of sexually explicit expression depicting persons who could reasonably confused as minors, based on their apparent ages, compared to the quantity of sexually explicit expression depicting persons who are obviously above the age of majority.  App. at XX.

Linz testified that "the universe of commercial pornography" is composed of more than one billion images. App. at XX. Of this quantity of sexually explicit

16

expression, Linz testified the quantity of expression depicting those who could reasonably confused as minors, based on their apparent ages, compared with the quantity depicting obviously mature adults is very small–only about ten percent of all commercial sexually explicit expression.  App. at XX.

The evidence, therefore, showed that, even as applied to the adult film industry, the statutes unnecessarily burden a substantial amount of expression in advancing their goal of preventing underage performers in commercially produced adult films.

      2.     The majority of expression produced by the individual Plaintiffs depicts persons who could not reasonably be confused as minors.

The individual Plaintiffs introduced into evidence their body of work: volumes of photographs, books, videos, DVDs, and images from their websites.  App. at XX, XX, XX, XX, XX.[6]  *See United States v. Various Articles of Merch., Schedule No. 287*, 230 F.3d 649, 653 (3d Cir. 2000). This evidence establishes that a substantial majority of persons depicted in Plaintiffs' expression are clearly adults who could not be confused as minors, based on their apparent ages.

Evidence of the actual ages of the persons in Plaintiffs' expression bolsters that

---

[6]    Plaintiffs' Ex. 43, 51,52, 60-73B, and 109 have been included in the Appendix.  Plaintiffs' Ex. 45-47, 50, 74-108, and 117-27 are videotapes and DVDs that were admitted as exhibits at trial, but because of their format could not be included in the Appendix.  The district court required the parties to take possession of their respective exhibits. Plaintiffs, therefore, have custody of these exhibits; they can be made available for review by the Court.

conclusion. And the testimony of the Government's expert, Dr. Francis Biro, the Director of the Division of Adolescent Medicine at University of Cincinnati Children's Hospital and an expert on pubertal maturation, App. at XX, XX, adds further support.

The Government produced Biro's testimony to demonstrate that some of Plaintiffs' expression did, in fact, depict younger-looking adults–a point that Plaintiffs did not contest. It selected approximately 150 images from Plaintiffs' expression produced in discovery and asked Biro to assess how old the people in the images looked. App. at XX.[7] He admitted that he did not know how the Government selected the images for his review, nor did he know whether they were a representative sample of any particular Plaintiff's body of work. App. at XX.

Biro concluded that about half of the 150 images selected by the Government depicted persons who were in their twenties or younger, App. at XX–meaning, of course, that roughly 50 percent appeared to be older. App. at XX. He then grouped these images of younger adults into three categories. Biro designated 20 images as depictions of persons who he, as an expert in pubertal maturation, might confuse as

---

[7] Plaintiffs produced examples of their sexually explicit expression to the Government in the course of discovery in addition to documentation of the ages of the persons depicted. App. at XX, XX. This documentation established that all of the individuals depicted were adults. App. at XX.

18

minors. App. at XX. He designated another 31 images as depictions of persons who a lay-person might potentially confuse as minors. *Id.* Lastly, Biro identified 30 images for which he did not have enough information to make a reliable estimate of age. *Id.*

On cross-examination, Biro admitted that there was a general age range where confusion about whether someone is an adult or a minor might exist. He testified that generally speaking, the age range where there might be confusion about whether someone *under* 18 might appear to be an *adult*, or whether someone *over* 18 might appear to be a *minor*, was between the ages of 15 and 24, App. at XX–roughly 14 percent of the U.S. population. App. at XX. He agreed that generally speaking, 12- and 13-year olds will not be confused as adults, and most 14-year olds will not be confused as adults, either. App. at XX. Biro further testified that generally speaking, someone who is 25-years old or older[8] will not be confused as someone 17-years old or younger, and that nearly everyone who has reached the age of 30 will not be

---

[8] Legislation regulating sales of tobacco and alcohol to minors recognizes these benchmarks. *See* N.Y. Pub. Health Law § 1399-cc (McKinney) (for sales of tobacco "identification need not be required of any individual who reasonably appears to be at least twenty-five years of age...."). *See also* 21 C.F.R. § 1140.14 ( no age verification required for sale of tobacco for any person over the age of 26); Oregon Administrative Rule 845-006-0335 (requiring age verification if person appears to be under the age of 26 for sale of alcohol); Me. Rev. Stat. tit. 28-A, § 706 (prohibiting sale of alcohol to anyone under the age of 27 unless age verified by photo identification); Me. Rev. Stat. tit. 22, § 1555-B (same re: tobacco).

confused as a minor. App. at XX.

These benchmarks and documentation of the ages of the persons depicted in Plaintiffs' expression compiled from photo identification documents produced in discovery, demonstrate that a substantial majority of Plaintiffs' expression is unnecessarily burdened, based on the Government's own analysis.

Plaintiff David Steinberg is a recognized writer and photographer who explores human sexuality in both genres, openly and thoughtfully. He has edited several books of photography related to human sexuality and personally knows 150 to 200 photographers who produce erotic fine art. App. at XX, XX. His own photography captures ordinary people–not normally featured in commercial sexual imagery and many of whom are older, disabled, and obese–engaged in sexual intimacy. App. at XX, XX. Eighty-eight percent of his models were more than 25-years old, while 76 percent were more than 30-years old, and 45 percent were more than 40 years old. App. at XX, XX. Only three of Steinberg's 260 models were 20 years old or younger. App. at XX.

Plaintiff Carol Queen, a sociologist, sexologist, and feminist sex educator, is the Director of the Center for Sex and Culture and works as the staff sexologist at Good Vibrations, a sex toy company founded by women and owned by women. Queen's commentary and academic work on sexuality have been widely published;

20

she has authored or edited 13 books and has published a number of articles, essays, and stories in various publications, including peer-reviewed journals. App. at XX. Queen has appeared in a number of sex education videos herself. App. at XX.

One of the important messages that Queen, as a sex educator, feels strongly about is masturbation as a healthy and accepted sexual practice.  In the wake of former Surgeon General Jocelyn Elder's firing for suggesting that masturbation should be included as part of sex education, Good Vibrations sponsored a "masturbate-a-thon," intended to be a serious, yet playful protest of Elder's firing. App. at XX.  People were asked to raise money and awareness, much like in charity walk-a-thons, by getting pledges in support of their masturbatory activity. App. at XX.  Continuing the event, the Center for Sex and Culture began staging live masturbate-a-thons, which were live-streamed on the internet along with commentary by Queen and others and which required them to comply with 18 U.S.C. § 2257. *See* 28 C.F.R. § 75.2 (a)(1). App. at XX. Queen explained that the event was restricted to adults–88 percent to 90 percent of whom were 25-years of age of older with the vast majority being in their 30s and 40s. App. at XX.

Plaintiff Barbara Nitke is another accomplished photographer and artist, whose work has been exhibited around the country and around the world. App. at XX.  A significant portion of Nitke's sexually explicit work has focused on private

21

individuals in the BDSM community, who engage in sadomasochistic acts as part of a loving and committed sexual relationship with their partners. App. at XX. Specifically, she was welcomed by the membership of the Eulenspiegel Society, an education and support group for the BDSM community, and was invited into their homes and to their events to photograph their sexual experiences. App. at XX. Nitke described the community as a close-knit group of adults who knew each other well. App. at XX. Documentation of the ages of the persons depicted in Nitke's work demonstrated that 63 percent of her models were 26-years of age or older, while 52 percent were over the age of 30, and 42 percent were over the age of 40. App. at XX.

Plaintiff Betty Dodson is a celebrated feminist sex educator who through her decades-long career has championed healthy female sexuality, which she holds includes education on masturbation, orgasm, and body image. App. at XX, XX. She is 84 years old. App. at XX. Plaintiff Carlin Ross is Dodson's business partner and fellow educator with whom she has produced DVDs and operates a popular website. App. at XX, XX. Dodson and Ross testified that genital shame is the number one impediment to a healthy sex life and that masturbation is the foundation of all human sexuality. App. at XX, XX. To address these issues, they host workshops and offer content on their website that, among other things, includes instructional videos and a genital art gallery that served as an important vehicle for reducing genital shame

22

and for Dodson's own research of the issue. App. at XX, XX. The ages of the women in Dodson's videos range from 21 to 83, with 75 percent being older than 26-years of age, and 30 percent being more than 40 years old. App. at XX.

Plaintiff Sinclair Institute is the world's largest producer of sex education and sexual health materials, for which it has received numerous awards. App. at XX. It has produced sexually explicit instructional videos for adults on a range of sexual topics from oral sex to solutions for ejaculatory control, with a focus on sexual issues for aging adults. Plaintiffs' Ex. 74-108, 119-27.The expression Sinclair Institute produces and offers is shaped and guided by an advisory council composed of clinicians and other professionals in the field of human sexuality. App. at XX.[9]

The adults depicted in expression produced by Sinclair are unambiguously mature; nearly 80 percent of the persons depicted in its films and on its DVD box covers are 26-years old or older, while 66 percent are 30-years old or older–with more than one-quarter of their performers being at least 40-years old.  App. at XX.  Dian Wilson, Sinclair Institute's officer manager and the employee responsible for compliance with 2257, explained that most of the persons depicted in its films, many of whom are married couples, are over the age of 30. App. at XX.

---

[9]    Sinclair also offers sexually explicit titles produced by other commercial producers on its website, some of which depict younger-looking performers. App. at XX.

Plaintiff Marie Levine–known professionally as Nina Hartley, a popular adult film actor–graduated cum laude from San Francisco University's nursing program and has produced a 38-volume educational series on human sexuality titled *The Nina Hartley Sex Guides*. App. at XX, XX. She speaks at universities and other forums to doctors, therapists, and others on sexual literacy and health. App. at XX. Levine explained that sexual speech is an important part of the conversation about human sexuality and sexual health; she cautioned that we suppress it at our peril. App. at XX.

Levine produces sexually explicit lessons intended to be both educational and entertaining that are livestreamed on her website, Nina.com, and available for viewing by website members, who pay a fee to allow them access to all portions of the website. App. at XX. After the lessons are livestreamed, they are archived on the website. App. at XX, XX. Roughly 60 percent of the performers in her lessons are older than 30; less than 25 percent are under the age of 26.  App. at XX.

Plaintiff Dave Levingston is a photographer by avocation.  Since his early days as a photographer, Levingston has been interested in photographing female nudes in nature, which he views as the source of our concept of beauty. App. at XX, XX. Now retired from his career as Deputy Chief of Media Relations for Wright-Patterson Air Force Base, he pursues photography full time. App. at XX. Levingston's work has been displayed in Europe and in the United States, including at the Kinsey Institute.

*Id.* at 88. Based on photo identification documents that he collected as part of the paperwork for his model releases for ***all*** of his photographs–not just those depicting nudity–56 percent of Levingston's models were more than 26-years old. App. at XX.

Plaintiff Barbara Alper is a recognized commercial photographer whose fine art photography hangs in museums around the world. App. at XX. As a member of Plaintiff American Society of Media Photographers, Inc., she has worked for the *New York Times*, *American Lawyer Magazine*, and the *Los Angeles Times*, among other publications. App. at XX, XX. Her work includes depictions of sexual sub-cultures in the adult-only clubs of New York City, London, and Bangkok during the 1980s and photos of couples making love. App. at XX. She has also created sexually explicit self-portraits of herself–she is 63-years old–and her husband and taken photos of her husband masturbating; these photos were created for their own private use, although three were published in a Norwegian magazine on human sexuality. App. at XX, XX, XX.

In sum, the evidence shows that:

1.    88 percent of the persons depicted in Steinberg's photographs were 25 years of age or older;

2.    Nearly 90 percent of the persons depicted in Queen's livestream production of the Center for Sex and Culture's masturbate-a-thon were

25 years of age or older;

3.     Nearly 80 percent of the persons depicted in Sinclair Institute's DVDs were 26 years or older;

4.     75 percent of the performers in Levine's webcam broadcasts were 26 years of age or older;

5.     75 percent of the persons depicted in Dodson's and Ross's DVDs were 26 years of age or older;

6.     63 percent of the models depicted in Nitke's photographs were 26 years of age or older; and

7.      56 percent of all models photographed by Levingston–whether nude or clothed–were 26 years of age or older.

