No. 13-3681

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

---

**FREE SPEECH COALITION, INC., et al.,**
**Appellant,**

**v.**

**ATTORNEY GENERAL OF THE UNITED STATES,**
**Appellee.**

---

**On Appeal from the United States District Court for the Eastern District of Pennsylvania (D.C. Civ. Action No. 2-09-cv-4607)**
**Honorable Michael M. Baylson**

---

**Joint Brief of the American Civil Liberties Union of Pennsylvania and the Electronic Frontier Foundation as AMICI CURIAE in Support of APPELLANTS FREE SPEECH COALITION, et al. and REVERSAL**

---

Counsel for *Amicus Curiae* the American Civil Liberties Union of Pennsylvania:

Fred T. Magaziner (PA 23332)
Catherine Wigglesworth (PA 314557)
DECHERT LLP
2929 Arch Street
Cira Centre
Philadelphia, PA  19104-2808
(215) 994-4000
(215) 994-2222 (Fax)
fred.magaziner@dechert.com
catherine.wigglesworth@dechert.com

Mary Catherine Roper (PA 71107)
AMERICAN CIVIL LIBERTIES
FOUNDATION OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA 19106
(215) 592-1513 x 116
(215) 592-1343 (Fax)
mroper@aclupa.org

Counsel for *Amicus Curiae* the Electronic Frontier Foundation:

Andrew Crocker (CA 291596)
Electronic Frontier Foundation
815 Eddy Street
San Francisco CA, 94109
(415) 436-9333 x 139
(415) 436-9993 (Fax)
andrew@eff.org

**Corporate disclosure statement (FED. R. APP. P. 26.1)**

I certify that *amicus curiae* the American Civil Liberties Union of

Pennsylvania does not have a parent corporation and that no publicly held

corporation owns 10 percent or more of any stake or stock in it.


Dated:  May 5, 2014                          /s/ *Fred T. Magaziner*
                                             Fred T. Magaziner
                                             Counsel for *Amicus Curiae* the
                                             American Civil Liberties Union of
                                             Pennsylvania

**Corporate disclosure statement (FED. R. APP. P. 26.1)**

I certify that *amicus curiae* the Electronic Frontier Foundation does not have a parent corporation and that no publicly held corporation owns 10 percent or more of any stake or stock in it.

Dated:  May 5, 2014                                    */s/ Andrew Crocker*
                                                        Andrew Crocker
                                                        Counsel for *Amicus Curiae* the
                                                        Electronic Frontier Foundation

# TABLE OF CONTENTS

INTEREST OF AMICI CURIAE ........................................................................1

SUMMARY OF THE ARGUMENT ..................................................................3

ARGUMENT .....................................................................................................5

I.     INTRODUCTION ...................................................................................5

II.    THE DISTRICT COURT APPLIED AN INCORRECT
       ANALYTICAL APPROACH ON REMAND ...........................................5

       A.    The Court Should Not Have Relied on Governmental
             Assurances Regarding How the Government Would Apply the
             Statute. .........................................................................................5

       B.    The District Court Was Wrong to Suggest that the Overbreadth
             Analysis Can Be Deferred Until Someone Brings a Declaratory
             Judgment Action ............................................................................8

       C.    *McCutcheon* Requires Consideration of How Easy It Would Be
             To Draw a Line Between Permissible and Impermissible
             Applications .................................................................................12

III.   THE STATUTE AS WRITTEN UNNECESSARILY BURDENS A
       LARGE  AMOUNT OF PERSONAL SEXUAL EXPRESSION ..............17

       A.    The Statute Applies to Photos and Videos Not Intended for
             Public Distribution ......................................................................18

       B.    The Statute Applies to "Sexting" By Cell Phone ............................20

       C.    The Statute Applies to Social Networking and "Tube" Sites ...........23

       D.    The Statute Applies to a Wide Variety of Professionals Who
             Use Sexual Images in Their Jobs for Purposes  Completely
             Unrelated to Adult "Entertainment" ...............................................24

CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aiello v. City of Wilmington,*
  623 F.2d 845 (3d Cir. 1980) .................................................................14

*Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,*
  421 U.S. 240 (1975)...........................................................................11

*Amer. Lib. Assn'n v. Thornburgh,*
  713 F.Supp. 469 (D.D.C. 1989), *vacated on other grounds sub nom.*
  *Amer. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992) ...............................21

*Ashcroft v. Free Speech Coalition,*
  535 U.S. 234 (2002)...........................................................................16

*Borden v. School District of the Township of East Brunswick,*
  523 F.3d 153 (3d Cir. 2008) ...............................................................13

*Broaderick v. Oklahoma,*
  413 U.S. 601 (1973)............................................................................9

*Buckley v. Valeo,*
  424 U.S. 1 (1976)..............................................................................13

*Eisenstadt v. Baird,*
  405 U.S. 438 (1972)...........................................................................22

*Free Speech Coalition, Inc. v. Attorney General of U.S.,*
  677 F.3d 519 (3d Cir. 2012) ...............................................................3, 5, 6, 12

*Free Speech Coalition, Inc. v. Holder,*
  957 F. Supp. 2d 564 (E.D. Pa. 2013).........................................................*passim*

*Galassini v. Town of Fountain Hills,*
  No. CV-11-02097-PHX-JAT, 2013 WL 5445483 (D. Ariz. Sept. 30,
  2013) .........................................................................................14

*Gibson v. Mayor & Council of the City of Wilmington,*
  355 F.3d 215 (3d. Cir. 2004) ...............................................................12

*Griswold v. Connecticut,*
   381 U.S. 479 (1965)..........................................................................................11

*Lawrence v. Texas,*
   539 U.S. 558 (2003).......................................................................................7 , 22

*Mapp v. Ohio,*
   367 U.S. 643 (1961)............................................................................................8

*McCutcheon v. Federal Election Commission,*
   572 U.S. ____, 134 S. Ct. 1434 (2014)..................................................4, 13, 14