The quantity of Plaintiffs' expression depicting persons who could not reasonably confused as minors far outweighs the quantity depicting those who are not obviously adults. *See Pitt News v. Pappert*, 379 F.3d 96, 108 (3rd Cir. 2004) (striking down law preventing publications at educational institutions from receiving payment for running alcoholic beverage advertisements that burdened speech for "more than 67% of Pitt students and more than 75% of the University population...over the legal drinking age" as not narrowly tailored); *Educational Media Co. at Virginia Tech., Inc. v. Insley*, 731 F.3d 291, 301 (4th Cir. 2013)

26

(striking down regulation of alcoholic beverage advertising where "a majority of the College Newspapers' readers [were] age 21 or older"–"roughly 60%" of one of the newspapers' readership was age 21 or older and "nearly 64%" of the other newspapers' readership was age 21 or older as overbroad).

        3.     The statutes are not narrowly tailored to advance their actual, legitimate goal.

Precision in identifying the legitimate interest which a regulation of speech is intended to advance is important in evaluating a law's narrow tailoring. Recently, in *McCutcheon v. F.E.C.*, 134 S.Ct. 1434 (2014),[10] the Supreme Court took pains to identify the "primary purpose" of the legislation in evaluating the constitutionality of aggregate limits on campaign contributions, and took equal pains to identify what interests were not acceptable governmental interests justifying restrictions on speech.

The Court began by determining that there was only "one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *Id.* at 1450. It went on to state:

> No matter how desirable it may seem, it is not an acceptable governmental objective to "level the playing field," or to "level electoral opportunities," or to "equaliz[e] the financial resources of the candidates."

---

[10] That *McCutcheon* involved an evaluation of restrictions on campaign contributions in no way dilutes the relevance of its analysis of how a court must evaluate the fit between the statutory means and the government's objective.

27

*Id.*

Thus, the Court explained, the "corruption" that the government could legitimately target was "quid pro quo" corruption. *Id.* But in doing so, it could not restrict individuals from "spending large sums of money...to garner 'influence over or access' to elected officials"–activities the Court found are protected by the First Amendment. *Id.* at 1450-51. Evaluated in terms of the prevention of *quid pro quo* corruption or its appearance, the Court determined that the aggregate limits were "poorly tailored" to that interest. *Id.* at 1457.

Under *McCutcheon's* analysis, 18 U.S.C. §§ 2257, 2257A are likewise poorly tailored to the only legitimate interest justifying them.

The legitimate objective that the statutes purport to advance is the protection of children from exploitation by pornographers. *Free Speech Coalition*, 677 F.3d at 534. That is the interest against which the statutes' narrow tailoring must be measured. *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Bd.*, 502 U.S. 105, 120 (1991). And like the government's interest in preventing *quid quo pro* corruption in *McCutcheon*, the government's interest in protecting children from sexual exploitation cannot be redefined or expanded to capture constitutionally protected activity. *McCutcheon*, 134 S.Ct. at 1450. But that is precisely what the Government does here.

28

In attempting to argue that the statutory means "perfect[ly] fit" its objective, the Government explains that the speech burdened–constitutionally protected expression depicting adults–would qualify as child pornography if it depicted children and therefore, the statutory restrictions on protected expression depicting adults are justified. DDE 177-1, Memorandum in Support of Defendant's Motion for Summary Judgment at 38. That's exactly like saying, however, that aggregate limits on campaign contributions made to political candidates are narrowly tailored to advance the government's interest in preventing corruption because those contributions would be corrupt if they were made as part of a *quid pro quo* arrangement. The Court in *McCutcheon* made short work of that argument.

It's important to emphasize that under the First Amendment, all speech is presumed to be protected, and the speaker cannot be made to bear the burden of proving otherwise. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 67 (1989). When the government seeks to impose sanctions on expression, it is the ***government*** that bears the burden of showing that it is ***not*** protected. The burden of proving that the expression ***is*** protected under the First Amendment cannot constitutionally be shifted to the photographer or film maker who produced it–which would reverse the First Amendment's presumption of protection. *Am. Library Ass'n*, 713 F. Supp. at 484. That, however, is what 18 U.S.C. §§ 2257, 2257A do: they require producers

29

of expression to create and maintain a record of the age of each and every person depicted in their expression to prove that it is not child pornography.

When measured against the actual, legitimate objective of the statutes–the suppression of child pornography–the evidence here–particularly the testimony of the Government's expert, Janis Wolak–establishes that the restrictions imposed by the statutes here are "disproportionate to the government's interest" they were designed to serve. *McCutcheon*, 134 S.Ct. at 1458. *See Free Speech Coalition*, 677 F.3d at 547 (Rendell, J., concurring). Wolak explained that most child pornography is intentionally created by people who are related to or acquainted with their victim, App. at XX, XX, and is traded on private peer-to-peer networks where a user downloads software to his computer that allows him to trade electronic files with others for free, relatively anonymously, and without the involvement of a server. App. at XX, XX. Much of it depicts very young, prepubescent children who would not be mistaken as youthful-looking adults. App. at XX, XX, XX.[11]

Wolak's description of the nature of the production and distribution of the vast bulk of child pornography shows exactly why the statutes–whose burdens fall heavily, if not exclusively, on sexual expression depicting adults–fail to serve their

---

[11]     Plaintiffs' expert, Dr. Linz, concluded that nearly 99 percent of commercially available sexually explicit material is not child pornography. App. at XX.

function of protecting children from sexual exploitation "in any meaningful way."*McCutcheon*, 134 S.Ct. at 1452.[12]

**B.      The Burdens Unnecessarily Imposed on Plaintiffs' Speech Are Severe.**

In evaluating whether the statutes burden substantially more of Plaintiffs'speech than is necessary, it is important to identify what those burdens are and how they affect Plaintiffs' speech.

1.      Creating, maintaining, and organizing the records.

The statutes require all producers of expression to obtain photo-identification from the subject of their expression, to copy it, and to maintain the copy for inspection by government agents.  When an individual–whether 30, 40, 50, or 60 years of age–refuses to produce a photo ID so that it can be copied and inspected by the government as a condition of appearing in expression with sexual content, the producer is absolutely prohibited from creating it–whether in a private portrait of a mature couple's sexual intimacy such as those created by Plaintiffs Alper and Nitke, App at XX, XX, XX, whether as part of a forum dedicated to sexual health and

---

[12]   Plaintiffs' Ex. 113 reflects how little-used the statutes are as a basis for prosecution. App. at XX. The  United States Attorneys Criminal Caseload statistics indicate that between 2002 and 2012, nearly 4,000 cases were filed for child pornography offenses under 18 U.S.C. § 2252A.   For that same time period, only nine cases were filed for offenses under 18 U.S.C. § 2257. As of September 2012, no cases had ever been filed for an offense under 18 U.S.C. § 2257A.

education like Plaintiffs Dodson's and Ross's website gallery of genitalia, App. at XX, XX, whether as part of a retrospective on the lives of prostitutes such as the one that the Kinsey Institute was interested in having Plaintiff Levingston create, App. at XX, XX, or whether in a photo-documentary of public sex by those in an alternative lifestyle like Alper's proposed project on Fire Island. App. at XX.

The statutes' censorial effect is neither isolated nor inconsequential: Dodson and Ross were forced to remove 1,800 images from their website because they could not meet the demands of the statute, App. at XX; Levingston removed an award-winning photo from his website for the same reason. App. at XX, XX, XX.

That same requirement restricts Carol Queen's Dadaist appropriationist art, which she creates by "appropriating" images of genitals and sexual conduct produced by others and arranging them to create a collage–for, she is unable to collect the records for those images from which she creates her artwork. App. at XX, XX, XX. See *Amer. Lib. Ass'n v. Reno*, 33 F.3rd 78, 93 (D.C. Cir. 1994) (acknowledging that application of the recordkeeping requirements raises a serious First Amendment problem as applied to appropriationist artists).

Moreover, the requirement that identification records be kept for each person depicted in the expression has choked off distribution of serious expression containing sexual imagery produced outside the United States because foreign

32

photographers are not required to and do not keep photo-identification documents of their models, and of course, cannot and do not label their publications with the location of those non-existent records. App. at XX, XX, XX.

The regulations requiring the way records must be maintained–demanding that Plaintiffs create various indexes and cross-references, keep a copy of the expression in which the person is depicted with their records, and list all urls where the images are published on the internet–create a recordkeeping nightmare. Commercial producers hire full-time staff to meet these demands. Dian Wilson described in meticulous detail the measures that she takes on behalf of Sinclair Institute to insure compliance. She testified about applying bar codes, maintaining a visual library system, scanning 10,000 images per year into the computer, managing the requisite indices and cross-references, which she likened to "a giant spider web," and holding "fire drills" to prepare for a record inspection. App. at XX.

Individuals like Nitke, Steinberg, and Levine, and the many members of ASMP who are sole proprietors, face the same compliance issues. App. at XX. They must devote a substantial amount of time–first deciphering what the regulations require and then trying to execute them–on top of the demands of practicing their art and making a living. The record inspections conducted by the FBI showed that all but the most sophisticated producers fumbled in trying to comply with these demands. But, of

33

course, failure to comply constitutes a violation of the statutes subject to criminal prosecution. *See supra* at 13 n.4.

>    2.    Affixing the statement describing where the records are located to their expression.

Affixing the requisite statement describing where the records are located poses equally difficult challenges. Steinberg takes between 700 and 1,000 photos during a single photo shoot and prints out hundreds of 4 x 6 proofs from which his models select a photo for enlargement as a portrait. App. at XX. The regulations require Steinberg to affix a label "printed in typeface no less than 12-point type," which must be "prominently displayed," on his expression. 28 C.F.R. §§ 75.6 (e); 75.8 (f). Labeling each image is not only time-consuming and burdensome, but obscures the images and degrades the integrity and artistry of the image. App. at XX.

The labeling requirement becomes even more troublesome for those photographers like Nitke and Levingston, and the members of ASMP, who shoot digitally and take thousands of photos during each shoot. App. at XX, XX, XX. Nitke, Levingston, and Eugene Mopsik, Executive Director of ASMP, testified that they don't know how to go about labeling a digital image–much less go about labeling the thousands of images they create during each shoot. App. at XX, XX, XX. But again, failure to affix the label on even just one image subjects them to criminal prosecution. 18 U.S.C. §§ 2257 (e); 2257A (e)

34

The labeling requirement also poses a particular dilemma for someone like Plaintiff Alper who has taken personal photographs of herself and her husband and maintains her records in her home. App. at XX, XX. The statutes require her to affix a statement with her home address on her private sexual images.

It is for that very reason that Plaintiff Levine, a well-known adult film star, retained a third party recordkeeper, even though she knows that she will be criminally liable for any mistakes made by the third party recordkeeper. App. at XX. Her concerns about using a third party recordkeeper, however, are outweighed by the safety and privacy issues raised by being forced to publish her home address on her website.

Those same concerns led Tom Hymes to censor himself and to refrain from using any images that might trigger the recordkeeping requirements on his website covering the adult industry. App. at XX. Hymes's website is not a money-making venture and therefore, he cannot afford to hire a third party recordkeeper–although he testified that he also declined to use a third party recordkeeper because he was unwilling to assume the risk of being criminally prosecuted for their mistakes. App. at XX.

Lastly, Plaintiff Queen testified that she knew of no way to affix a statement to the live stream footage of the Center for Sex and Culture's masturbate-a-thons.

App. at XX.  She resorted to periodically appearing on camera and announcing the location where the records were maintained. App. at XX.

### 3.    The record inspections.

The record inspection requirements also create a host of nearly impossible demands for the Plaintiffs.  The Attorney General or his designee is authorized "to enter without delay" and "without advance notice," a producer's premises to conduct an inspection of his or her records.  28 C.F.R. § 75.5.  It is a criminal violation to refuse to permit the inspection. 18 U.S.C. §§ 2257 (f)(5); 2257A (f)(5).