*McLaughlin v. Hagel,*
   No. CIV.A. 11-11905-RGS, 2013 WL 6622898 (D. Mass. Dec. 17, 2013) ......11

*Miller v. California,*
   413 U.S. 15 (1973)............................................................................................15

*Miller v. Mitchell,*
   598 F.3d 139 (3d Cir. 2010) .............................................................................20

*Pence v. City of St. Louis,*
   958 F. Supp. 2d 1079 (E.D. Mo. 2013) .............................................................14

*Reliable Consultants, Inc. v. Earle,*
   517 F.3d 738 (5th Cir. 2008) .........................................................................9, 22

*Roth v. United States,*
   354 U.S. 476 (1957)..........................................................................................16

*Secretary of State of Maryland v. Joseph H. Munson Co., Inc.,*
   467 U.S. 947 (1984)............................................................................................9

*Stanley v. Georgia,*
   394 U.S. 557 (1969).................................................................................3, 8, 22

*Thomas v. Collins,*
   323 U.S. 516 (1945)..........................................................................................10

*Triplett Grille, Inc. v. City of Akron,*
   40 F.3d 129 (6th Cir. 1994) ..............................................................................16

*United States v. Knox*,
  32 F.3d 733 (3d Cir. 1994) ...............................................................21

*United States v. Stevens*,
  559 U.S. 460 (2010) ............................................................................6

*Watchtower Bible & Tract Soc. of N.Y., Inc. v. Village of Stratton*,
  536 U.S. 150 (2002) ..........................................................................10

**STATUTES**

18 U.S.C. § 2256 ....................................................................................25

18 U.S.C. § 2257 ...............................................................................2, 17

18 U.S.C. § 2257A .............................................................................2, 18

42 U.S.C. § 1988 ....................................................................................11

28 U.S.C. § 2412 ....................................................................................11

**OTHER AUTHORITIES**

73 Fed. Reg. 77437 ................................................................................23

73 Fed. Reg. 77438 ................................................................................24

73 Fed. Reg. 77440 ................................................................................21

73 Fed. Reg. 77461 ................................................................................23

Spencer Akerman & James Ball, *Optic Nerve: Millions of Yahoo Webcam
  Images Intercepted by GCHQ* , THE GUARDIAN (Feb. 27, 2014), *available
  at* http://www.theguardian.com/world/2014/feb/27/ ...........................7

Dan Amira, *Older People Are Now Sexting Each Other,* N.Y. MAGAZINE
  (Feb. 2, 2010 1:40 P.M.), *available at* http://nymag.com/daily/intel/2010/
  02/senior_citizens_are_sexting_ea.html .............................................20

BLACK'S LAW DICTIONARY (9th ed. 2009) .............................................21

Joyce Chang, *A Sexy Gift, Dear Valentine, to Remember Me*, N.Y. TIMES
  (Feb. 2, 2003), *available at* http://www.nytimes.com/2003/02/02/style/a-
  sexy-gift-dear-valentine-to-remember-me.html ..................................19

Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 914-
15 (2d ed. 2002) ...............................................................................14

Alexander de Avila, *This Study Says Your Parents Are Sexting*, POLICYMIC
(Oct. 23, 2013), http://www.policymic.com/articles/69655/this-study-
says-your-parents-are-sexting.......................................................20, 23

Richard Fallon Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853 (1991) ........14

Seth F. Kreimer, Pervasive Image Capture and the First Amendment:
Memory, Discourse, and the Right to Record, Univ. of Pa. Law School,
Public Law Research Paper No. 10-06, at 6-11 (February 15, 2010),
*available at* http://ssrn.com/abstract=1553920..................................................20

Claire Cain Miller, *Revelations of N.S.A. Spying Cost U.S. Tech Companies*,
N.Y. TIMES (March 21, 2014), *available at*
http://www.nytimes.com/2014/03/22/business/fallout-from-snowden-
hurting-bottom-line-of-tech-companies.html?_r=0.............................................7

Charlie Savage, *N.S.A. Often Broke Rules of Privacy, Audit Shows*, N.Y.
TIMES (AUG. 16, 2013), *available at*
http://www.nytimes.com/2013/08/16/us/nsa-often-broke-rules-on-
privacy-audit-shows.html ...................................................................7

Laurie Sendall, *What Everyone's Really Doing in Bed: Sex Survey Statistics*,
GLAMOUR MAGAZINE (December 2013), http://www.glamour.com/sex-
love-life/2013/12/sex-survey-statistics-what-men-and-women-are-doing-
in-bed#slide=5 .................................................................................19

*The State of Sex*, ESQUIRE (Feb. 20, 2007),
http://www.esquire.com/women/sex/ESQ0207stateofsex.. ...............................19

*Study Reveals Majority of Adults Share Intimate Details Via Unsecured
Digital Devices*, McAfee (Feb. 4, 2014),
http://www.mcafee.com/us/about/news/2014/q1/20140204-01.aspx ..........20, 23

*Who's Filming and Uploading Amateur Porn*, HUFFINGTON POST (Feb. 12,
2014 5:33 P.M.), http://www.huffingtonpost.com/2014/02/12/ amateur-
porn-filming-uploading-women-bible-belt_n_4776919.html ............................19

*You've Been Sexting a Lot More, Lot More, Study Shows*, WIRED (Feb. 13,
2014), http://www.wired.com/2014/02/sexting-relationship-report/ .................20

## INTEREST OF AMICI CURIAE

The American Civil Liberties Union (ACLU) is a nationwide, non-partisan organization dedicated to defending and preserving the principles embodied in the Bill of Rights.  The ACLU of Pennsylvania is a state affiliate of the ACLU.  Since its founding over 85 years ago, the ACLU has been involved in many of the leading First Amendment cases, and has often appeared before this Court, both as direct counsel and as *amicus curiae*.