The regulation governing inspections requires that they are to be conducted: (1) between the hours of 9:00 a.m. and 5:00 p.m., Monday through Friday, or (2) any other time during which the producer is actually conducting business relating to producing a depiction of actual sexually explicit conduct.  28 C.F.R. § 75.5 (c)(1). The regulations further provide that if a producer does not maintain at least 20 normal business hours per week, then she must provide written notice to the "inspecting agency," of the hours during which the records will be available for inspection, which "in no case may be less than 20 hours per week." *Id.*

The individual Plaintiffs are simply unable to comply with the regulation's requirements.  Photographers Alper, Nitke, Steinberg, Levingston, and many members of ASMP and FSC, who operate one or two person shops, are not available

36

for record inspections 20-hours per week. App. at XX, XX, XX, XX, XX, XX, XX.

They are freelancers who work on-location–away from where their records are

located. App. at XX. Some assignments require travel–taking them out of the area for

days, if not weeks at a time. Their need to earn a living and pursuit of their art makes

compliance impossible.

The statutes and regulations impose these burdens on a considerable amount

of Plaintiffs' expression that the evidence establishes depicts people who could not

reasonably be confused as minors. The statutes fail the narrow tailoring test.

## II.    THE STATUTES ARE UNCONSTITUTIONALLY OVERBROAD.

In concluding that the district court erred in dismissing Plaintiffs' overbreadth

challenge to the statutes, this Court wrote:

> Without some notion of both the amount of speech that implicates the
> government's interest in protecting children (e.g., depictions of
> performers who reasonably could be minors based on their apparent
> ages) and the amount of speech that is burdened but does not further the
> government's interest (e.g., depictions of performers who are obviously
> adults), we cannot intelligently weigh the legitimate versus problematic
> applications of the Statutes.

> Moreover, Plaintiffs should be permitted to develop the record as to
> whether the Statutes are unconstitutionally overbroad based on their
> purported regulation of purely private conduct. Plaintiffs assert that the
> Statutes are substantially overbroad because they burden the entire
> universe of constitutionally protected expression involving sexually
> oriented images of adults–including private, noncommercial depictions
> created and viewed by adults in their homes.

37

*Free Speech Coalition*, 677 F.3d at 538. The Court identified two independent paths by which unconstitutional overbreadth could be established. Plaintiffs produced a formidable body of evidence in support of each.

In reviewing that evidence, it is important to remember that courts conventionally assess a law's overbreadth by posing "reasonable but challenging hypotheticals to determine the statute's sweep." *United States v. Stevens*, 533 F.3d 218, 235 (3rd Cir. 2008) (en banc) *aff'd* 559 U.S. 460 (2010). *Cf. United States v. Williams*, 553 U.S. 285, 301-02 (2008) (rejecting "fanciful" hypotheticals as evidence of overbreadth).

In *Stevens*, for instance, the Court cited potential unconstitutional applications of the statute to hunting magazines, hunting videos, depictions of Spanish bullfighting, and Japanese dogfights–relying on "reasonable" hypotheticals provided by amici in their briefs filed in the case. 133 S.Ct. at 1589-90.

Similarly, in *Brown v. Entertainment Merchants Ass'n*, 131 S.Ct. 2729, 2736-37 (2011), the Court relied on "reasonable" hypotheticals provided in an amicus brief (Grimm's *Fairy Tales*, "penny dreadfuls," and Homer's *The Odyssey*) as well as applications to literary classics (Dante's *Inferno*, Golding's *Lord of the Flies*) independently provided by the Court itself in reaching the conclusion that California's statute regulating video games was unconstitutionally underinclusive.

*See also Free Speech Coalition v. Ashcroft*, 535 U.S. 234, 247-48 (2002)  (citing *Romeo and Juliet* and award-winning movies, *Traffic,* and *American Beauty*, as potential unconstitutional applications rendering the challenged statute unconstitutionally overbroad); *McCauley v. University of the Virgin Islands,* 618 F.3d 232, 251 (3rd Cir. 2010).

Here, Plaintiffs went further and produced evidence of the statutes' substantial overbreadth.

### A.    The Statutes Burden a Substantial Amount of Private Expression.

This Court rejected the narrowing construction proposed by the Government and emphasized that "the plain language of the Statutes makes clear that they apply broadly to all producers of actual or simulated sexually explicit depictions regardless of whether those depictions were created for the purpose of sale or trade." *Free Speech Coalition*, 677 F.3d at 539.

1.    Expression created by husbands and wives in the privacy of their homes.

The record shows that married couples create a substantial quantity of sexually explicit imagery in their homes for their own private use.

Plaintiff Barbara Alper testified that she has photographed herself with her husband and has photographed her husband masturbating as part of their marital

relationship. App. at XX, XX. She has published three of the photos, but the rest remain private expressions of sexual intimacy with her spouse. App. at XX.

Barbara Nitke testified that she created private portraits for many couples in the BDSM community. App. at XX, XX.

David Steinberg also testified that much of his work depicted husbands and wives who invited him into their homes to capture their sexual intimacy on camera. App. at XX. Like Alper and Nitke, Steinberg has published some of the images, but a number remain unpublished, private portraits. App. at XX.

Plaintiffs' Ex. 37 contains additional evidence of the prevalence of the production of sexual imagery in the lives of ordinary American married couples. App. at XX.

Listed among the most popular images on Instagram, a photo-sharing application, "are tens of thousands of images of genitalia and nude–or nearly naked– men and women posing provocatively in beds, in bathrooms, or with a partner in a similar state of undress." App. at XX.

Interviewed by ABC News, Judy Kuriansky, a clinical psychologist, offered: "There are more people than you would imagine who live next door to you or down the block that have at least taken pictures of themselves having sex.... It's more common than you think."  App. at XX. Bethany Marshall, a relationship expert,

40

likewise observed: "It's fairly common, even if it's with your own little camera at home [for couples to make sex tapes]." App. at XX.

Companies have developed technology that allows husbands and wives living apart to continue to enjoy sexual relations over Skype. App. at XX, XX. "Amelia," age 33, a British proponent of the technology, explained its worth and importance:

> My partner has been working in America for the past six months and we've been communicating by Skype. But there is only so long you can keep a spark going in a relationship without physical contact. These gadgets have really injected new life into our calls. The brilliant thing is that it is not just purely a masturbatory experience. We can control each other's device by moving our own–and it's that element that makes it so good. We feel so connected, even though we are on the other side of the world.

App. at XX.

"Facetime Sex Chat" provides another way for couples in long distance relationships to enjoy sexual intimacy. App. at XX. The company's literature states: "We have interviewed hundreds of couples with iPhones and other smart phones. Many said they've tried Facetime Sex chat and love it. Others say they haven't but are very interested." App. at XX.

In fact, one study by Plaintiffs' expert, Dr. Michelle Drouin, found that one in four persons in a committed relationship who sent a sexually explicit photo message did so because his or her partner was faraway. M. Drouin, et al., "Let's talk about sexting, baby: Computer-mediated sexual behaviors among young adults," *Computers*

41

*in Human Behavior* at 4. App. at XX.

A healthy number of adult Americans, therefore, produce sexual imagery as part of their marital and sexual relationships. The statutes unconstitutionally intrude into their private sexual lives . *Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *United States v. Windsor,* 133 S.Ct. 2675 (2013); *Stanley v. Georgia*, 394 U.S. 557 (1969). For this reason alone, the statutes are unconstitutionally overbroad.

2.    Sexting

The record also establishes that millions of Americans produce and "transfer" sexually explicit images on their cell phones and mobile devices to one another–a practice known as sexting.

 Plaintiffs produced the testimony of two expert witnesses who conducted independent research on sexting as part of their professional areas of study and reported their findings in peer-reviewed journals. M. Drouin, et al., "Texting, sexting, attachment, and intimacy in college students' romantic relationships," 28 *Computers in Human Behavior* 444 (2012), App. at XX; M. Drouin, et al., "Let's talk about sexting, baby: Computer-mediated sexual behaviors among young adults," *Computers in Human Behavior* (2013), App. at XX; D. Gordon-Messer, et al., "Sexting among young adults," *Journal of Adolescent Medicine* (2012), App. at XX.  Their studies of young adults between the ages of 18 and 24 revealed that a significant percentage of

these young adults send sexual imagery to a partner on their cell phones.

Michelle Drouin, Ph.D., a tenured professor at Indiana University-Purdue University, Fort Wayne studied sexting among 744 students enrolled in Introduction to Psychology at IU-PU, whose ages spanned from 18 to 36 and who represented more than 48 different majors. App. at XX, XX. Drouin's study focused on students who had been in a committed relationship and questioned them about the frequency with which they sent "sexually explicit picture and video messages" within their most committed relationship. App. at XX. Their responses revealed that 54 percent of the study's participants had sent a sext to their partner. App. at XX.

Drouin then conducted a follow-up study. App. at XX. This study revealed that 37 percent to 41 percent of the participants had sent a sexually explicit photo to a partner in a committed relationship, in a casual relationship, or in a cheating relationship. App. at XX, XX. One in five of the respondents had sent a nude photo to his or her partner; one in ten had sent photos of a solo sex act (e.g. masturbation). App. at XX, XX.

Marc Zimmerman, Ph.D., the Chair of the Department of Health Behavior and Health Education at University of Michigan, ranked as one of the top three programs in the country, also studied sexting behavior in young adults. App. at XX, XX. His study, sponsored by the National Institute of Health and reported in the Journal of

43

Adolescent Health, the premier journal of adolescent health and medicine, collected data on sexting in conjunction with data on substance use in young adults between the ages of 18 and 24. App. at XX, XX.

Using a survey methodology known as respondent-driven sampling, an accepted methodology in Zimmerman's field, Zimmerman collected data from 3,447 participants. App. at XX. He then weighted the group to derive a sample size of 828 respondents. App. at XX. From this sample, he found that 30 percent responded affirmatively to a question asking them if they had ever sent "a sexually suggestive nude or nearly nude photo or video of themselves to someone else" on their cell phones; more than 40 percent responded that they had received such a message from someone they knew. App. at XX.

Dr. Drouin and Dr. Zimmerman were asked to provide an estimate of the prevalence of sexting among young adults, based on their own research and the research of others on sexting, and to extrapolate that estimate using U.S. Census data. Drouin estimated that one-third of young adults between the ages of 18 and 24 have sent a sext and that based on U.S. Census data, 10.2-million adults in this age group have done so. App. at XX. Dr. Zimmerman estimated that 30 percent of young adults have sent a sext, while 41 percent have received one. App. at XX. His extrapolation using U.S. Census data was that 9-million young adults between the ages of 18 and

44

24 have sent a sext while 12-million have received one.  App. at XX. Importantly, Drouin's and Zimmerman's estimates were limited to only a segment of the population–young adults 18 to 24 years old. App. at XX. Add the number of adults 25-years of age or older who sext, and the number climbs significantly.

The Government has argued that Drouin's and Zimmerman's studies are neither useful nor relevant because their definitions of sexting did not perfectly match the definitions of images covered by the statutes.  DDE 217, Defendant's Post-Trial Brief at 37.

Drouin's first study used the term, *sexually explicit*, to describe the imagery about which the study asked; her second study found that 20% of the participants had sent an image of complete nudity while 10% had sent an image of a solo sext act–imagery covered by the statutes. App. at XX.

But more importantly, Drouin's and Zimmerman's studies–which were undertaken independently of this litigation, thus adding to their credibility, Reference Manual on Scientific Evidence, 2d Ed. (Federal Judicial Center 2000) at 237–establish that a sizeable percentage of Americans produce and exchange sexually explicit imagery and nude images that include the genitals.  Their definitions of sexting included substantial material covered by the statutes. That the studies' description of that imagery does not perfectly match the language of the statute does

45

not undermine the point of their testimony in terms of overbreadth, which is that millions of adults sext images that trigger the requirements of the statutes.

The Government also criticized the methodologies of Drouin's and Zimmerman's studies as "unreliable," notwithstanding the fact that they were published in peer-reviewed journals. To this end, the Government introduced the testimony of Dr. Philip Stark, a statistician, who testified that because the studies did not employ random probability samples and their estimates of the prevalence of sexting were not based on random probability samples, their estimates of sexting's prevalence were not precise quantitative statements, used in the field of statistics. App. at XX, XX.