The Electronic Frontier Foundation ("EFF") is a member-supported civil liberties organization working to protect free speech and privacy rights in the online world. With more than 30,000 dues-paying members nationwide, including 645 active donors in Pennsylvania, EFF represents the interests of technology users in both court cases and in broader policy debates surrounding the application of law—including the First Amendment—in the digital age. As part of its mission, EFF has often served as counsel or amicus in cases involving free speech online. *See, e.g., Doe v. Harris*, No. 12-cv-5713-THE, 2013 WL 144048 (N.D. Cal. Jan. 11, 2013); *Backpage.com v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wash. 2012); *Free Speech Coalition, Inc. v. Holder*, 729 F. Supp. 2d 691 (E.D. Pa. 2010); *Savage v. Council of American-Islamic Relations, Inc*., No. 07-cv-06076-SI, 2008 WL 2951281 (N.D. Cal. July 25, 2008).

Amici seek to protect the rights of the millions of ordinary Americans who create sexually explicit "depictions" for personal non-commercial use that put

them at risk of criminal liability under 18 U.S.C. §§ 2257 and 2257A (collectively "the Statute").  (This brief does not address the many problems with how the Statute applies to producers of commercial depictions; Appellants' Brief more than adequately addresses the important issues regarding commercial depictions.)

No counsel for a party has authored this brief in whole or in part, and no person or entity other than amicus, its members and their counsel has made a monetary contribution to fund the preparation or submission of this brief.  *See* Fed. R. App. P. 29(c)(5).

All parties have consented to the filing of this *amicus curiae* brief.

## SUMMARY OF THE ARGUMENT

Our nation's concept of liberty includes the right to engage in personal sexual expression without government intrusion or risk of criminal liability. *See*, *e.g.*, *Stanley v. Georgia*, 394 U.S. 557 (1969).

Because it is so obvious that the Constitution forbids Congress from criminalizing personal sexual expression, even the government itself has urged this Court to construe the Statute to apply only to depictions that are created for commercial sale or trade. Unfortunately, however, the Statute is not so limited; it clearly applies as well to non-commercial personal expression. And as this Court already held when it reversed and remanded this case to the district court, the Statute cannot be saved by construing it narrowly when Congress chose instead to write it so broadly. *Free Speech Coalition, Inc. v. Attorney General of U.S.*, 677 F.3d 519, 538-40 (3d Cir. 2012) ("*FSC I*").

The district court's decision on remand was flawed. As Appellants' Brief well and thoroughly explains (and the ACLU and EFF have nothing to add in this regard), the court's findings of fact are at odds with the evidentiary record. The district court's analysis is wrong in three other ways as well: (1) the court improperly relied on governmental assurances, (2) the court wrongly concluded that the question of overbreadth as applied to personal non-commercial depictions could be deferred until someone who wants to create a sexually explicit "depiction" brings a declaratory judgment action to find out if he or she can legally

do so, and (3) the district court did not properly analyze whether the Statute is "narrowly tailored."

The recent Supreme Court decision in *McCutcheon v. Federal Election Commission*, 572 U.S. ____, 134 S. Ct. 1434 (2014), teaches that when Congress legislates in areas as important and sensitive as this, it must find "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the best disposition but one whose scope is in proportion to the interest served, . . . . not necessarily the least restrictive means but  . . . a means narrowly tailored to achieve the desired objective." *McCutcheon*, 134 S. Ct. at 1456-57 (quotation omitted). This Statute is not "narrowly tailored," however.  To the contrary, the Statute applies to the sexually explicit photos and videos that millions of Americans routinely create for their own pleasure and that of their partners, it applies to the "sext" messages that millions of young and not-so-young American citizens send back and forth, and it applies to the sexually explicit "self-portraits" that millions of ordinary Americans post on social network sites with no thought of commercial or financial gain.  The Statute even applies to non-obscene depictions created for artistic, journalistic and educational purposes.

Because the Statute exceeds the government's power under the First Amendment, the ACLU and EFF urge the Court to reverse the judgment of the district court.

- 4 -

# ARGUMENT

## I.    Introduction

The ACLU and EFF defer to Appellants' Brief on the question whether the record supports the district court's findings of fact.  This brief focuses instead on three other significant problems with the district court's decision (Section II) and provides additional information on the vast scope of constitutionally-protected speech to which the Statute applies (Section III).

## II.    The District Court Applied an Incorrect Analytical Approach on Remand

### A.    The Court Should Not Have Relied on Governmental Assurances Regarding How the Government Would Apply the Statute.

In reversing the district court's Rule 12(b)(6) dismissal of the Amended Complaint, this Court held that if the Statute was overbroad, governmental promises to refrain from prosecuting non-commercial uses could not save it.  This Court directed the district court to determine on remand whether "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *FSC I*, 677 F.3d at 537 (quotation omitted).

The district court purported to do as instructed, but the court also again relied improperly on governmental assurances.  The court relied on the testimony of federal agents that they had "no interest in enforcing the Statute as to purely private communications and that [the government] would have no conceivable way of even doing this—because it would have no knowledge of those private

- 5 -

communications in the first place." *Free Speech Coalition, Inc. v. Holder*, 957 F. Supp. 2d 564, 599-600 (E.D. Pa. 2013) ("*FSC II*").

For at least three reasons, the testimony of these government agents was entitled to zero weight.

First, this Court has already held that the question of overbreadth does not turn on what the government says about its intentions; what the government says today it can ignore tomorrow. *See FSC I*, 677 F.3d at 539 n.15 ("[A] promise by the government that it will interpret statutory language in a narrow, constitutional manner cannot, without more, save a potentially unconstitutionally overbroad statute.") (citation omitted); *see also United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").