The Government's criticism of the studies as falling short of statistical precision again overlooks the task at hand. The Court remanded for the development of an evidentiary record on the amount of private expression implicated by the statutes in order to evaluate whether the amount is "substantial"–not to discern a "precise quantitative statement" regarding the amount of that expression. Drouin's and Zimmerman's studies provide the very type of evidence that this Court requested, and it demonstrates that substantial numbers of adults create sexual imagery as part of their private sexual relationships.

On cross-examination, Dr. Stark agreed that sexting was not an isolated

46

phenomenon, App. at XX, and further agreed that it would be wholly unnecessary to conduct a survey using random probability samples to draw a reasonable conclusion about whether large numbers (as opposed to the precise number) of people engage in certain conduct–voting for a particular party's candidate for President, for example. App. at XX.

Stark specifically criticized Drouin's and Zimmerman's use of "convenience samples"–samples drawn from "members of the population that are easily accessible," App. at XX, versus random probability samples. In doing so, he relied on a passage from the Federal Judicial Center's Reference Manual on Scientific Evidence. App. at XX. Stark admitted, however, that he had omitted an important portion of that passage from the Manual:

> A majority of the consumer surveys conducted for Lanham Act litigation present results from nonprobability convenience samples. They are admitted into evidence based on the argument that nonprobability sampling is used widely in marketing research and that "results of these studies are used by major American companies in making decisions of considerable consequence."

*Id*. at 244 (footnote omitted) (citation omitted). App. at XX.

Drouin's and Zimmerman's academic research and testimony is not the only evidence Plaintiffs offered on the prevalence of sexting. Dr. Linz, Plaintiffs' expert who has studied sexually oriented material throughout his career, testified about the development of technologies that allow individuals to produce and share sexually

47

explicit messages with one another, including cell phones.

Linz reviewed and used as part of the basis for his conclusion, documentation in Plaintiffs' Ex. 37 regarding the prevalence of sexting. That documentation included a Harris Interactive Poll commissioned by a cell phone security company that reported that more than one-quarter of all adults admitted taking or receiving explicit photos with their cell phones and that 40 percent of adults between the ages of 18 and 34 have done so. App. at XX. It also included an article from AARP regarding sexting "among the 50-plus set."App. at XX. And three articles described particular cell phone applications providing security for a person's sexts. App. at XX, XX, XX.

### 3.    Adult social networking websites

Millions of adults share their personal sexual imagery on adult dating websites and social networks.   Dr. Linz  testified about the numerous online forums where adults post or upload sexually explicit messages to other adults.  They operate like many other online forums where adults share their photos as a means of communication with others of like interests or as part of personal messages sent to explore potential romantic relationships.  *See e.g.*, pinterest.com; match.com.

Most follow a similar protocol.  For instance, AdultFriendfinder, one of the largest and oldest adult dating websites, is "open to people from all walks of life with one thing in common - the desire to share their sexuality." App. at XX.  Members are

invited to post explicit photos, share amateur videos, and connect for webcam chats. *Id*. According to the website, it has more than 41 million members with 110 million visits per month. *Id*. Millions of images that contain depictions of sexual conduct covered by the statutes here at issue are posted for no purpose other than to "share their sexuality." App. at XX.

AdultFriendfinders is far from the only website of its kind.  Plaintiffs' Ex. 37 lists 20 additional examples of adult dating and social networking websites–e.g., Alt.com, xxx.BlackBook.com, Adam4Adam,com–on which adults share sexually explicit photos, App. at XX, XX.  Plaintiffs' Ex. 116 contains 1,700 pages of images from eleven of these websites.

The millions of adult social network and dating website members produce their sexually explicit expression–not as part of a commercial enterprise–but for purely personal reasons: they wish to associate and exchange their sexual thoughts, fantasies, and beliefs with other like-minded adults.

### 4.    Artistic, educational, and journalistic expression

While 18 U.S.C. § 2257A provides an exemption for mainstream Hollywood productions or television broadcasts containing depictions of simulated sexual conduct, there is no exception when sexually explicit visual depictions appear in artistic, educational, or journalistic expression.  In addition to the works of Plaintiffs

Nitke, Alper, and Steinberg, the important and artistic expression of Barbara DeGenieve, Helmet Newton, Tony Ward, and other similar artists depicting mature adults engaged in sexual conduct is subject to 18 U.S.C. §§ 2257, 2257A.[13]

The educational expression created by Plaintiffs Dodson and Ross, the Sinclair Institute, and Carol Queen, the news stories published by The New Yorker and the Atlantic containing photographs of the abuses at Abu Ghraib, and other important visual commentaries depicting and examining sexual crimes by photo-journalists and documentary-makers are all subject to these same requirements.[14]

**B.    The Statutes Unconstitutionally Burden a Substantial Amount of Expression in Which the Persons Depicted Are Obviously Adults.**

The same evidence demonstrating that the statutes are not narrowly tailored under intermediate scrutiny because they burden expression depicting persons who are obviously adults likewise demonstrates their overbreadth under the second path identified by this Court. *Supra* at 15-26.

Both Plaintiffs' expert, Dr. Linz, and the Government's expert, Dr. Dines,

---

[13]   Plaintiffs' Ex. 37 contains a representative sampling of artistic expression burdened by the statutes. App. at XX-XX.

[14]   Plaintiffs' Ex. 37 also contains examples of important visual commentary on sexual conduct including sexual abuse and rape.  App. at XX-XX.

testified that Google searches for sexually explicit expression yield results in the billions. App. at XX, XX. Of these billions of depictions, between 67 percent (according to Dines) and 90 percent (according to Linz) are of persons who could not reasonably be confused as minors. App. at XX, XX. Add to this enormous body of speech, the depictions produced by the individual Plaintiffs and it becomes clear that the statutes' "impermissible applications... far outnumber any permissible ones." *Stevens*, 559 U.S. at 481.

## III.    THE STATUTES AND THEIR IMPLEMENTING REGULATIONS ARE UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT.

This Court explained that "there are two ways in which the government's conduct may constitute a 'search' implicating the Fourth Amendment." *Free Speech Coalition,* 677 F.3d at 543. Under *United States v. Jones*, 132 S. Ct. 945 (2012), a search occurs "where the government unlawfully, physically occupies private property for the purpose of obtaining information." *Id.* Additionally, "a Fourth Amendment search occurs when 'the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action.'" *Id. quoting Smith v. Maryland*, 442 U.S. 735, 740 (1979). *See also Katz v. United States,* 389 U.S. 347, 360 (1967) (Harlan, J., concurring).

### A.    The Statutes and Regulations Authorize Unconstitutional Warrantless Searches and Seizures Without Probable Cause.

Under the authority of 18 U.S.C. § 2257, the FBI conducted 29 inspections of 27 producers (two of the 29 were re-inspections) between July 24, 2006 and September 19, 2007.  App. at XX, XX, XX, XX, XX, XX. Of the 27 producers who were searched, 12 were members of the Free Speech Coalition at the time of their inspection. App. at XX. Four producers who were inspected are currently members. App. at XX, XX.

All 29 inspections were conducted without a search warrant and without probable cause to believe that a crime had been committed. App. at XX. Six of the inspections were conducted in private homes. App. at XX, XX, XX, XX, XX, XX, XX, XX.[15] Other inspections were performed in private areas of business premises to which the general public was not given access–private offices, employee break rooms, locked file rooms.  App. at XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX. The agents also gained access to private storage facilities that had been rented by the producers to store the records and to which the public did not have access. App. at XX, XX, XX.

---

[15]  Former Special Agent Charles Joyner testified at trial, but in addition, the Court admitted portions of his deposition testimony as evidence in support of Plaintiffs' Fourth Amendment challenge.  App. at XX-XX, XX-XX, XX.

With the exception of one or two inspections, a team of between three and seven agents appeared at the home or office of the producer without advance notice. App. at XX, XX, XX.  For most of the inspections, when the agents arrived, they presented the producer with a letter advising him or her that the FBI was conducting an inspection of records to insure compliance with 18 U.S.C. § 2257, that the statute required the producer to make such records available at all reasonable times, that violations of the statute were subject to criminal penalties, that the FBI was authorized to enter the premises without delay, and that it was a criminal violation to delay or obstruct the FBI from conducting the inspection. App. at XX, XX, XX.

Before beginning the inspections, the FBI took photographs of the exterior of the premises and various interior areas documenting where the records were maintained and where the agents examined the records. App. at XX.  These photographs show that the FBI entered personal offices, employee break rooms, office conference rooms, and studios. Plaintiffs' Ex. 32;[16] App. at XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX, XX. The agents gained access to locked rooms where the records, which included private information about the performers depicted, were stored as well as closed file cabinets. App. at XX, XX. The

---

[16]    The photos, contained in Plaintiffs' Ex. 32, App. at XX-XX, amply demonstrate that the agents occupied private areas for the purpose of gathering information. *Free Speech Coalition,* 677 F.3d at 543.

photos taken during record inspections at residences capture home offices, file cabinets, dining room tables, App. at XX, XX, XX, XX, XX, XX, XX, XX, and the inside of an attached garage. App. at XX, XX.

After taking photos of the inspection site, the agents examined the producer's 2257 records. The FBI either searched through the producer's records and removed those it wished to examine or told the custodian of records which records it wanted to examine and had him or her pull out the records and bring them to the inspection team. App. at XX. The team of agents examined the records and completed an on-site inspection review. App. at XX. For many inspections, the team of agents remained on the premises for more than five or six hours. App. at XX, XX, XX, XX, XX. During each of the inspections, the agents made copies of all of the 2257 records for the items that they had selected, using a portable copy machine. App. at XX. At the end of the inspection, the agents took a photo of the area where the records had been examined. App. at XX.

Agent Lawrence, one of two FBI agents who led the various inspections, admitted, without qualification, that without the authority conferred by 18 U.S.C. § 2257 to enter the premises without delay and to inspect the records, the only way the FBI could have carried out the very activities they engaged in would be by obtaining a search warrant based on probable cause. App. at XX, XX.

54

With regard to some of the searches, the Government has suggested that they occurred in areas to which general members of the public had access, DDE, Defendant's Post-Trial Brief at 48-49–in contrast to offices, break rooms, and file rooms to which they clearly did not. But the occupation and activities of the agents in those areas–reception areas and a large room where inventory was stored–far exceeded the limited access extended to the public at large. App. at XX, XX. Thus, even in these areas, the agents' presence unreasonably invaded private premises.

In all cases, the agents took physical possession of and examined private records containing private information belonging to their owner, to which no member of the public would have been allowed access. The warrantless inspection scheme violates the Fourth Amendment. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 312 (1978); *Patel v. City of Los Angeles*, 738 F.3d 1058, 1061-62 (9th Cir. 2013) (en banc). *See* H. Ladov, *For the Kids: How Congress Stripped Porn Producers of Their Fourth Amendment Rights*, 15 Rutgers J. L. & Religion 72 (2013).

### B.    The Administrative Search Exception Does Not Apply.

The district court determined, nevertheless, that the inspection scheme–save for its application to searches at "bona fide" residences–satisfied the administrative search exception. App. at XX. Plaintiffs contend that the Government failed to meet its burden of establishing that the administrative search exception applies. *Allinder*

*v. State of Ohio*, 808 F.2d 1180, 1187 (6th Cir. 1987); *United States v. Herrold*, 962 F.2d 1131, 1137 (3rd Cir. 1992) (government bears burden of proof in demonstrating warrantless search is permissible under exception to Fourth Amendment warrant requirement).

Judge Rendell's concurring opinion in the first appeal examined the administrative search exception and concluded that it did not apply. *Free Speech Coalition*, 677 F.3d at 548-50 (Rendell, J., concurring). The majority did not disagree with the concurrence's fundamental analysis of the administrative search exception, but ruled that a resolution of the question should await development of the record. *Id*. at 544-45. The record establishes that the exception does not apply.