Second, the government's assurance that it "would have no conceivable way" of finding out about "private communications" — that in fact "it would have no knowledge of those private communications in the first place" —is a straw man, and a poor one at that. Personal sexual communications take many forms—see section III, *infra*—that could be exposed to government scrutiny in a variety of ways. Once a sexual "depiction" is shared with a second person there is no guarantee that the depiction will remain private; it is out of the control of the person who initially produced it. And in light of recent revelations about its use of technological surveillance, the government cannot seriously contend that it has no

access to "sext" messages and other personal communications transmitted by cell phone through text messaging or other applications, or that it cannot discover, if it so desires, who is posting sexually explicit depictions on websites for purely personal purposes unconnected to any thought of financial gain.[1]

Third, the government can and will exploit access to private spaces to enforce laws like the Statute. History shows that even when the government has no particular intention to enforce certain statutes, police or agents who are frustrated in their efforts to find evidence relating to the crimes that they *are* investigating sometimes resort instead to charging the suspects with violations of unrelated laws that are otherwise rarely enforced. In *Lawrence v. Texas*, for instance, after police who were investigating a possible "weapons disturbance" found no weapons, they instead arrested Mr. Lawrence under Texas's rarely enforced sodomy law. *See Lawrence v. Texas*, 539 U.S. 558, 562-63 (2003).

---

[1] *See, e.g.*, Charlie Savage, *N.S.A. Often Broke Rules of Privacy, Audit Shows*, N.Y. TIMES (Aug. 16, 2013), *available at* http://www.nytimes.com/2013/08/16/us/nsa-often-broke-rules-on-privacy-audit-shows.html; *see also* Claire Cain Miller, *Revelations of N.S.A. Spying Cost U.S. Tech Companies*, N.Y. TIMES (March 21, 2014), *available at* http://www.nytimes.com/2014/03/22/business/fallout-from-snowden-hurting-bottom-line-of-tech-companies.html?_r=0; Spencer Akerman & James Ball, *Optic Nerve: Millions of Yahoo Webcam Images Intercepted by GCHQ*, THE GUARDIAN (Feb. 27, 2014), *available at* http://www.theguardian.com/world/2014/feb/27/gchq-nsa-webcam-images-internet-yahoo ("In one six-month period in 2008 alone, the agency collected webcam imagery—including substantial quantities of sexually explicit communications—from more than 1.8 million Yahoo user accounts globally.").

Similarly, in *Stanley v. Georgia*, after police found none of the "bookmaking" materials they were looking for in Mr. Stanley's home, they arrested him under a rarely enforced Georgia law prohibiting possession of pornography. *See Stanley v. Georgia*, 394 U.S. 557, 558-59 (1969). Most pertinent, perhaps, is *Mapp v. Ohio*, 367 U.S. 643 (1961), in which police officers investigating a bombing ended up instead charging Mapp with possession of "lewd and lascivious books, pictures and photographs." *Mapp*, 367 U.S. at 643.

In light of cases like *Lawrence*, *Stanley* and *Mapp*, it is not the least bit far-fetched to imagine that federal agents who are frustrated in their search for illegal drugs or firearms, for example, might resort to charging someone instead with violating the Statute by "sexting" a lascivious photo to his wife.

### B. The District Court Was Wrong to Suggest that the Overbreadth Analysis Can Be Deferred Until Someone Brings a Declaratory Judgment Action

The district court trivialized the threat that the Statute poses to ordinary Americans by glibly suggesting that any "hypothetical private couple . . . who does in fact feel their First Amendment rights are being unreasonably curbed by the Statute's record-keeping requirements" can bring their own federal declaratory judgment lawsuit challenging the Statute as applied to their personal sex life! *FSC II*, 957 F. Supp. 2d at 601 (citing *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 339-40 (6th Cir. 2009)).

This suggestion is inconsistent with both First Amendment jurisprudence and with fundamental notions of privacy and liberty.

Facial challenges by their very nature invite the examination of potential overbroad applications that are not then before the court, *i.e.*, conduct that has not yet been the subject of prosecution. *See Broaderick v. Oklahoma*, 413 U.S. 601, 612 (1973) (In an overbreadth challenge, "[l]itigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others *not before the court* to refrain from constitutionally protected speech or expression.") (emphasis added); *see also Reliable Consultants, Inc. v. Earle*, 517 F.3d 738, 744 (5th Cir. 2008). Hence, the commercial producers who are plaintiffs/appellants in this case did indeed have standing to raise claims on behalf of individuals seeking to engage in non-commercial speech. *See*, *e.g.*, *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984) ("Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute from chilling the First Amendment rights of other parties not before the court. [The plaintiff's] ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake.").

But worse than the legal flaws in the district court's declaratory judgment "solution" to the problem of overbreadth is that it would be offensive to our basic

notions of privacy and liberty to force someone to file this kind of declaratory

judgment action.  A couple who wishes to send "sext" photos to one another

should not have to go to court, and identify themselves to the government in so

doing, to find out whether they face potential criminal liability because their photos

lack the statutory notices about government inspections.  Just as "[i]t is quite

incompatible with the requirements of the First Amendment" for the government to

require a person to register if they wish to make a public speech advocating a

disfavored cause, *Thomas v. Collins*, 323 U.S. 516, 539-40 (1945), or wish to

distribute religious pamphlets anonymously, *see Watchtower Bible & Tract Soc. of*

*N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165-66 (2002), it is at least as great

an affront to our notion of liberty to tell a couple that they should file a declaratory

judgment action in federal court before creating any sexually-explicit photos or

videos for their personal use. [2]

---

[2]  As for the practicalities of an as-applied lawsuit, the district court gave undue
weight to the Sixth Circuit's passing speculation that the hypothetical couple may
be able to bring their constitutional challenge "'in their own names or as an
anonymous John and Jane Doe" and would be entitled to attorney fees if they win.
*FSC II*, 957 F. Supp. 2d at 601 (*quoting Connection Distrib. Co.*, 557 F.3d at 339–
40)).

Even if a district court judge were to allow a private couple to proceed as John and
Jane Doe plaintiffs (and if the couple were willing to file the lawsuit, knowing that
they could lose their motions to proceed using pseudonyms and file depictions of
their intimate activities under seal), their identity and sexually explicit depictions
would necessarily have to be made available to the opposing party, *i.e.*, the
government, and become the subject of discovery.  Further, the suggestion that

It is true, of course, that in order to test the constitutionality of statutes, citizens sometimes deliberately violate laws with the expectation that they will be prosecuted.  For example, in *Griswold v. Connecticut*, 381 U.S. 479 (1965), the plaintiffs, in order to create a "case or controversy" that was ripe for adjudication, opened a birth control clinic that deliberately violated the state's law against the use of contraceptives, knowing full well (and, indeed, hoping) that they would be prosecuted.  It is one thing to expect a doctor to bring himself to the attention of law enforcement authorities by opening a clinic, however, and quite another thing for a couple who wish to send "sext" messages back and forth to tell the government about it by means of a declaratory judgment action.