In determining whether the administrative search exception applies, the threshold matter is whether the law at issue targets businesses within a "pervasively regulated" industry where the expectation of privacy is sufficiently diminished by a history of government oversight. *New York v. Burger*, 482 U.S. 691, 701 (1987); *Heffner v. Murphy*, 745 F.3d 56 (3rd Cir. 2014). The "regulatory presence" must be sufficiently comprehensive and defined so "that the owner of *commercial property* cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan v. Dewey,* 452 U.S. 594, 600 (1981) (emphasis added).

The inspection regimen in the statutes and regulations at issue here is ***not*** limited to ***commercial premises*** but applies to private homes. The record discloses that six of the inspections were conducted in residences. For that reason alone, the administrative search exception cannot apply.

But beyond that, recordkeeping inspections are not limited to a specific industry, let alone one that is part of a "closely regulated industry." The statutes define the universe of persons subject to inspection as "whoever produces" sexually explicit expression. The inspection provisions here apply to a vast assortment of disparate producers of expression–artists, free lance photographers and journalists, sex educators and therapists, lovers–some of whom create non-commercial expression, and none of whom are part of ***any*** industry, much less a closely regulated one. *Free Speech Coalition*, 677 F.3d at 548 (Rendell, J., concurring).

However, even if the inspection scheme were confined to the premises of commercial producers of sexually explicit expression, it would still fail under *Burger* because they, too, are not part of a closely regulated industry; the First Amendment prevents that very circumstance. *See J.L. Spoons v. City of Brunswick*, 49 F. Supp. 2d 1032, 1040 (N.D. Ohio 1999); *See also, Deja Vu v. Union Township*, 326 F.3d 791, 806 (6th Cir. 2003) *reheard en banc*, 411 F.3d  777 (6th Cir. 2005); *Annex Books, Inc. v. City of Indianapolis*, 333 F. Supp. 2d 773, 787-89 (S.D. Ind. 2004)

*reversed on other grounds,* 581 F.3d 460 (7th Cir. 2009).

The district court, nonetheless, relied on the general criminal prohibitions against the production of child pornography to find that producers of sexually explicit expression were part of a "closely regulated industry."App. at XX. The concurrence pointed out the error in that position. *Free Speech Coalition*, 677 F.3d at 548-49.

The simple fact is that the criminal statutes prohibiting the production, distribution, and possession of child pornography on which the district court relied are not regulations of the adult film industry; the producers of adult films are not in any way involved with the production or distribution of child pornography. App. at XX-XX. Those general criminal statutes apply to all persons and do not regulate any particular industry, and certainly do not do so pervasively.

This Court's recent decision in *Heffner* demonstrates exactly what a closely regulated industry looks like. *See Heffner*, 2014 WL 627743 at *2 (describing Pa. Stat. Ann. § 479's licensing and regulatory scheme of funeral businesses). There is no trace of one here.

But even if the "closely regulated industry" threshold could be cleared, the Government has failed to establish that warrantless searches are justified under other *Burger* requirements for administrative searches. Judge Rendell observed:

> [T]he warrantless inspection regime created by sections 2257 and 2257A
> is not necessary to further the statutes' purpose. This is not a case where

58

the government must conduct random, unannounced inspections of a business premises to ensure health and safety (as, for example, in the case of mine inspections, *see Donovan v. Dewey*, 452 U.S. 594, 603, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981) (noting the "notorious history of serious accidents and unhealthful working conditions" in the mining industry)).

*Free Speech Coalition*, 677 F.3d at 549 (Rendell, J., concurring). *Hodgins v. United States Dept. of Agriculture*, 238 F.3d 421 (6th Cir. 2000); *Allinder*, 808 F.2d at 1187-88.

The record fully supports Judge Rendell's analysis. When questioned about the effect of providing advance notice of the inspections, both FBI Agents admitted there was little risk that a producer could use the delay to create false evidence, and no risk that they would destroy any evidence. App. at XX, XX. In fact, Agent Joyner, the FBI Agent in charge of creating the inspection program, testified that any efforts by a producer to "clean up" their records in advance of an inspection would be "wonderful" since their goal was for producers to "have good records." App. at XX, XX. For a number of the inspections, the FBI ended up giving advance notice when it suited its own needs in facilitating the inspection. App. at XX.

In fact, Agent Lawrence testified, "as an FBI agent [a 2257 record inspection] was the only situation where [he] did an inspection of records without a search warrant." App. at XX.

Moreover, the inspection regime here is unreasonable because it fails to allow

59

a producer who is subject to inspection to "obtain judicial review of the reasonableness of the demand [to inspect] prior to suffering the penalties for refusing to comply." *Patel,* 738 F.3d at 1065. The regulations implementing the statutes authorize the Attorney General to enter the premises "without delay" and "without advance notice." 28 C.F.R. § 75.5. The statutes expressly provide that it is unlawful "to refuse to permit the Attorney General or his or her designee to conduct an inspection under subsection (c)." 18 U.S.C. §§ 2257 (f)(5), 2257A (f)(5). *See* App. at XX.

This precise flaw led the Ninth Circuit, sitting en banc, to conclude that an ordinance[17] that required hotel guest records "be made available to any officer of the Los Angeles Police Department for inspection" was facially invalid because it "lacked an essential procedural safeguard against arbitrary or abusive inspection demands." *Patel,* 738 F.3d at 1064. Citing *Camara v. Mun. Court*, 387 U.S. 523, 545 (1967) and *Donovan v. Lone Steer, Inc.,* 464 U.S. 408, 415 (1984), the en banc court determined that because the ordinance did not allow a hotel owner to obtain judicial review of the reasonableness of a demand to inspect prior to suffering the

---

[17]    The court "assumed without deciding," that the ordinance authorized "administrative record inspections rather than 'searches for evidence of crime,' which would ordinarily require a warrant. *Michigan v. Tyler*, 436 U.S. 499, 511-12, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978)." *Patel*, 738 F.3d at 1063.

penalties for refusal, it was facially invalid under the Fourth Amendment. *Id.* at 1064-65. *Contrast Heffner,* 745 F. 3d 56 (wherein the inspection scheme under 63 Pa. Stat. Ann. § 479.16(b),  provided that the inspections were to be conducted by "licensed funeral directors" appointed by the state board and did not criminalize a refusal to permit an inspection).

## CONCLUSION

Plaintiffs-Appellants, therefore, request that this Court reverse the judgment of the Court below and remand with instructions to enter a judgment declaring 18 U.S.C. §§ 2257, 2257A and their implementing regulations unconstitutional under the First and Fourth Amendments and permanently enjoining their enforcement.

Respectfully submitted,

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY &DEVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113
Telephone: 216-781-5245
Fax: 216-781-8207

Counsel for Plaintiffs-Appellants

**CERTIFICATE OF COMPLIANCE WITH RULES
32 (a) (7)(B), FEDERAL RULES OF APPELLATE
PROCEDURE AND RULES 28.3 AND 31.1 3RD CIRCUIT
LOCAL APPELLATE RULES AND SERVICE**

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Third Cir. R. 28.3 and 31.1, the undersigned certifies:

1.    THE UNDERSIGNED IS A MEMBER OF THE BAR OF THIS COURT;

2.    EXCLUSIVE OF THE EXEMPTED PORTIONS IN FED. R. APP. P. 32(a)(7)(B)(iii), THE BRIEF CONTAINS: 13,982 words.

THE BRIEF HAS BEEN PREPARED:

In proportionally spaced typeface using:

Software Name and Version:  Corel WordPerfect 10

In:  Times New Roman, 14 font

3.    I HEREBY CERTIFY THAT ON APRIL 28, 2014, THE FOREGOING APPELLANTS' BRIEF WAS FILED ELECTRONICALLY. NOTICE OF THIS FILING WILL BE SENT TO ALL PARTIES BY OPERATION OF THE COURT'S ELECTRONIC FILING SYSTEM.  L.R. 113.4. PARTIES MAY ACCESS THIS FILING THROUGH THE COURT'S SYSTEM.

5.    THE FINAL VERSION OF THE BRIEF WITH CITES TO THE APPENDIX, WHICH HAS BEEN DEFERRED, WILL BE FILED IN ACCORDANCE WITH THE COURT'S ORDER OF MARCH 27, 2014;

6.    SYMANTEC ENDPOINT PROTECTION HAS BEEN RUN ON THE FILE AND NO VIRUS WAS DETECTED.

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DEVAN

Counsel for Plaintiffs-Appellants

18 U.S.C.A. § 2257
§ 2257. Record keeping requirements
Effective: July 27, 2006
Currentness

**(a)** Whoever produces any book, magazine, periodical, film, videotape, digital image, digitally- or computer-manipulated image of an actual human being, picture, or other matter which--

**(1)** contains one or more visual depictions made after November 1, 1990 of actual sexually explicit conduct; and

**(2)** is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce; shall create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction.

**(b)** Any person to whom subsection (a) applies shall, with respect to every performer portrayed in a visual depiction of actual sexually explicit conduct--

**(1)** ascertain, by examination of an identification document containing such information, the performer's name and date of birth, and require the performer to provide such other indicia of his or her identity as may be prescribed by regulations;

**(2)** ascertain any name, other than the performer's present and correct name, ever used by the performer including maiden name, alias, nickname, stage, or professional name; and

**(3)** record in the records required by subsection (a) the information required by paragraphs (1) and (2) of this subsection and such other identifying information as may be prescribed by regulation.

**(c)** Any person to whom subsection (a) applies shall maintain the records required by this section at his business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times.

**(d)(1)** No information or evidence obtained from records required to be created or maintained by this section shall, except as provided in this section, directly or indirectly, be used as evidence against any person with respect to any violation of law.

**(2)** Paragraph (1) of this subsection shall not preclude the use of such information or evidence in a prosecution or other action for a violation of this chapter or chapter 71, or for a violation of any applicable provision of law with respect to the furnishing of false information.

**(e)(1)** Any person to whom subsection (a) applies shall cause to be affixed to every copy of any matter described in paragraph (1) of subsection (a) of this section, in such manner and in such form as the Attorney General shall by regulations prescribe, a

statement describing where the records required by this section with respect to all performers depicted in that copy of the matter may be located. In this paragraph, the term "copy" includes every page of a website on which matter described in subsection (a) appears.

**(2)** If the person to whom subsection (a) of this section applies is an organization the statement required by this subsection shall include the name, title, and business address of the individual employed by such organization responsible for maintaining the records required by this section.

**(f)** It shall be unlawful--

**(1)** for any person to whom subsection (a) applies to fail to create or maintain the records as required by subsections (a) and (c) or by any regulation promulgated under this section;

**(2)** for any person to whom subsection (a) applies knowingly to make any false entry in or knowingly to fail to make an appropriate entry in, any record required by subsection (b) of this section or any regulation promulgated under this section;

**(3)** for any person to whom subsection (a) applies knowingly to fail to comply with the provisions of subsection (e) or any regulation promulgated pursuant to that subsection;

**(4)** for any person knowingly to sell or otherwise transfer, or offer for sale or transfer, any book, magazine, periodical, film, video, or other matter, produce in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce or which is intended for shipment in interstate or foreign commerce, which--

**(A)** contains one or more visual depictions made after the effective date of this subsection of actual sexually explicit conduct; and

**(B)** is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce; which does not have affixed thereto, in a manner prescribed as set forth in subsection (e)(1), a statement describing where the records required by this section may be located, but such person shall have no duty to determined the accuracy of the contents of the statement or the records required to be kept; and

**(5)** for any person to whom subsection (a) applies to refuse to permit the Attorney General or his or her designee to conduct an inspection under subsection (c).