---

such a couple could recover attorneys' fees if they happened to convince the court that their proposed explicit depiction was legal is highly speculative at best.  Such an action likely would be brought against federal agents or the United States, and not under 42 U.S.C. § 1983 or any of the other statutes as to which fee shifting is available.  *See* 42 U.S.C. § 1988(b) (fee shifting available for enumerated civil rights statutes not implicated here); *see also Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 260-61 n.33 (1975) (listing several federal fee shifting statutes, none of which would apply to the court's hypothetical declaratory judgment action).  Even if this couple were to seek attorneys' fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, they would need to succeed in proving that that the position of the United States was not "substantially justified," a heavy burden in such a scenario.  *See McLaughlin v. Hagel*, No. CIV.A. 11-11905-RGS, 2013 WL 6622898, at *1 (D. Mass. Dec. 17, 2013) (defense of federal statute, even "despite a personal belief that the statute was unconstitutional" was substantially justified and "paid the appropriate respect to the primacy of the Supreme Court in matters of constitutional interpretation.").

### C.    *McCutcheon* Requires Consideration of How Easy It Would Be To Draw a Line Between Permissible and Impermissible Applications

This Court directed the district court to consider the four factors of *Gibson v. Mayor & Council of the City of Wilmington*, 355 F.3d 215, 226 (3d. Cir. 2004).[3] *FSC I*, 677 F.3d at 537-38.  Under *McCutcheon*, however, an additional factor must also be considered:  how easy or difficulty it would have been to draw a line in the Statute between permissible and impermissible applications.  It is one thing to forgive a statute's overreach if it is tailored reasonably well, but because of the inherent imprecision of language and the impossibility of foreseeing every future situation, the statute inadvertently spills over into some impermissible applications.  It is something else, however, to "give a break" to a statute that makes no effort to draw the lines that obviously should have been drawn.  In the latter case, the Statute's unreasonable overbreadth can be enough by itself to invalidate the Statute, without regard to counting the number of permissible and impermissible applications.

---

[3]  In *Gibson*, the Court held that a court should consider: "'the number of valid applications, the historic or likely frequency of conceivably impermissible applications, the nature of the activity or conduct sought to be regulated, and the nature of the state interest underlying the regulation.'"  *Gibson*, 355 F.3d at 226 (quoting *Aiello v. City of Wilmington*, 623 F.2d 845, 860 (3d Cir. 1980) (Sloviter, J., concurring in part and dissenting in part)).

In *McCutcheon*, the Supreme Court applied this principle in explaining why it had rejected the overbreadth challenge in *Buckley v. Valeo*, 424 U.S. 1 (1976), but was holding another part of the Federal Election Campaign Act of 1971 unconstitutionally overbroad. In the former case, as the Supreme Court explained, it would have been impossible for Congress to write language that isolated only the "suspect contributions," whereas in the latter case, Congress could easily have narrowly tailored the statutory provision:

> Quite apart from the foregoing, the aggregate limits violate the First Amendment because they are not "closely drawn to avoid unnecessary abridgment of associational freedoms." *Buckley*, 424 U. S., at 25. In the First Amendment context, fit matters. Even when the Court is not applying strict scrutiny, we still require "a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' . . . that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective." *Board of Trustees of State Univ. of N. Y. v. Fox*, 492 U. S. 469, 480 (1989) (quoting *In re R. M. J.*, 455 U. S. 191, 203 (1982)). Here, because the statute is poorly tailored to the Government's interest in preventing circumvention of the base limits, it impermissibly restricts participation in the political process.

*McCutcheon*, 134 S. Ct. at 1456-57.[4] The Court went on to explain that the law's lack of narrow tailoring was particularly problematic because "there are multiple

---

[4] Similarly, in *Borden v. School District of the Township of East Brunswick*, 523 F.3d 153 (3d Cir. 2008), this Court upheld a school district regulation that

alternatives available to Congress that would serve the Government's [] interest,

while avoiding 'unnecessary abridgment' of First Amendment rights." *Id.* at 1459

(quoting *Valeo*, 424 U.S. at 25).[5]

---

prohibited school district representatives from initiating or participating in prayer. Because it is almost impossible to define prospectively exactly what conduct will violate the Establishment Clause and what conduct will not, the regulation was written in a way that inevitably covered some situations that arguably should not have been covered. Nevertheless, in upholding the regulation, the Court recognized, in effect, that some overbreadth was inevitable because it would have been impossible for the school district to find language that precisely addressed only the conduct that actually violated the Establishment Clause.

[5] *See also* Erwin Chemerinsky, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES 914-15 (2d ed. 2002) ("It is also possible that a law can be shown to be overbroad by demonstrating great harm to particularly important speech. Professor Richard Fallon has persuasively argued that substantial overbreadth should be determined by a balancing test with a court weighing the states' substantive interest in being able to 'employ a standard that is broader than the less restrictive substitutes' against 'the First Amendment interest in . . . avoiding the chilling of constitutionally protected conduct.'") (quoting Richard Fallon Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 894 (1991)); Fallon, 100 Yale L.J. at 894 (noting that analyzing overbreadth as a comparison between "the number of cases to which a court might constitutionally apply a statute, and the number of cases in which the statute's application would violate constitutional rights . . . calls for uncabined judicial speculation in areas that are, at best, on the outer fringes of the courts' practical competence"); *cf. Aiello*, 623 F.2d at 854 ("A statutory scheme which encompasses the kind of expressive and associational activity that has been traditionally held to be entitled to a high degree of first amendment protection should be subjected to closer judicial scrutiny than one which does not."); *Pence v. City of St. Louis*, 958 F. Supp. 2d 1079, 1085 (E.D. Mo. 2013) (issuing preliminary injunction against enforcement of allegedly overbroad statute and taking into account the fact that the city's "interests in maintaining public order and convenience can be better served by measures less intrusive on First Amendment freedoms"); *Galassini v. Town of Fountain Hills*, No. CV-11-02097-PHX-JAT, 2013 WL 5445483, at *19 (D. Ariz. Sept. 30, 2013) (finding statute overbroad because "it sweeps in a substantial amount of constitutionally protected