**(g)** The Attorney General shall issue appropriate regulations to carry out this section.

**(h)** In this section--

**(1)** the term "actual sexually explicit conduct" means actual but not simulated conduct as defined in clauses (i) through (v) of section 2256(2)(A) of this title;

**(2)** the term "produces"--

**(A)** means--

**(i)** actually filming, videotaping, photographing, creating a picture, digital image, or digitally- or computer-manipulated image of an actual human being;

**(ii)** digitizing an image, of a visual depiction of sexually explicit conduct; or, assembling, manufacturing, publishing, duplicating, reproducing, or reissuing a book, magazine, periodical, film, videotape, digital image, or picture, or other matter intended for commercial distribution, that contains a visual depiction of sexually explicit conduct; or

**(iii)** inserting on a computer site or service a digital image of, or otherwise managing the sexually explicit content, of a computer site or service that contains a visual depiction of, sexually explicit conduct; and

**(B)** does not include activities that are limited to--

**(i)** photo or film processing, including digitization of previously existing visual depictions, as part of a commercial enterprise, with no other commercial interest in the sexually explicit material, printing, and video duplication;

**(ii)** distribution;

**(iii)** any activity, other than those activities identified in subparagraph (A), that does not involve the hiring, contracting for, managing, or otherwise arranging for the participation of the depicted performers;

**(iv)** the provision of a telecommunications service, or of an Internet access service or Internet information location tool (as those terms are defined in section 231 of the Communications Act of 1934 (47 U.S.C. 231)); or

**(v)** the transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication, without selection or alteration of the content of the communication, except that deletion of a particular communication or material made by another person in a manner consistent with section 230(c) of the Communications Act of 1934 (47 U.S.C. 230(c)) shall not constitute such selection or alteration of the content of the communication; and

**3)** the term "performer" includes any person portrayed in a visual depiction engaging in, or assisting another person to engage in, sexually explicit conduct.

**(i)** Whoever violates this section shall be imprisoned for not more than 5 years, and fined in accordance with the provisions of this title, or both. Whoever violates this section after having been convicted of a violation punishable under this section shall be imprisoned for any period of years not more than 10 years but not less than 2 years, and fined in accordance with the provisions of this title, or both.

**CREDIT(S)**

(Added Pub.L. 100-690, Title VII, § 7513(a), Nov. 18, 1988, 102 Stat. 4487; amended Pub.L. 101-647, Title III, §§ 301(b), 311, Nov. 29, 1990, 104 Stat. 4808; Pub.L. 103-322, Title XXXIII, § 330004(14), Sept. 13, 1994, 108 Stat. 2142; Pub.L. 108-21, Title V, § 511(a), Apr. 30, 2003, Stat. 684; Pub.L. 109-248, Title V, § 502(a), July 27, 2006, 120 Stat. 625.)

18 U.S.C.A. § 2257A
§ 2257A. Record keeping requirements for simulated sexual conduct
Effective: July 27, 2006
Currentness

**(a)** Whoever produces any book, magazine, periodical, film, videotape, digital image, digitally- or computer-manipulated image of an actual human being, picture, or other matter that--

**(1)** contains 1 or more visual depictions of simulated sexually explicit conduct; and

**(2)** is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce; shall create and maintain individually identifiable records pertaining to every performer portrayed in such a visual depiction.

**(b)** Any person to whom subsection (a) applies shall, with respect to every performer portrayed in a visual depiction of simulated sexually explicit conduct--

**(1)** ascertain, by examination of an identification document containing such information, the performer's name and date of birth, and require the performer to provide such other indicia of his or her identity as may be prescribed by regulations;

**(2)** ascertain any name, other than the performer's present and correct name, ever used by the performer including maiden name, alias, nickname, stage, or professional name; and

**(3)** record in the records required by subsection (a) the information required by paragraphs (1) and (2) and such other identifying information as may be prescribed by regulation.

**(c)** Any person to whom subsection (a) applies shall maintain the records required by this section at their business premises, or at such other place as the Attorney General may by regulation prescribe and shall make such records available to the Attorney General for inspection at all reasonable times.

**(d)(1)** No information or evidence obtained from records required to be created or maintained by this section shall, except as provided in this section, directly or indirectly, be used as evidence against any person with respect to any violation of law.

**(2)** Paragraph (1) shall not preclude the use of such information or evidence in a prosecution or other action for a violation of this chapter or chapter 71, or for a violation of any applicable provision of law with respect to the furnishing of false information.

**(e)(1)** Any person to whom subsection (a) applies shall cause to be affixed to every copy of any matter described in subsection (a)(1) in such manner and in such form as the Attorney General shall by regulations prescribe, a statement describing where the records required by this section with respect to all performers depicted in that

ADDENDUM 4

copy of the matter may be located. In this paragraph, the term "copy" includes every page of a website on which matter described in subsection (a) appears.

**(2)** If the person to whom subsection (a) applies is an organization the statement required by this subsection shall include the name, title, and business address of the individual employed by such organization responsible for maintaining the records required by this section.

**(f)** It shall be unlawful--

**(1)** for any person to whom subsection (a) applies to fail to create or maintain the records as required by subsections (a) and (c) or by any regulation promulgated under this section;

**(2)** for any person to whom subsection (a) applies knowingly to make any false entry in or knowingly to fail to make an appropriate entry in, any record required by subsection (b) or any regulation promulgated under this section;

**(3)** for any person to whom subsection (a) applies knowingly to fail to comply with the provisions of subsection (e) or any regulation promulgated pursuant to that subsection; or

**(4)** for any person knowingly to sell or otherwise transfer, or offer for sale or transfer, any book, magazine, periodical, film, video, or other matter, produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce or which is intended for shipment in interstate or foreign commerce, that--

**(A)** contains 1 or more visual depictions made after the date of enactment of this subsection of simulated sexually explicit conduct; and

**(B)** is produced in whole or in part with materials which have been mailed or shipped in interstate or foreign commerce, or is shipped or transported or is intended for shipment or transportation in interstate or foreign commerce; which does not have affixed thereto, in a manner prescribed as set forth in subsection (e)(1), a statement describing where the records required by this section may be located, but such person shall have no duty to determine the accuracy of the contents of the statement or the records required to be kept.

**(5)** for any person to whom subsection (a) applies to refuse to permit the Attorney General or his or her designee to conduct an inspection under subsection (c).

**(g)** As used in this section, the terms "produces" and "performer" have the same meaning as in section 2257(h) of this title.

**(h)(1)** The provisions of this section and section 2257 shall not apply to matter, or any image therein, containing one or more visual depictions of simulated sexually explicit conduct, or actual sexually explicit conduct as described in clause (v) of section 2256(2)(A), if such matter--

**(A)(i)** is intended for commercial distribution;

**(ii)** is created as a part of a commercial enterprise by a person who certifies to the Attorney General that such person regularly and in the normal course of business

collects and maintains individually identifiable information regarding all performers, including minor performers, employed by that person, pursuant to Federal and State tax, labor, and other laws, labor agreements, or otherwise pursuant to industry standards, where such information includes the name, address, and date of birth of the performer; and

**(iii)** is not produced, marketed or made available by the person described in clause (ii) to another in circumstances such than 1 an ordinary person would conclude that the matter contains a visual depiction that is child pornography as defined in section 2256(8); or

**(B)(i)** is subject to the authority and regulation of the Federal Communications Commission acting in its capacity to enforce section 1464 of this title, regarding the broadcast of obscene, indecent or profane programming; and

**(ii)** is created as a part of a commercial enterprise by a person who certifies to the Attorney General that such person regularly and in the normal course of business collects and maintains individually identifiable information regarding all performers, including minor performers, employed by that person, pursuant to Federal and State tax, labor, and other laws, labor agreements, or otherwise pursuant to industry standards, where such information includes the name, address, and date of birth of the performer.

**(2)** Nothing in subparagraphs (A) and (B) of paragraph (1) shall be construed to exempt any matter that contains any visual depiction that is child pornography, as defined in section 2256(8), or is actual sexually explicit conduct within the definitions in clauses (i) through (iv) of section 2256(2)(A).

**(i)(1)** Whoever violates this section shall be imprisoned for not more than 1 year, and fined in accordance with the provisions of this title, or both.

**(2)** Whoever violates this section in an effort to conceal a substantive offense involving the causing, transporting, permitting or offering or seeking by notice or advertisement, a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct in violation of this title, or to conceal a substantive offense that involved trafficking in material involving the sexual exploitation of a minor, including receiving, transporting, advertising, or possessing material involving the sexual exploitation of a minor with intent to traffic, in violation of this title, shall be imprisoned for not more than 5 years and fined in accordance with the provisions of this title, or both.

**(3)** Whoever violates paragraph (2) after having been previously convicted of a violation punishable under that paragraph shall be imprisoned for any period of years not more than 10 years but not less than 2 years, and fined in accordance with the provisions of this title, or both. The provisions of this section shall not become effective until 90 days after the final regulations implementing this section are published in the Federal Register. The provisions of this section shall not apply to any

matter, or image therein, produced, in whole or in part, prior to the effective date of this section.

**(k)** 2 On an annual basis, the Attorney General shall submit a report to Congress--

**(1)** concerning the enforcement of this section and section 2257 by the Department of Justice during the previous 12-month period; and

**(2)** including--

**(A)** the number of inspections undertaken pursuant to this section and section 2257;

**(B)** the number of open investigations pursuant to this section and section 2257;

**(C)** the number of cases in which a person has been charged with a violation of this section and section 2257; and

**(D)** for each case listed in response to subparagraph (C), the name of the lead defendant, the federal district in which the case was brought, the court tracking number, and a synopsis of the violation and its disposition, if any, including settlements, sentences, recoveries and penalties.

**CREDIT(S)**

(Added Pub.L. 109-248, Title V, § 503(a), July 27, 2006, 120 Stat. 626.)

# PART 75—CHILD PROTECTION RESTORATION AND PENALTIES ENHANCEMENT ACT OF 1990; PROTECT ACT; ADAM WALSH CHILD PROTECTION AND SAFETY ACT OF 2006; RECORDKEEPING AND RECORD-INSPECTION PROVISIONS

Contents
§75.1 Definitions.
§75.2 Maintenance of records.
§75.3 Categorization of records.
§75.4 Location of records.
§75.5 Inspection of records.
§75.6 Statement describing location of books and records.
§75.7 Exemption statement.
§75.8 Location of the statement.
§75.9 Certification of records.

Authority: 18 U.S.C. 2257, 2257A.

Source: Order No. 2765-2005, 70 FR 29619, May 24, 2005, unless otherwise noted.

§75.1 Definitions.

(a) Terms used in this part shall have the meanings set forth in 18 U.S.C. 2257, and as provided in this section. The terms used and defined in these regulations are intended to provide common-language guidance and usage and are not meant to exclude technologies or uses of these terms as otherwise employed in practice or defined in other regulations or federal statutes (i.e., 47 U.S.C. 230, 231).

(b) Picture identification card means a document issued by the United States, a State government, or a political subdivision thereof, or a United States territory, that bears the photograph, the name of the individual identified, and the date of birth of that individual, and provides specific information sufficient for the issuing authority to confirm its validity, such as a passport, Permanent Resident Card (commonly known as a "Green Card"), or employment authorization document issued by the United States, a driver's license or other form of identification issued by a State or the District of Columbia; or a foreign government-issued equivalent of any of the documents listed above when the person who is the subject of the picture identification card is a non-U.S. citizen located outside the United States at the time of original production and the producer maintaining the required records, whether a U.S. citizen or non-U.S. citizen, is located outside the United States on the original production date. The picture identification card must be valid as of the original production date.

(c) Producer means any person, including any individual, corporation, or other organization, who is a primary producer or a secondary producer.

(1) Primary producer is any person who actually films, videotapes, photographs, or creates a digitally- or computer-manipulated image, a digital image, or a picture of, or who digitizes an image of, a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct. When a corporation or other organization is the primary producer of any particular image or picture, then no individual employee or agent of that corporation or other organization will be considered to be a primary producer of that image or picture.

(2) Secondary producer is any person who produces, assembles, manufactures, publishes, duplicates, reproduces, or reissues a book, magazine, periodical, film, videotape, or digitally- or computer-manipulated image, picture, or other matter intended for commercial distribution that contains a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct, or who inserts on a computer site or service a digital image of, or otherwise manages the sexually explicit content of a computer site or service that contains a visual depiction of, an actual human being engaged in actual or simulated sexually explicit conduct, including any person who enters into a contract, agreement, or conspiracy to do any of the foregoing. When a corporation or other organization is the secondary producer of any particular image or picture, then no individual of that corporation or other organization will be considered to be the secondary producer of that image or picture.

(3) The same person may be both a primary and a secondary producer.