The same can be said about the Statute in this case:  there are "alternatives available to Congress that would serve the Government's [] interest, while avoiding 'unnecessary abridgment' of First Amendment rights."  In fact, the government itself has already pointed out the exceedingly simple "alternative[] available to Congress," *i.e.*, a Statute that applies only to commercial depictions intended for sale or trade.

Not only does the Statute fail to draw an easily drawn line between depictions meant for commercial gain and those that are not intended to produce such gain, but with its sweeping language, the Statute does not even distinguish between erotic art and obscenity.  *See Miller v. California*, 413 U.S. 15, 24 (1973) (holding that a "lack [of] serious literary, artistic, political, or scientific value" is one of the necessary criteria for determining whether a work is obscene).

The Supreme Court has long recognized that "in the area of freedom of speech and press the courts must always remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression."  *Miller*, 413 U.S. at 23-24.  Indeed, in multiple cases, the Court has emphasized the importance of distinguishing between speech that may be proscribed and speech that, while distasteful to some, is protected by the First Amendment:

---

speech without any sufficiently important governmental interest in regulating such speech.").

> [S]ex and obscenity are not synonymous. Obscene material is material which deals with sex in a manner appealing to prurient interest. The portrayal of sex, *e.g.*, in art, literature and scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern.

*Roth v. United States*, 354 U.S. 476, 487 (1957); *cf. Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) (striking down as overbroad a statute banning, without regard to literary, artistic, political, or scientific value, depictions of sexually explicit conduct that involve, appear to involve, or are advertised as involving minors); *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 136 (6th Cir. 1994) (striking down statute banning public nudity as unconstitutionally overbroad when it did not limit its sweep to expressive conduct associated with the ills it sought to prevent, but also captured "live performances with serious literary, artistic, or political value").

    The Statute acknowledges no such distinction. The Statute applies on its face to non-obscene "depictions" that are created or distributed by professionals for educational, journalistic, artistic or scholarly purposes. As so applied, the Statute is unconstitutional because the burdens placed on protected expression far outweigh the risk of the sexual exploitation of children at the hands of educators, scientists, artists, or journalists—*i.e.*, the Statute is not narrowly tailored to protect

children from sexual exploitation. Rather, there is no advantage to be gained by the Statute's unnecessary overbreadth. Congress enacted the Statute as a way to neutralize the risk posed to children by the adult entertainment industry's preference for "young-looking" performers, s*ee* App. at 20-21, but even if such a risk actually exists in the adult entertainment industry, it does not follow that journalists, educators and scholars pose a threat to children. Indeed, neither Congress nor any government agency has ever made a finding that sex educators or medical professionals specializing in the study or treatment of sex disorders have a youth bias that endangers children. Accordingly, the application of the Statute to such private individuals fails to further the goal of the Statute.

### III.    The Statute As Written Unnecessarily Burdens a Large Amount of Personal Sexual Expression

By applying not only to commercial "depictions" intended for sale or trade in interstate commerce, but also to all depictions "produced in whole or in part *with materials* which have been mailed or shipped in interstate or foreign commerce," 18 U.S.C. § 2257(a)(2) (emphasis added), the Statute covers the whole universe of nonpublic expression. Every smart phone, camera and videocamera has been shipped in interstate or foreign commerce, so the Statute applies to all personal sexually explicit "depictions," even if they are never distributed to or shared with

anyone outside the privacy of a couple's bedroom.[6]  As the district court

acknowledged, the Statute applies to "private persons—be they husbands-and-

wives, persons in dating relationships, or strangers exchanging information to

potentially date one another—who produce and share sexually explicit depictions

with each other for private, noncommercial purposes." *FSC II*, 957 F. Supp. 2d at

597.

### A.    The Statute Applies to Photos and Videos Not Intended for Public Distribution

The Statute applies to depictions that consenting adults create for their own

pleasure and that of their partners.  For example, if a husband uses a Nikon or Sony

camera to take an erotic photograph of his wife that he places in his dresser drawer,

never sending it to anyone or sharing it with anyone other than his wife, the statute

_____

[6]  Ironically, and underscoring its overbreadth with respect to purely private conduct, the Statute expressly does not apply to any depiction that "is not produced, marketed or made available . . . to another in circumstances such tha[t] an ordinary person would conclude that the matter contains a visual depiction that is child pornography," *but only* if such depictions are "created by a commercial enterprise" and "intended for commercial distribution."  18 U.S.C. § 2257A(h)(1). The statute thus prizes for-profit speech over the many forms of similar, but private, expression exercised by millions of Americans.

Under this statutory regime, the publisher of *Penthouse* magazine is exempt from the Statute's recordkeeping requirements when distributing a "lascivious" photo of women, but a husband who takes an identical photo of his own wife must maintain a file with a copy of her driver's license, designate 20 hours per week when the government can inspect the records, send the government notice of the designated hours for inspection of those records, and label the photo in accordance with § 2257.

requires that he place a section 2257 label on the photo and notify the government of the 20 hours per week when government agents can inspect his records to confirm that his wife is an adult. The same is true if a woman records herself and her lover and shares the video with their close friends.

The Statute's impact on individuals who create such personal depictions is anything but trivial or remote. One 2007 survey showed that 21% of women ages 21 to 49 reported that they had videotaped or photographed sex.[7] In another survey, 24% of women surveyed reported that they had made their own erotic video.[8] Other articles have found that nude portraits are "popular with ordinary people" as gifts to their lovers.[9] The Statute's application to such depictions significantly burdens expression without in any way furthering the Statute's purpose.