(4) Producer does not include persons whose activities relating to the visual depiction of actual or simulated sexually explicit conduct are limited to the following:

(i) Photo or film processing, including digitization of previously existing visual depictions, as part of a commercial enterprise, with no other commercial interest in the sexually explicit material, printing, and video duplication;

(ii) Distribution;

(iii) Any activity, other than those activities identified in paragraphs (c)(1) and (2) of this section, that does not involve the hiring, contracting for, managing, or otherwise arranging for the participation of the depicted performers;

(iv) The provision of a telecommunications service, or of an Internet access service of Internet information location tool (as those terms are defined in section 231 of the Communications Act of 1934 (47 U.S.C. 231));

(v) The transmission, storage, retrieval, hosting, formatting, or translation (or any combination thereof) of a communication, without selection or alteration of the content of the communication, except that deletion of a particular communication or material made by another person in a manner consistent with section 230(c) of the

Communications Act of 1934 (47 U.S.C. 230(c)) shall not constitute such selection or alteration of the content of the communication; or

(vi) Unless the activity or activities are described in section 2257(h)(2)(A), the dissemination of a depiction without having created it or altered its content.

(d) Sell, distribute, redistribute, and re-release refer to commercial distribution of a book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, digital image, picture, or other matter that contains a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct, but does not refer to noncommercial or educational distribution of such matter, including transfers conducted by bona fide lending libraries, museums, schools, or educational organizations.

(e) Copy, when used:

(1) In reference to an identification document or a picture identification card, means a photocopy, photograph, or digitally scanned reproduction;

(2) In reference to a visual depiction of sexually explicit conduct, means a duplicate of the depiction itself (e.g., the film, the image on a Web site, the image taken by a webcam, the photo in a magazine); and

(3) In reference to an image on a webpage for purposes of §§75.6(a), 75.7(a), and 75.7(b), means every page of a Web site on which the image appears.

(f) Internet means collectively the myriad of computer and telecommunications facilities, including equipment and operating software, which constitute the interconnected world-wide network of networks that employ the Transmission Control Protocol/Internet Protocol, or any predecessor or successor protocols to such protocol, to communicate information of all kinds by wire or radio.

(g) Computer site or service means a computer server-based file repository or file distribution service that is accessible over the Internet, World Wide Web, Usenet, or any other interactive computer service (as defined in 47 U.S.C. 230(f)(2)). Computer site or service includes without limitation, sites or services using hypertext markup language, hypertext transfer protocol, file transfer protocol, electronic mail transmission protocols, similar data transmission protocols, or any successor protocols, including but not limited to computer sites or services on the World Wide Web.

(h) URL means uniform resource locator.

(i) Electronic communications service has the meaning set forth in 18 U.S.C. 2510(15).

(j) Remote computing service has the meaning set forth in 18 U.S.C. 2711(2).

(k) Manage content means to make editorial or managerial decisions concerning the

sexually explicit content of a computer site or service, but does not mean those who manage solely advertising, compliance with copyright law, or other forms of non-sexually explicit content.

(l) Interactive computer service has the meaning set forth in 47 U.S.C. 230(f)(2).

(m) Date of original production or original production date means the date the primary producer actually filmed, videotaped, or photographed, or created a digitally- or computer-manipulated image or picture of, the visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct. For productions that occur over more than one date, it means the single date that was the first of those dates. For a performer who was not 18 as of this date, the date of original production is the date that such a performer was first actually filmed, videotaped, photographed, or otherwise depicted. With respect to matter that is a secondarily produced compilation of individual, primarily produced depictions, the date of original production of the matter is the earliest date after July 3, 1995, on which any individual depiction in that compilation was produced. For a performer in one of the individual depictions contained in that compilation who was not 18 as of this date, the date of original production is the date that the performer was first actually filmed, videotaped, photographed, or otherwise depicted for the individual depiction at issue.

(n) Sexually explicit conduct has the meaning set forth in 18 U.S.C. 2256(2)(A).

(o) Simulated sexually explicit conduct means conduct engaged in by performers that is depicted in a manner that would cause a reasonable viewer to believe that the performers engaged in actual sexually explicit conduct, even if they did not in fact do so. It does not mean not sexually explicit conduct that is merely suggested.

(p) Regularly and in the normal course of business collects and maintains means any business practice(s) that ensure that the producer confirms the identity and age of all employees who perform in visual depictions.

(q) Individually identifiable information means information about the name, address, and date of birth of employees that is capable of being retrieved on the basis of a name of an employee who appears in a specified visual depiction.

(r) All performers, including minor performers means all performers who appear in any visual depiction, no matter for how short a period of time.

(s) Employed by means, in reference to a performer, one who receives pay for performing in a visual depiction or is otherwise in an employer-employee relationship with the producer of the visual depiction as evidenced by oral or written agreements.

[Order No. 2765-2005, 70 FR 29619, May 24, 2005, as amended at 73 FR 77468, Dec. 18, 2008]

§75.2 Maintenance of records.

(a) Any producer of any book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, digital image, picture, or other matter that is produced in whole or in part with materials that have been mailed or shipped in interstate or foreign commerce, or is shipped, transported, or intended for shipment or transportation in interstate or foreign commerce, and that contains one or more visual depictions of an actual human being engaged in actual sexually explicit conduct (except lascivious exhibition of the genitals or pubic area of any person) made after July 3, 1995, or one or more visual depictions of an actual human being engaged in simulated sexually explicit conduct or in actual sexually explicit conduct limited to lascivious exhibition of the genitals or pubic area of any person made after March 18, 2009, shall, for each performer portrayed in such visual depiction, create and maintain records containing the following:

(1) The legal name and date of birth of each performer, obtained by the producer's examination of a picture identification card prior to production of the depiction. For any performer portrayed in a depiction of an actual human being engaged in actual sexually explicit conduct (except lascivious exhibition of the genitals or pubic area of any person) made after July 3, 1995, or of an actual human being engaged in simulated sexually explicit conduct or in actual sexually explicit conduct limited to lascivious exhibition of the genitals or pubic area of any person made after March 18, 2009, the records shall also include a legible hard copy or legible digitally scanned or other electronic copy of a hard copy of the identification document examined and, if that document does not contain a recent and recognizable picture of the performer, a legible hard copy of a picture identification card. For any performer portrayed in a depiction of an actual human being engaged in actual sexually explicit conduct (except lascivious exhibition of the genitals or pubic area of any person) made after June 23, 2005, or of an actual human being engaged in simulated sexually explicit conduct or in actual sexually explicit conduct limited to lascivious exhibition of the genitals or pubic area of any person made after March 18, 2009, the records shall include a copy of the depiction, and, where the depiction is published on an Internet computer site or service, a copy of any URL associated with the depiction. If no URL is associated with the depiction, the records shall include another uniquely identifying reference associated with the location of the depiction on the Internet. For any performer in a depiction performed live on the Internet, the records shall include a copy of the depiction with running-time sufficient to identify the performer in the depiction and to associate the performer with the records needed to confirm his or her age.

(2) Any name, other than the performer's legal name, ever used by the performer, including the performer's maiden name, alias, nickname, stage name, or professional

name. For any performer portrayed in a visual depiction of an actual human being engaged in actual sexually explicit conduct (except lascivious exhibition of the genitals or pubic area of any person) made after July 3, 1995, or of an actual human being engaged in simulated sexually explicit conduct or in actual sexually explicit conduct limited to lascivious exhibition of the genitals or pubic area of any person made after March 18, 2009, such names shall be indexed by the title or identifying number of the book, magazine, film, videotape, digitally- or computer-manipulated image, digital image, picture, URL, or other matter. Producers may rely in good faith on representations by performers regarding accuracy of the names, other than legal names, used by performers.

(3) Records required to be created and maintained under this part shall be organized alphabetically, or numerically where appropriate, by the legal name of the performer (by last or family name, then first or given name), and shall be indexed or cross-referenced to each alias or other name used and to each title or identifying number of the book, magazine, film, videotape, digitally- or computer-manipulated image, digital image, picture, URL, or other matter.

(4) The primary producer shall create a record of the date of original production of the depiction.

(b) A producer who is a secondary producer as defined in §75.1(c) may satisfy the requirements of this part to create and maintain records by accepting from the primary producer, as defined in §75.1(c), copies of the records described in paragraph (a) of this section. Such a secondary producer shall also keep records of the name and address of the primary producer from whom he received copies of the records. The copies of the records may be redacted to eliminate non-essential information, including addresses, phone numbers, social security numbers, and other information not necessary to confirm the name and age of the performer. However, the identification number of the picture identification card presented to confirm the name and age may not be redacted.

(c) The information contained in the records required to be created and maintained by this part need be current only as of the date of original production of the visual depiction to which the records are associated. If the producer subsequently produces an additional book, magazine, film, videotape, digitally- or computer-manipulated image, digital image, or picture, or other matter (including but not limited to an Internet computer site or service) that contains one or more visual depictions of an actual human being engaged in actual or simulated sexually explicit conduct made by a performer for whom he maintains records as required by this part, the producer may add the additional title or identifying number and the names of the performer to the existing records maintained pursuant to §75.2(a)(2). Producers of visual depictions made after July 3, 1995, and before June 23, 2005, may rely on picture identification

cards that were valid forms of required identification under the provisions of part 75 in effect during that time period.

(d) For any record of a performer in a visual depiction of actual sexually explicit conduct (except lascivious exhibition of the genitals or pubic area of any person) created or amended after June 23, 2005, or of a performer in a visual depiction of simulated sexually explicit conduct or actual sexually explicit conduct limited to lascivious exhibition of the genitals or pubic area of any person made after March 18, 2009, all such records shall be organized alphabetically, or numerically where appropriate, by the legal name of the performer (by last or family name, then first or given name), and shall be indexed or cross-referenced to each alias or other name used and to each title or identifying number of the book, magazine, film, videotape, digitally- or computer-manipulated image, digital image, or picture, or other matter (including but not limited to an Internet computer site or service). If the producer subsequently produces an additional book, magazine, film, videotape, digitally- or computer-manipulated image, digital image, or picture, or other matter (including but not limited to an Internet computer site or service) that contains one or more visual depictions of an actual human being engaged in actual or simulated sexually explicit conduct made by a performer for whom he maintains records as required by this part, the producer shall add the additional title or identifying number and the names of the performer to the existing records, and such records shall thereafter be maintained in accordance with this paragraph.

(e) Records required to be maintained under this part shall be segregated from all other records, shall not contain any other records, and shall not be contained within any other records.

(f) Records required to be maintained under this part may be kept either in hard copy or in digital form, provided that they include scanned copies of forms of identification and that there is a custodian of the records who can authenticate each digital record.

(g) Records are not required to be maintained by either a primary producer or by a secondary producer for a visual depiction of sexually explicit conduct that consists only of lascivious exhibition of the genitals or pubic area of a person, and contains no other sexually explicit conduct, whose original production date was prior to March 18, 2009.

(h) A primary or secondary producer may contract with a non-employee custodian to retain copies of the records that are required under this part. Such custodian must comply with all obligations related to records that are required by this Part, and such a contract does not relieve the producer of his liability under this part.

[Order No. 2765-2005, 70 FR 29619, May 24, 2005, as amended at 73 FR 77469, Dec. 18, 2008]

§75.3 Categorization of records.

Records required to be maintained under this part shall be categorized alphabetically, or numerically where appropriate, and retrievable to: All name(s) of each performer, including any alias, maiden name, nickname, stage name or professional name of the performer; and according to the title, number, or other similar identifier of each book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, digital image, or picture, or other matter (including but not limited to Internet computer site or services). Only one copy of each picture of a performer's picture identification card and identification document must be kept as long as each copy is categorized and retrievable according to any name, real or assumed, used by such performer, and according to any title or other identifier of the matter.

§75.4 Location of records.

Any producer required by this part to maintain records shall make such records available at the producer's place of business or at the place of business of a non-employee custodian of records. Each record shall be maintained for seven years from the date of creation or last amendment or addition. If the producer ceases to carry on the business, the records shall be maintained for five years thereafter. If the producer produces the book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, digital image, or picture, or other matter (including but not limited to Internet computer site or services) as part of his control of or through his employment with an organization, records shall be made available at the organization's place of business or at the place of business of a non-employee custodian of records. If the organization is dissolved, the person who was responsible for maintaining the records, as described in §75.6(b), shall continue to maintain the records for a period of five years after dissolution.