---

[7] *See The State of Sex*, ESQUIRE (Feb. 20, 2007), http://www.esquire.com/women/sex/ESQ0207stateofsex. *See also You May be Surprised by Who's Filming and Uploading Amateur Porn*, HUFFINGTON POST (Feb. 12, 2014 5:33 P.M.), http://www.huffingtonpost.com/2014/02/12/amateur-porn-filming-uploading-women-bible-belt_n_4776919.html (discussing data that "suggests that we should reconsider assumptions about who is watching, making and sharing porn").

[8] Laurie Sendall, *What Everyone's Really Doing in Bed: Sex Survey Statistics*, GLAMOUR MAGAZINE (December 2013), http://www.glamour.com/sex-love-life/2013/12/sex-survey-statistics-what-men-and-women-are-doing-in-bed#slide=5.

[9] Joyce Chang, *A Sexy Gift, Dear Valentine, to Remember Me*, N.Y. TIMES (Feb. 2, 2003), *available at* http://www.nytimes.com/2003/02/02/style/a-sexy-gift-dear-valentine-to-remember-me.html.

### B.    The Statute Applies to "Sexting" By Cell Phone

The Statute covers "sext" messages that one person sends to another by cell phone.

This Court knows from its own cases that it is commonplace for young people to use their smart phones to send "sext" photos back and forth. *Cf. Miller v. Mitchell*, 598 F.3d 139 (3d Cir. 2010) (enjoining a district attorney who threatened to criminally charge "sexting" teens if they refused to attend an education program). "Sexting" of photos is not just for teenagers, however; mature adults "sext" as well.[10] A recent survey found that 24% of 50-75 year olds had sent personal or intimate photos and messages by text, email, or photo over social media.[11] There can be no question that "sexting" is pervasive.

---

[10] *See* Dan Amira, *Older People Are Now Sexting Each Other,* N.Y. MAGAZINE (Feb. 2, 2010 1:40 P.M.), *available at* http://nymag.com/daily/intel/2010/02/senior_citizens_are_sexting_ea.html; *see also* Alexander de Avila, *This Study Says Your Parents Are Sexting,* POLICYMIC (Oct. 23, 2013), http://www.policymic.com/articles/69655/this-study-says-your-parents-are-sexting; Seth F. Kreimer, Pervasive Image Capture and the First Amendment: Memory, Discourse, and the Right to Record, Univ. of Pa. Law School, Public Law Research Paper No. 10-06, at 6-11 (February 15, 2010), *available at* http://ssrn.com/abstract=1553920.

[11] *See You've Been Sexting a Lot More, Study Shows*, WIRED (Feb. 13, 2014), http://www.wired.com/2014/02/sexting-relationship-report/ (noting that "20 percent of cell phone owners reported receiving nude or nearly-nude images" and citing a professor of communications' belief that the "sexting phenomenon" will "continue growing"); *see also Study Reveals Majority of Adults Share Intimate Details Via Unsecured Digital Devices*, McAfee (Feb. 4, 2014), http://www.mcafee.com/us/about/news/2014/q1/20140204-01.aspx ("While 98%

The district court downplayed the significance of the millions and millions of "sext" messages by trying to distinguish "sext" messages with "a 'lascivious display' of genitals" from "sext" messages with mere "nudity or other sexually suggestive poses." *See* 957 F. Supp. 2d at 587.  This is not a tenable distinction.

The dictionary defines "lascivious" as "tending to excite lust" in the viewer. BLACK'S LAW DICTIONARY (9th ed. 2009).  The very purpose of sending a "sext" message to one's lover, however, is exactly that:  to excite his or her sexual desire. Indeed, because "lascivious" can describe anything that excites sexual desire, "lascivious exhibition of the genitals or pubic area" has been held to include "any frontal nude image of a person in what might otherwise be called an 'erotic' pose," *Amer. Lib. Assn'n v. Thornburgh*, 713 F. Supp. 469, 474 (D.D.C. 1989), *vacated on other grounds sub nom. Amer. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C. Cir. 1992), and even to include non-nude images.  *United States v. Knox*, 32 F.3d 733, 737 (3d Cir. 1994); *see also* 73 Fed. Reg. 77440.  To uphold the Statute on the grounds that many "sexts" may not be lascivious makes no sense.

The real question is why the government should be intruding at all into this activity.  What possible justification can there be to impose criminal liability on a couple who find themselves in two different locations and want to use 21st century

---

of respondents use their mobile device to take photos, 54% send or receive intimate content including video, photos, emails and messages.").

technology to show each other the same parts of their anatomy that couples have always (since the dawn of civilization) been permitted to show to each other in person?

The Supreme Court time and again has declared that government has no business telling consenting adults how to conduct their sex lives. *See, e.g., Lawrence v. Texas*, 539 U.S. at 572 ("[L]iberty gives substantial protection to adult persons in deciding how to conduct their private lives in matters pertaining to sex") (striking down Texas law criminalizing sodomy); *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972) ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."); *Stanley*, 394 U.S. at 565 ("Whatever may be the justification for other statutes regulating obscenity, we do not think they reach into the privacy of one's own home.") (striking down a law punishing the private possession of pornographic materials); *see also Earle*, 517 F.3d at 744 (invalidating a ban on selling sex toys because such a law "restricts the exercise of the constitutional right to engage in private intimate conduct in the home free from government intrusion"). Yet that is what the application of the Statute to personal forms of intimate expression does here.

### C.    The Statute Applies to Social Networking and "Tube" Sites

The Statute also covers the sexually explicit "self-portraits" that millions of ordinary Americans post on social network and tube sites for personal purposes, with no thought of sale or trade or purpose of financial gain.  Whether or not plaintiffs' evidence on the prevalence of this practice satisfied the district court's need for precise numbers is beside the point.  Beyond question, this sort of activity is extraordinarily common.  *See* de Avila, *supra* n.10; *Study Reveals Majority of Adults Share Intimate Details Via Unsecured Digital Devices*, *supra* n.11.