[73 FR 77470, Dec. 18, 2008]

§75.5 Inspection of records.

(a) Authority to inspect. Investigators authorized by the Attorney General (hereinafter "investigators") are authorized to enter without delay and at reasonable times any establishment of a producer where records under §75.2 are maintained to inspect during regular working hours and at other reasonable times, and within reasonable limits and in a reasonable manner, for the purpose of determining compliance with the record-keeping requirements of the Act and any other provision of the Act (hereinafter "investigator").

(b) Advance notice of inspections. Advance notice of record inspections shall not be given.

(c) Conduct of inspections. (1) Inspections shall take place during normal business hours and at such places as specified in §75.4. For the purpose of this part, "normal business hours" are from 9 a.m. to 5 p.m., local time, Monday through Friday, or, for inspections to be held at the place of business of a producer, any other time during which the producer is actually conducting business relating to producing a depiction of actual sexually explicit conduct. To the extent that the producer does not maintain at least 20 normal business hours per week, the producer must provide notice to the inspecting agency of the hours during which records will be available for inspection, which in no case may be less than 20 hours per week.

(2) Upon commencing an inspection, the investigator shall:

(i) Present his or her credentials to the owner, operator, or agent in charge of the establishment;

(ii) Explain the nature and purpose of the inspection, including the limited nature of the records inspection, and the records required to be kept by the Act and this part; and

(iii) Indicate the scope of the specific inspection and the records that he or she wishes to inspect.

(3) The inspections shall be conducted so as not to unreasonably disrupt the operations of the establishment.

(4) At the conclusion of an inspection, the investigator may informally advise the producer or his non-employee custodian of records of any apparent violations disclosed by the inspection. The producer or non-employee custodian or records may bring to the attention of the investigator any pertinent information regarding the records inspected or any other relevant matter.

(d) Frequency of inspections. Records may be inspected once during any four-month period, unless there is a reasonable suspicion to believe that a violation of this part has occurred, in which case an additional inspection or inspections may be conducted before the four-month period has expired.

(e) Copies of records. An investigator may copy, at no expense to the producer or to his non-employee custodian of records, during the inspection, any record that is subject to inspection.

(f) Other law enforcement authority. These regulations do not restrict the otherwise lawful investigative prerogatives of an investigator while conducting an inspection.

(g) Seizure of evidence. Notwithstanding any provision of this part or any other regulation, a law enforcement officer may seize any evidence of the commission of any felony while conducting an inspection.

[Order No. 2765-2005, 70 FR 29619, May 24, 2005, as amended at 73 FR 77470,

Dec. 18, 2008]

§75.6 Statement describing location of books and records.

(a) Any producer of any book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, digital image, or picture, or other matter (including but not limited to an Internet computer site or service) that contains one or more visual depictions of an actual human being engaged in actual sexually explicit conduct made after July 3, 1995, and produced, manufactured, published, duplicated, reproduced, or reissued after July 3, 1995, or of a performer in a visual depiction of simulated sexually explicit conduct or actual sexually explicit conduct limited to lascivious exhibition of the genitals or pubic area of any person made after March 18, 2009, shall cause to be affixed to every copy of the matter a statement describing the location of the records required by this part. A producer may cause such statement to be affixed, for example, by instructing the manufacturer of the book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, digital image, picture, or other matter to affix the statement. In this paragraph, the term "copy" includes every page of a Web site on which a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct appears.

(b) Every statement shall contain:

(1) The title of the book, magazine, periodical, film, or videotape, digitally- or computer-manipulated image, digital image, picture, or other matter (unless the title is prominently set out elsewhere in the book, magazine, periodical, film, or videotape, digitally- or computer-manipulated image, digital image, picture, or other matter) or, if there is no title, an identifying number or similar identifier that differentiates this matter from other matters which the producer has produced;

(2) [Reserved]

(3) A street address at which the records required by this part may be made available. A post office box address does not satisfy this requirement.

(c) If the producer is an organization, the statement shall also contain the title and business address of the person who is responsible for maintaining the records required by this part.

(d) The information contained in the statement must be accurate as of the date on which the book, magazine, periodical, film, videotape, digitally or computer-manipulated image, digital image, picture, or other matter is produced or reproduced.

(e) For the purposes of this section, the required statement shall be displayed in typeface that is no less than 12-point type or no smaller than the second-largest typeface on the material and in a color that clearly contrasts with the background

color of the material. For any electronic or other display of the notice that is limited in time, the notice must be displayed for a sufficient duration and of a sufficient size to be capable of being read by the average viewer.

(f) If the producer contracts with a non-employee custodian of records to serve as the person responsible for maintaining his records, the statement shall contain the name and business address of that custodian and may contain that information in lieu of the information required in paragraphs (b)(3) and (c) of this section.

[Order No. 2765-2005, 70 FR 29619, May 24, 2005, as amended at 73 FR 77470, Dec. 18, 2008]

§75.7 Exemption statement.

(a) Any producer of any book, magazine, periodical, film, videotape, digitally- or computer-manipulated image, digital image, picture, or other matter may cause to be affixed to every copy of the matter a statement attesting that the matter is not covered by the record-keeping requirements of 18 U.S.C. 2257(a)-(c) or 18 U.S.C. 2257A(a)-(c), as applicable, and of this part if:

(1) The matter contains visual depictions of actual sexually explicit conduct made only before July 3, 1995, or was last produced, manufactured, published, duplicated, reproduced, or reissued before July 3, 1995. Where the matter consists of a compilation of separate primarily produced depictions, the entirety of the conduct depicted was produced prior to July 3, 1995, regardless of the date of secondary production;

(2) The matter contains only visual depictions of simulated sexually explicit conduct or of actual sexually explicit conduct limited to lascivious exhibition of the genitals or pubic area of any person, made before March 18, 2009;

(3) The matter contains only some combination of the visual depictions described in paragraphs (a)(1) and (a)(2) of this section.

(b) If the primary producer and the secondary producer are different entities, the primary producer may certify to the secondary producer that the visual depictions in the matter satisfy the standards under paragraphs (a)(1) through (a)(3) of this section. The secondary producer may then cause to be affixed to every copy of the matter a statement attesting that the matter is not covered by the record-keeping requirements of 18 U.S.C. 2257(a)-(c) or 18 U.S.C. 2257A(a)-(c), as applicable, and of this part.

[73 FR 77471, Dec. 18, 2008]

ADDENDUM 18

§75.8 Location of the statement.

(a) All books, magazines, and periodicals shall contain the statement required in §75.6 or suggested in §75.7 either on the first page that appears after the front cover or on the page on which copyright information appears.

(b) In any film or videotape which contains end credits for the production, direction, distribution, or other activity in connection with the film or videotape, the statement referred to in §75.6 or §75.7 shall be presented at the end of the end titles or final credits and shall be displayed for a sufficient duration to be capable of being read by the average viewer.

(c) Any other film or videotape shall contain the required statement within one minute from the start of the film or videotape, and before the opening scene, and shall display the statement for a sufficient duration to be read by the average viewer.

(d) A computer site or service or Web address containing a digitally- or computer-manipulated image, digital image, or picture shall contain the required statement on every page of a Web site on which a visual depiction of an actual human being engaged in actual or simulated sexually explicit conduct appears. Such computer site or service or Web address may choose to display the required statement in a separate window that opens upon the viewer's clicking or mousing-over a hypertext link that states, "18 U.S.C. 2257 [and/or 2257A, as appropriate] Record-Keeping Requirements Compliance Statement."

(e) For purpose of this section, a digital video disc (DVD) containing multiple depictions is a single matter for which the statement may be located in a single place covering all depictions on the DVD.

(f) For all other categories not otherwise mentioned in this section, the statement is to be prominently displayed consistent with the manner of display required for the aforementioned categories.

[Order No. 2765-2005, 70 FR 29619, May 24, 2005, as amended at 73 FR 77471, Dec. 18, 2008]


§75.9 Certification of records.

(a) In general. The provisions of §§75.2 through 75.8 shall not apply to a visual depiction of actual sexually explicit conduct constituting lascivious exhibition of the genitals or pubic area of a person or to a visual depiction of simulated sexually explicit conduct if all of the following requirements are met:

(1) The visual depiction is intended for commercial distribution;

(2) The visual depiction is created as a part of a commercial enterprise;

(3) Either—

(i) The visual depiction is not produced, marketed or made available in circumstances such that an ordinary person would conclude that the matter contains a visual depiction that is child pornography as defined in 18 U.S.C. 2256(8), or,

(ii) The visual depiction is subject to regulation by the Federal Communications Commission acting in its capacity to enforce 18 U.S.C. 1464 regarding the broadcast of obscene, indecent, or profane programming; and

(4) The producer of the visual depiction certifies to the Attorney General that he regularly and in the normal course of business collects and maintains individually identifiable information regarding all performers, including minor performers, employed by that person, pursuant to Federal and State tax, labor, and other laws, labor agreements, or otherwise pursuant to industry standards, where such information includes the name, address, and date of birth of the performer. (A producer of materials depicting sexually explicit conduct not covered by the certification regime is not disqualified from using the certification regime for materials covered by the certification regime.)

(b) Form of certification. The certification shall take the form of a letter addressed to the Attorney General signed either by the chief executive officer or another executive officer of the entity making the certification, or in the event the entity does not have a chief executive officer or other executive officer, the senior manager responsible for overseeing the entity's activities.

(c) Content of certification. The certification shall contain the following:

(1) A statement setting out the basis under 18 U.S.C. 2257A and this part under which the certifying entity and any sub-entities, if applicable, are permitted to avail themselves of this exemption, and basic evidence justifying that basis.

(2) The following statement: "I hereby certify that [name of entity] [and all sub-entities listed in this letter] regularly and in the normal course of business collect and maintain individually identifiable information regarding all performers employed by [name of entity]"; and

(3) If applicable because the visual depictions at issue were produced outside the United States, the statement that: "I hereby certify that the foreign producers of the visual depictions produced by [name of entity] either collect and maintain the records required by sections 2257 and 2257A of title 18 of the U.S. Code, or have certified to the Attorney General that they collect and maintain individually identifiable information regarding all performers, including minor performers, employed by that person, pursuant to tax, labor, and other laws, labor agreements, or otherwise pursuant to industry standards, where such information includes the name, address, and date of birth of the performer, in accordance with 28 CFR part 75; and [name of

entity] has copies of those records or certifications." The producer may provide the following statement instead: "I hereby certify that with respect to foreign primary producers who do not either collect and maintain the records required by sections 2257 and 2257A of title 18 of the U.S. Code, or certify to the Attorney General that they collect and maintain individually identifiable information regarding all performers, including minor performers, whom they employ pursuant to tax, labor, or other laws, labor agreements, or otherwise pursuant to industry standards, where such information includes the names, addresses, and dates of birth of the performers, in accordance with 28 CFR part 75, [name of entity] has taken reasonable steps to confirm that the performers in any depictions that may potentially constitute simulated sexually explicit conduct or lascivious exhibition of the genitals or pubic area of any person were not minors at the time the depictions were originally produced." "Reasonable steps" for purposes of this statement may include, but are not limited to, a good-faith review of the visual depictions themselves or a good-faith reliance on representations or warranties from a foreign producer.

(d) Entities covered by each certification. A single certification may cover all or some subset of all entities owned by the entity making the certification. However, the names of all sub-entities covered must be listed in such certification and must be cross-referenced to the matter for which the sub-entity served as the producer.

(e) Timely submission of certification. An initial certification is due June 16, 2009. Initial certifications of producers who begin production after December 18, 2008, but before June 16, 2009, are due on June 16, 2009. Initial certifications of producers who begin production after June 16, 2009 are due within 60 days of the start of production. A subsequent certification is required only if there are material changes in the information the producer certified in the initial certification; subsequent certifications are due within 60 days of the occurrence of the material change. In any case where a due date or last day of a time period falls on a Saturday, Sunday, or federal holiday, the due date or last day of a time period is considered to run until the next day that is not a Saturday, Sunday, or federal holiday.

[73 FR 77471, Dec. 18, 2008]