On this issue, the government is two-faced.  On the one hand, the government has said repeatedly in its briefs that the Statute should be construed to apply only to commercial depictions intended for sale or trade.  *See* Appellee Br. at 47-48.  On the other hand, the DOJ's implementing regulations evince a clear intent to prosecute private, non-commercial users of social networking sites who fail to abide by the Statute's notification and record-keeping requirements.  *See* 73 Fed. Reg. at 77437; *id.* at 77461.  Hence, at least according to the government's regulations, social networkers who post a sexually explicit or "lascivious" self-photo on-line must label it with their own home address for anyone to see, including their employers, friends, and family, thereby making them vulnerable to potential stalkers and harassers.

**D.    The Statute Applies to a Wide Variety of Professionals Who Use Sexual Images in Their Jobs for Purposes Completely Unrelated to Adult "Entertainment"**

By its plain, unambiguous language, the Statute also applies to a variety of professionals who create sexual images for their professional work but who have nothing to do with the adult entertainment industry.

The Statute applies to a photographer who takes a "lascivious" picture of a woman as a Valentine's Day gift for her husband, even if the photo is for the couple's own personal enjoyment and never leaves the couple's home; to a journalist reporting on matters involving sex, even if the pictures she uses are redacted or blurred (if the blurred or pixilated photo or video portrays actual or simulated sexually explicit conduct, the Statute applies, *see* 73 Fed. Reg. at 77438); to publishers of sex education textbooks or sex manuals who illustrate their books with pictures of actual sexual activity or of genitalia; to academics who use sexually explicit images in studying and writing about sexual behavior; to bystanders photographing or videotaping the Philly Naked Bike Ride, *see* http://phillynakedbikeride.org/; and even to artists who use live models in creating art that a viewer may find erotic.  Indeed, if read quite literally, the Statute would

apply to Matisse or Picasso if he were alive today and drew a highly stylized, abstract picture of a couple who were actually making love.[12]

## CONCLUSION

There is nothing narrow about this Statute. It covers a broad array of sexually explicit speech, and requires even private individuals who have produced images in the context of their own intimate relationships unintended for public distribution to (1) label those images with identifying information; (2) wait at home 20 hours a week in case the government should wish to drop by unannounced (or hire a third-party custodian), or (3) run the risk of a felony conviction and up to five years in prison.

The ACLU urges the Court to reverse the judgment of the district court.

---

[12]  Nothing in the Statute exempts stylized or obscured depictions. To the contrary, the Statute applies to all depictions of "(i) sexual intercourse . . . or (v) lascivious exhibition of the genitals or pubic area of any person." *See* 18 U.S.C. § 2256(2)(A). As such, artists from many ancient cultures would fall afoul of § 2257's prohibitions. (In order for the ID requirement to make any sense at all, of course, live models would somehow have to be involved in the process.)

Dated:  May 5, 2014

Respectfully submitted,

/s/ Andrew Crocker

Andrew Crocker (CA 291596)
ELECTRONIC FRONTIER FOUNDATION
815 Eddy Street
San Francisco CA, 94109
(415) 436-9333 x 139
(415) 436-9993 (Fax)
andrew@eff.org


Attorneys for the Electronic Frontier
Foundation

/s/ Fred T. Magaziner

Fred T. Magaziner (PA 23332)
Catherine Wigglesworth (PA 314557)
DECHERT LLP
2929 Arch Street
Cira Centre
Philadelphia, PA  19104-2808
(215) 994-4000
(215) 994-2222 (Fax)
fred.magaziner@dechert.com
catherine.wigglesworth@dechert.com

Mary Catherine Roper (PA 71107)
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA 19106
(215) 592-1513 x116 (Telephone)
(215) 592-1343 (Fax)
mroper@aclupa.org

Attorneys for American Civil Liberties
Union of Pennsylvania, Amicus Curiae

CERTIFICATE OF COMPLIANCE

1.  Pursuant to L.A.R. 28.3(d), I, Fred T. Magaziner, certify that Fred T. Magaziner and Mary Catherine Roper, counsel for Amicus Curiae the American Civil Liberties Union of Pennsylvania, and Andrew Crocker, counsel for Amicus Curiae the Electronic Frontier Foundation, are members of the bar of this Court.

2.  I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 29(d) & 32(a)(7)(B) because this brief contains 5910 words according to the word count program of Microsoft Word, excluding those parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and L.A.R. 29.1(b).

3.  I certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Times New Roman, Microsoft Word 2007, in 14 point Regular type.

4.  I certify that this brief complies with the electronic filing requirements of L.A.R. 31.1(c) because: (1) the text of the electronic brief file with the Court is identical to the text of the paper copies of the brief filed with the Court; and (2) the .pdf file containing this brief electronically filed with the Court via the electronic filing system was scanned for viruses using Symantec Endpoint Protection, and no virus was detected.

Dated:  May 5, 2014                      /s/ *Fred T. Magaziner*
                                         Fred T. Magaziner

                                         Counsel for *Amicus Curiae* the
                                         American Civil Liberties Union of
                                         Pennsylvania

CERTIFICATE OF SERVICE

I hereby certify that on May 5, 2014, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the appellate CM/ECF system.

I further certify that the foregoing was served via First Class Mail upon the following persons:

J. Michael Murray
Lorraine R. Baumgardner
Berkman, Gordon, Murray & Devan
55 Public Square
2121 The Illuminating Bldg.
Cleveland, OH  44113-1949

*Attorneys for Appellants*

Anne Murphy
Scott R. McIntosh
United States Department of Justice
Appellate Section 7644
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0000

*Attorney for Appellee*

As required by L.A.R. 31.1, as amended by the Court's Order dated April 29, 2013, seven (7) copies of this Brief were hand-delivered to the Clerk of Court on May 5, 2014.

/s/ *Catherine Wigglesworth*