Case No. 13-3681

## IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

**FREE SPEECH COALITION, INC.**, *et al.,*

Plaintiffs - Appellants,

– vs –

**ATTORNEY GENERAL OF THE UNITED STATES**,

Defendant-Appellee.

On Appeal from the United States District Court for the
Eastern District of Pennsylvania

# APPELLANTS' REPLY BRIEF

J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY & DEVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113
Telephone: 216-781-5245
Fax: 216-781-8207

Counsel for Plaintiffs-Appellants

# <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    THE STATUTES AND REGULATIONS ARE NOT NARROWLY TAILORED TO ADVANCE THE GOVERNMENT'S INTEREST IN PROTECTING CHILDREN FROM SEXUAL EXPLOITATION. . . . . . . 2

II.   THE STATUTES AND REGULATIONS ARE OVERBROAD. . . . . . . 16

III.  THE STATUTORY AND REGULATORY INSPECTION REGIME IS UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT. . . . . 25

      A.    Plaintiffs' Fourth Amendment Claim is Justiciable. . . . . . . . . . . . . 25

      B.    The Administrative Search Exception Does Not Apply. . . . . . . . . 29

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CERTIFICATE OF COMPLIANCE WITH RULES 32 (a) (7)(B), FEDERAL RULES OF APPELLATE PROCEDURE AND RULES 28.3 AND 31.1 3RD CIRCUIT LOCAL APPELLATE RULES AND SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

Page

## CASES

*A Quantity of Copies of Books v. Kansas,* 378 U.S. 205 (1964). . . . . . . . . . . . . . 32

*Aiello v. City of Wilmington, Del.*, 623 F.3d 845 (3rd Cir. 1980). . . . . . . . . .  23-24

*Amer. Lib. Ass'n v. Thornburgh,* 713 F.Supp. 469 (D.D.C. 1989),
   *vacated sub nom., Amer. Lib. Ass'n v. Barr,*
   956 F.2d 1178 (D.C.Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*American Civil Liberties Union v. Ashcroft,*
   322 F.3d 240 (3rd Cir. 2003) *aff'd and remanded*
   *Ashcroft v. American Civil Liberties Union*,
   542 U.S. 656 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Annex Books, Inc. v. City of Indianapolis, Ind.*, 740 F.3d 1136
   (7th Cir. 2014) *petition for cert. filed,* 82 U.S.L.W. 1116
   (U.S. May 27, 2014) (No. 13-1441). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Burwell v. Hobby Lobby*, 134 S.Ct. 2751 (2014). . . . . . . . . . . . . . . . . . . . . . . . . 9

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000). . . . . . . . . . . . . . . . . . . . . . . . . 28

*Free Speech Coalition v. Attorney General,*
   677 F.3d 519 (3rd Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 16, 30

*Friends of the Earth, Inc. v. Laidlaw Environmental*
   *Services, Inc.*, 528 U.S. 167 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Hill v. Colorado*, 530 U.S. 703 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010). . . . . . . . . . . . . . . . . 28

## <u>TABLE OF AUTHORITIES (cont'd)</u>

*Jenkins v. Georgia*, 418 U.S. 153 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Lawrence v. Texas*, 539 U.S. 558 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Marcus v. Search Warrant,* 367 U.S. 717 (1961). . . . . . . . . . . . . . . . . . . . . . . . . 32

*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978). . . . . . . . . . . . . . . . . . . . . . . . . 30

*McCauley v. University of the Virgin Islands,*
     618 F.3d 232 (3rd Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*McCullen v. Coakley*, 134 S.Ct. 2518 (2014). . . . . . . . . . . . . . 2-5, 8, 10, 11, 14-15

*New York v. Burger*, 482 U.S. 691 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Pittsburgh League of Young Voters Educ. Fund v.*
     *Port Authority of Allegheny Cty.,*
     653 F.3d 290 (3rd Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Reno v. Am. Civil Liberties Union*, 521 U.S. 844 (1997). . . . . . . . . . . . . . . . . . . 22

*Riley v. California*, 134 S.Ct. 2490 (2014). . . . . . . . . . . . . . . . . . . . . . . . . 20-21

*Stanford v. Texas,* 379 U.S. 476 (1976). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Stanley v. Georgia,* 394 U.S. 557 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334 (2014). . . . . . . . . . . . . . . . . 28

*United States v. Grape*, 549 F.3d 591 (3rd Cir. 2008). . . . . . . . . . . . . . . . . . . . . 28

*United States v. Knox*, 32 F.3d 733 (3rd Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES (cont'd)

*United States v. Playboy Entertainment Group, Inc.*,
    529 U.S. 803 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*United States v. Stevens*, 559 U.S. 460 (2010). . . . . . . . . . . . . . . . . . . . . 24-25

*United States v. Williams*, 553 U.S. 285 (2008). . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Windsor*, 133 S.Ct. 2675 (2013). . . . . . . . . . . . . . . . . . . . . . 16

## CONSTITUTIONAL PROVISIONS

United States Const., amend. I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 5, 30, 32

United States Const., amend. IV. . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 27, 29, 32

## STATUTES, RULES AND REGULATIONS

8 U.S.C. § 1324a (b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

8 U.S.C. § 1324a (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 2251. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 2252. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 2252A.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

18 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 2254. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 2256. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## TABLE OF AUTHORITIES (cont'd)

18 U.S.C. § 2257. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9, 11, 14, 32

18 U.S.C. § 2257 (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 2257 (f)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

18 U.S.C. § 2257 (i). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 2257A. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11, 32

18 U.S.C. § 2257A (c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 2257A (f)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31

18 U.S.C. § 2257A (h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

18 U.S.C. § 2257A (k)(2)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

28 C.F.R. § 75.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 C.F.R. § 75.5 (b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

28 C.F.R. § 75.5 (c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

73 Fed. Reg. 77436. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

73 Fed. Reg. 77437. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

73 Fed. Reg. 77438. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

73 Fed. Reg. 77439. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

73 Fed. Reg. 77440. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## **TABLE OF AUTHORITIES (cont'd)**

73 Fed. Reg. 77441. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

73 Fed. Reg. 77445. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

73 Fed. Reg. 77461. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## STANDARD OF REVIEW

This Court in *Pittsburgh League of Young Voters Educ. Fund v. Port Authority of Allegheny Cty.,* 653 F.3d 290, 295 (3rd Cir. 2011) stressed that in cases raising First Amendment issues, appellate courts have an obligation to conduct "[i]ndependent fact review" to assure that the trial court's judgment "does not constitute a forbidden intrusion on the field of free expression...and to provide appellate courts with greater control over the case-by-case elaboration of First Amendment principles." (citations omitted). *See also, McCauley v. University of the Virgin Islands,* 618 F.3d 232, 241n.8 (3rd Cir. 2010) (after stating that court exercises plenary review over legal questions pertaining to First Amendment, noted: "Although we generally review a district court's factual findings for clear error, [i]n the First Amendment context, reviewing courts have a duty to engage in a searching, independent factual review of the full record." (citation omitted)). *See Jenkins v. Georgia*, 418 U.S. 153, 160 (1974) (examining film, "Carnal Knowledge," to determine that jury's finding of obscenity could not be sustained "as a matter of constitutional law"). All of the factual determinations made by the court below are intrinsic to the First Amendment analysis and must be reviewed independently by this Court.

I.    **THE STATUTES AND REGULATIONS ARE NOT NARROWLY TAILORED TO ADVANCE THE GOVERNMENT'S INTEREST IN PROTECTING CHILDREN FROM SEXUAL EXPLOITATION.**

The Supreme Court's recent decision in *McCullen v. Coakley*, 134 S.Ct. 2518 (2014), (which the Government cites, but does not discuss, Appellee's Brief at 61) demonstrates exactly how a law is to be evaluated to determine whether it satisfies the narrow tailoring requirement under intermediate scrutiny and the overbreadth doctrine. *American Civil Liberties Union v. Ashcroft*, 322 F.3d 240, 266 (3rd Cir. 2003) *aff'd and remanded Ashcroft v. American Civil Liberties Union*, 542 U.S. 656 (2004).

The Massachusetts statute at issue in *McCullen* prohibited anyone (except for a few exempt classes of individuals) from knowingly standing "on a 'public way or sidewalk' within 35 feet of an entrance or driveway" of an abortion clinic. *Id.* at 2525. An earlier version of the law, modeled on legislation approved in *Hill v. Colorado*, 530 U.S. 703 (2000), had established "no approach" buffer zones, which prohibited anyone from knowingly coming within six feet of another person to engage in advocacy activities. *McCullen*, 134 S.Ct. at 2525.  Massachusetts maintained that these "no approach" buffers were inadequate and cumbersome to enforce, and therefore, amended the law to provide for fixed buffers in zones surrounding the clinics. *Id.* at 2525-26. Petitioners challenged the law under the First Amendment,

2

contending the fixed buffer zones unconstitutionally restricted their right to express opposition to abortion by offering information and "sidewalk counseling" to clinic patients–as opposed to using signs or chanting. *Id.* at 2527-28.[1]

The Court began by determining Massachusetts's law was a content-neutral regulation of speech, which, to survive constitutional scrutiny, must be "narrowly tailored to serve a significant governmental interest." *Id.* at 2531, 2534. It explained that "by demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency'" and stressed that "mere convenience" is not an acceptable justification for a law burdening speech. *Id.* at 2534-35. (citation omitted).

The Court found Massachusetts's fixed buffer zones served important governmental interests in ensuring public safety, promoting the free flow of traffic, and protecting women's freedom to seek pregnancy-related services. *Id.* at 2535.

It went on to find, however, the buffers imposed serious burdens on the petitioners' speech. *Id*. Specifically, the evidence showed petitioners' "ability to initiate...close, personal conversations that they view as essential to 'sidewalk

---

[1]  In contrast to the statutes at issue here, the statute in *McCullen* did not regulate speech on its face but rather incidentally affected it by creating buffer zones around clinics.  Here, the burdens are not incidental; the statutes on their face directly regulate expression.

3

counseling'" had been compromised, and the buffers had made it "substantially more difficult" to distribute printed material to clinic patients. *Id.* at 2535-36. The Court dismissed the Commonwealth's argument that since the buffers did not ban petitioners' expression, the burdens they imposed were tolerable. *Id.* at 2537. *Cf.* Appellee's Brief at 47, 49.

The Court then turned its attention to whether the law burdened substantially more speech than ***necessary*** to achieve Massachusetts's interests. *Id.* In doing so, it explored whether Massachusetts "too readily" had "foregone options that could serve its interests just as well without substantially burdening" speech. *Id.*

First, the Court noted the harassing, intimidating, and obstructionist conduct that the fixed buffers were designed to alleviate was itself the subject of a separate provision in the same legislation prohibiting such conduct. *Id.* It also observed there were "available generic criminal statutes" forbidding the same. *Id.* at 2538.

The Court next examined other existing laws and alternative measures that were less intrusive and more targeted while still advancing the government's interest in securing public safety and protecting against harassment and intimidation of clinic patients. *Id.* at 2537-38.

Massachusetts claimed, however, these alternatives would not work. *Id.* at 2539. Point by point, the Court explained why Massachusetts was wrong and how it

4

had failed to support it claims that lesser alternatives would not advance its objectives. *Id.* at 2539-40. The Commonwealth, the Court found, had simply made a case for showing why its "chosen route" made law enforcement's job easier. *Id.* at 2540. That, however, was "not enough to satisfy the First Amendment." *Id.* The Court found the statute was not narrowly tailored and therefore, was unconstitutional. *Id.* at 2541.

Under *McCullen's* analysis, 18 U.S.C. §§ 2257, 2257A meet that same fate.

Like the public safety issues underlying Massachusetts's statute in *McCullen*, prevention of the sexual exploitation of children is an important governmental interest.

Moreover, the record here demonstrates that the statutes "impose serious burdens" on expression that "have clearly taken their toll" on Plaintiffs' speech, *id.* at 2535–a fact the Government has assiduously avoided discussing.

Jeffrey Douglas, Chair of the Free Speech Coalition, described the Gordian knot posed by the various statutory and regulatory requirements with which commercial producers, retailers, and distributors of adult materials must comply–many of which are all but impossible. App. at XX-XX. Producers must assure that their records are properly alphabetized, photo identification is precisely placed in the correct file, indices are up-to-date, and records are in perfect order

5

when the government knocks at their door for inspection; wholesalers, in addition to

obtaining the requisite records from each producer of the materials they offer, must

sort through this mass of records to prepare their own indices and cross-referencing

systems, which again must be available for inspection at a moment's notice; retailers

and distributors must examine every piece of inventory–both print and digital–to

verify it contains a compliant label on its packaging as well as on the DVD or video

inside. Any misstep in compliance with these requirements is not punished by a

simple administrative penalty as under other regulatory recordkeeping schemes, but

by a potential prison term of up to five years. 18 U.S.C. § 2257 (i).

Plaintiffs involved in the production of adult materials confirmed the extent of

those burdens. Dian Wilson testified at length about the painstaking measures she

takes on behalf of the Sinclair Institute to assure that her employer does not face

criminal prosecution. App. at XX-XX. Marie Levine, an adult film star, testified

about being compelled to incur the expense and risk of hiring a third-party

recordkeeper to maintain her records to avoid publishing her home address on her

website, App. at XX; contrary to the Government's contention, Appellee's Brief at

67, the regulations expressly provide that Levine is liable for all lapses in compliance,

including those committed by her third-party recordkeeper. 28 C.F.R. § 75.2.

While the regulations are burdensome for larger commercial producers, they

6

are a complete nightmare for one and two-person businesses. Eugene Mopsik, the Executive Director of American Society of Media Photographers, testified about the impossibility of compliance by the hundreds of professional photographers in his organization who produce photos with sexual imagery–many of whom operate their businesses solo–with the requirement that each individual photo be labeled with a statement describing the location of the records and the mandate that the records be made available for inspection at least 20 hours per week.  App. at XX-XX.  *See also,* App at XX-XX (Nitke); App. at XX-XX (Levingston); App. at XX-XX (Steinberg); App. at XX (Alper).

And the statutes have snuffed out speech.  Betty Dodson and Carlin Ross removed 1,800 constitutionally protected images from their website because of the statutes' mandates. App. at XX.Tom Hymes censors images on his website covering the adult industry because of them. App. at XX. Dave Levingston self-censors his portraits of nudes, has declined to pursue a documentary with the Kinsey Institute, and has removed an award-winning photograph from his website for the same reason. App. at XX. Barbara Nitke has been prevented from publishing a complete volume of her sexually explicit work, App. at XX-XX; Carol Queen has restricted her appropriationist art, App. at XX-XX; David Steinberg has been prevented from distributing a Norwegian fine art magazine for which he serves as its U.S.

7

representative, App. at XX-XX; and Barbara Alper cannot document anonymous public sex on Fire Island or publish a complete volume of her current sexually explicit work with images that predate the statutes for which she does not have requisite photo identification, App. at XX-XX–all because of the statutes' criminal recordkeeping and labeling requirements.

Are these burdens necessary to achieve the government's interests? As *McCullen* teaches, the answer lies in an examination of existing laws or alternative measures which could accomplish the government's interests in preventing the use of minors in the production of sexually explicit expression without substantially burdening speech.

We start with the most obvious: the numerous state and federal laws imposing "substantial...criminal penalties for creating and distributing child pornography, *see generally* 18 U.S.C. §§ 2251–2254, 2256; Pornography Report 602-08 (summarizing federal and state child pornography laws)...." *Free Speech Coalition v. Attorney General*, 677 F.3d 519, 547 (3rd Cir. 2012) (Rendell, J., concurring). *See infra* at 11.

Equally conspicuous is the certification provision found in 18 U.S.C. § 2257A (h), available to Hollywood producers who, like adult film producers, maintain identification documents as a matter of course. This certification procedure is a perfect example of a more targeted regulation that would serve the government's

interest in preventing the appearance of minors in commercially produced sexually explicit expression–allowing commercial producers to satisfy recordkeeping obligations by certifying they maintain records establishing their performers' ages (which the evidence established, they do, App. at XX, XX) without burdening private expression or imposing 18 U.S.C. § 2257's heavy burdens on producers of sexually explicit expression depicting adults. *See also, Burwell v. Hobby Lobby*, 134 S.Ct. 2751 (2014) (certification procedure allowing non-profits to exclude coverage for contraception serves as example of less restrictive measure that could be applied to accommodate religious convictions of closely held corporations under RFRA).

Moreover, laws designed to protect minors from alcohol or tobacco abuse by requiring merchants to check IDs of adults under the ages of 25 and 26, serve as examples of measures that would burden substantially less speech. *See* Appellants' Brief at 19 n.8. Regulatory schemes governing recordkeeping in other contexts like immigration documentation also serve as models for a less onerous mechanism to assure that producers of sexually explicit expression maintain age verification documentation. *See e.g.,* 8 U.S.C. § 1324a (b)(6), 8 U.S.C. § 1324a (e).

The Government, nonetheless, insists a universal age verification procedure enforced by criminal sanction is the only effective means of assuring that minors do

not appear in commercially produced sexually explicit expression.[2] Appellee's Brief at 43-44.

In making that argument, the Government does not contend there is a "widespread" problem with underage performers appearing in commercial adult material. *Cf. McCullen,* 134 S. Ct. at 2539. For good reason. The evidence demonstrated that the appearance of minors in commercially produced adult materials is nearly non-existent. *See Annex Books, Inc. v. City of Indianapolis, Ind*., 740 F.3d 1136, 1137 (7th Cir. 2014) *petition for cert. filed,* 82 U.S.L.W. 1116 (U.S. May 27, 2014) (No. 13-1441) (finding government's justification for law regulating adult bookstores was weak as a statistical matter and law could not withstand intermediate scrutiny). Both Jeffrey Douglas, who has represented clients in the adult industry since 1982, and Marie Levine, who has performed in adult films since the early 1980s, testified there have been only a handful of instances in which a minor has appeared in an adult film. App. at XX, XX-XX; XX. In each instance, the minor had been able to appear in the production, not because the producer had failed to obtain

---

[2]  At no point has the Government advanced the position–one that would be "hard to fathom," *Free Speech Coalition*, 677 F.3d at 547 (Rendell, J., concurring)– that the statutes are effective means of addressing "homemade" child pornography intentionally created by people who are related to or acquainted with their victims, which constitutes the substantial majority of sexually explicit expression depicting minors. App. at XX, XX.

photo identification, but because the minor had duped the producer by using fraudulent identification. Douglas listed the many reasons–apart from the industry's moral objections–why the appearance of minors in commercially produced expression simply does not occur. App. at XX-XX. The Government produced no evidence rebutting that testimony. (Its own expert testified most child pornography was made by family and acquaintances and distributed using peer-to-peer networks. App. at XX-XX, XX, XX, XX.).

Nor has the Government argued existing laws are ineffective tools in addressing the production and distribution of child pornography. *Cf. McCullen*, 134 S.Ct. at 2539. Again, the evidence simply would not support any such claim. Between 2002 and 2012, nearly 4,000 prosecutions were brought for child pornography offenses under 18 U.S.C. § 2252A. App. at 2434. Janis Wolak, the Government's expert on child pornography testified the success rate of these prosecutions is "extremely high." App. at XX. In contrast, for the same period of time, only nine prosecutions were brought under 18 U.S.C.§ 2257; no prosecution has ever been brought under 18 U.S.C. § 2257A. App. at 2434. These bare statistics cast considerable doubt on the Government's prediction that invalidating the statutes would "place minors at increased risk of exploitation." Appellee's Brief at 24.

The Government's main argument relies on the popularity of a genre known

as "teen porn," in which youthful-looking performers appear. It argues the entire universe of sexual imagery must be saddled with these burdensome requirements because performers' ages in "teen porn," "cannot be determined by visual inspection alone." Appellee's Brief at 27, 39.

But the Government's argument is undermined by the testimony of its own expert. Gail Dines testified "teen porn" constitutes only between one-fourth and one-third of all commercially produced adult expression. App. at XX. Based on the data available to her, Dines estimated only one-third of commercially produced sexual expression depicted adult performers who are youthful-looking enough to be confused as minors–leaving the remaining two-thirds of commercially produced sexually explicit expression unnecessarily burdened by the statutes. App. at XX, XX. (Plaintiffs' expert, Daniel Linz, testified only 10 percent of commercial adult expression depicted performers who might be confused as minors. App. at XX.).

The Government attempts to blunt the effect of Dines's testimony by claiming Plaintiffs-Appellants have overstated it. Appellee's Brief at 32. The record shows otherwise.

Dines was asked about her estimate of material depicting "teen porn" in the expert report she had prepared for this litigation:

Q.    Okay. Now, you have said, in your report, have you not–and I'll

12

put it up on the screen, if you don't recall this–that "Teen porn accounts for a significant proportion of the total online pornography, accounting for between one-quarter and one-third of the material on the most popular websites, depending upon the scope of the definition."

Isn't that what you said in your report?

A.    Yes, that's what I said.

Q.    And you've pretty much repeated that here?

A.    Yes.

App. at XX.  Further, Dines was asked and testified:

Q.    Okay.  Now, you would agree, Dr. Dines, that there is an enormous quantity of sexually explicit material produced in the United States that are of adults?

A.    Yes.

Q.    Okay.  And isn't it the case that the best opinion you can give us is that if the question is posed as to the quantity, the percentage of the universe of sexually explicit images of adults, produced in the United States, your best estimate of that material that depicts adults who are youthful looking enough to be confused as possible minors is approximately one-third?

A.    Yes, one-third.

App. at XX.

Dines went on to qualify that her estimate of one-third was based on "the most traveled websites," not the universe of material. App. at XX. She explained:

13

A.    ....What I'm saying is, is that of the top visited, a third–that's all we can tell from those charts. I cannot give you any other figures outside of that, because of the enormity of the data that exists, but when you go to the main traveled websites, that's what comes up.

Q.    ....[S]o what you're saying is, that's the best answer you can give, given the data that you have available to you?

A.    Yes.

App. at XX.

Dines testified, based on the data available to her (that being her review of the most traveled adult websites), her best estimate of sexually explicit material depicting performers who could possibly be confused as minors was one-third.

Of course, the evidence also demonstrated that commercial producers of sexually explicit expression–adult film makers and professional photographers alike–do not rely on "visual inspection alone" to determine whether a performer or model is an adult. It has been a longstanding practice–well before the enactment of 18 U.S.C. § 2257–to check identification documents to assure that their performers or models are adults. App. at XX, XX-XX, XX-XX.[3]

That leaves the Government with the same type of argument made by Massachusetts in *McCullen*, in support of its law's fixed buffer zones: the buffer

---

[3] Private individuals who send sexually explicit messages to one another or make homemade videos certainly do not need to examine a driver's license or passport to verify their own age or that of their husband, wife, or lover.

14

zones would make law enforcement's job much easier. Similarly, the Government

here argues that by "eliminating subjective disputes" about a performer's age, the

statutes would make law enforcement's job easier. Appellee's Brief at 50.

> Of course they would. But that is not enough to satisfy the First
> Amendment. To meet the requirement of narrow tailoring, the
> government must demonstrate that alternative measures that burden
> substantially less speech would fail to achieve the government's
> interests, not simply that the chosen route is easier. A painted line on
> the sidewalk is easy to enforce, but the prime objective of the First
> Amendment is not efficiency.

*McCullen*, 134 S.Ct. at 2540.

The testimony of the Government's expert, Dr. Biro, underscores the point. He

testified that "generally speaking," the age range where there could be confusion as

to whether a person *under the age of 18* might be an *adult*, or whether a person *over*

*the age of 18* might be a *minor*, is between the ages of 15 and 24. App. at XX. He

further admitted that the "vast majority" of persons who have reached the age of 30

would not be confused as minors. *Id.* Therefore, the statutes' application to visual

depictions of persons older than 25 or 30, is just not necessary.

The Government has, therefore, failed to sustain its burden of demonstrating

the statutes' constitutionality under intermediate scrutiny. *United States v. Playboy*

*Entertainment Group, Inc.*, 529 U.S. 803, 812-13 (2000); *McCullen,* 134 S.Ct. at

2540.

15

## II.    THE STATUTES AND REGULATIONS ARE OVERBROAD.

To evaluate a law's overbreadth, courts must "intelligently weigh the legitimate versus problematic applications of the statutes." *Free Speech Coalition*, 677 F.3d at 538. To that end, this Court asked that evidence be developed comparing the amount of speech that implicated the government's interest in protecting children (e.g., depictions of performers who reasonably could be minors based on their apparent ages) with the amount of speech that is burdened but does not further the government's interest (e.g. depictions of performers who are obviously adults).

It also requested that evidence be developed regarding the statutes' intrusion into private, non-commercial sexual expression between adults. *Free Speech Coalition,* 677 F.3d at 538. *See also, Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *United States v. Windsor*, 133 S.Ct. 2675 (2013); *Stanley v. Georgia,* 394 U.S. 557 (1969).

The Government avoids the comparison required to evaluate the statutes' overbreadth, however. Instead, it has devoted its energies to describing the amount of expression depicting youthful-looking adults, while ignoring the evidence amassed by Plaintiffs of the substantial quantity of sexual expression not implicated by the government's interest in protecting children, but nonetheless falling prey to the statutes' criminal mandates. Its analysis is, therefore, incomplete.

16

We have already discussed Dr. Dines's testimony that two-thirds of commercially produced sexually explicit expression depicts men and women who could not reasonably be confused as minors. *Supra* at 12-14. Plaintiffs' expert, Dr. Linz, estimates it to be 90 percent. App. at XX-XX.[4]

In addition, Plaintiffs presented numerous examples of their body of work: DVDs, videotapes, books, photographs, and expression published on the internet. App. at 1018-2433; Plaintiffs' Ex. 45-47, 50, 74-108, and 117-27.[5] Depiction after depiction features mature adults who could not reasonably be confused as minors. Between 63 percent and 90 percent of the persons depicted in actual sexual conduct in Plaintiffs' expression are at least 25 years old–with many of them, much older. *See* Appellants' Brief at 25-26, 20-24.

Plaintiffs also submitted a 500-page exhibit that included examples of artistic expression subject to the statutes, depicting obviously mature adults. App. at 777-821. Included among those examples are Barbara DeGenieve's Panhandler Project, App. at 781-83; Paul Knight's series, "Intimate couples," exhibited in museums in

---

[4] If the quantity of constitutionally protected sexually explicit expression depicting adults is compared to the quantity of unprotected child pornography, the percentage of protected expression burdened by the statutes becomes even greater. Dr. Linz testified "nearly 99 percent of the material that is available is not child pornography." App. at XX.

[5] *See* Appellants' opening brief at 17 n.6.

Glasgow, Sydney, Melbourne, London and Berlin, App. at 799; the critically acclaimed photography of Tony Ward, App. at 820-21; and the digital paintings of Tom Gallant. App. at 817. *See also,* App. at XX-XX.

They presented examples of important social and political expression containing sexual images subject to the statutes, including "The Ghosts of Abu Ghraib," App. at 822; "Standard Operating Procedure," App. at 823; "A Scream for Silence," App. at 825-27; "War Babies," App. at 828; "Bought and Sold: An Investigative Documentary on the International Trade in Women," App. at 832-33; "Sri Lanka's Killing Fields," App. at 834; "Raw Deal: A Question of Consent," App. at 836; "Whore's Glory," App. at 837; "Libyan rebels say captured cell phone videos show rape, torture," App. at 869-72; "Nigeria Rape Video: Footage of Brutal Attack on Woman Outrages Nation," App. at 873-74; "Inside the Anonymous Hacking File on the Steubenville 'Rape Crew.'" App. at 875-79. *See also*, App. at 822-79.

Additionally, Plaintiffs presented evidence regarding the production of sexual imagery by married couples–in their own bedrooms or using available technology to "keep the spark going" in long distance relationships. *See*, App. at XX,1028-30; XX-XX, XX-XX; XX, XX; Appellants' Brief at 39-42.

They also produced evidence of the large body of sexually explicit photos and videos shared between adults on social networks and adult dating websites. App. at

480-776, 2451-4432.[6]   *See e.g.,* App. at 490, 488 (alt.com: "1,662,951 active members" who join for the purpose of making connections for "dating, romance, friendship, and a variety of encounters"); App. at 516, 518 (adultspace.com: "over 5,000,000 sexy adult profiles" "where members are encouraged to celebrate their sexuality" and "upload their sexiest videos and pictures"); App. at 519, 529 (benaughty.com: 24,000,000 visitors each month); App. at 539, 546 (iwantu.com: "adult dating club - adult swingers' and singles personals" -21,165 visitors per month); App. at 549, 555-56 (upforit.com: "where hotties meet" -6,100,000 visitors each month); App. at 558 (hookup.com: "fast growing adult dating site" with "millions of local adult profiles"); App. at 610, 616-17 (hornymatches.com: "meet new friends and sex partners" - over 7,000,000 members and 11,000,000 visits per month); App. at 666, 670 (adultfriendfinder.com: 41,752,482 members with visual images that are "sexually oriented, and explicitly erotic"); App. at 693, 700 (naughtyconnect.com: 3,013,960 members); App. at 762, 768-69 (adam4adam.com: "The less you wear the better" - 55,980 guys online, 3.2 million visitors per month); App. at 771, 773 (collarme.com: "The largest BDSM Community on the Planet" - 8.1

---

[6]   In commentary accompanying the regulations, the Department of Justice made clear it interprets the statutes to apply to these websites, 73 Fed. Reg. 77437-38, 77461, and to require an individual posting sexually explicit expression to a website to affix the requisite statement to their expression. 73 Fed. Reg. 77439.

million visits per month).

Contrary to the district court's conclusion that Plaintiffs "provide[d] no information whatsoever about the proportion of such postings that contain depictions of 'sexually explicit' conduct as defined by the Statutes," App. at 57, Plaintiffs, in fact, introduced a five-volume exhibit, containing thousands of sexually explicit depictions–both actual and simulated–as a representative sample of images posted on these adult social networks and dating websites, which leaves no doubt about the enormous body of such depictions. *See* App. at 2451-4432.

Finally, Plaintiffs produced articles, surveys, and other documentation buttressing their claim that producing explicit photos and videos plays a large role in the private sex lives of ordinary American adults. *See* App. at 938-39 (pop culture references to sexting in primetime commercials);[7] App. at 945, 948, 950 (CNN report of FBI employee misconduct in sending nude photos via cell phone, quoting FBI Assistant Director Will as acknowledging a "rash of sexting" among FBI employees); App. at 880-81 (Harris Interactive poll on the prevalence of sexting); App. at 888-902 (articles describing cell phone applications designed to protect sexts). *See Riley v.*

---

[7] A recent mainstream movie focuses on the foibles of a married couple when their homemade "sex tape" in which they perform practices described in *The Joy of Sex* is circulated beyond the doors of their bedroom. *See* "Sex Tape," http://www.imdb.com/title/tt1956620/.

*California*, 134 S.Ct. 2473, 2490 (2014) (citing Harris Interactive poll to demonstrate ubiquity of cell phone use and noting array of available cell phone applications as evidence of private information available on cell phones).

In addition to this documentary evidence, Plaintiffs introduced the testimony of two experts, who had conducted research–independent of this litigation–about the prevalence of sexting, and the testimony of a third expert[8] about the quantity of sexually explicit expression in total, the quantity of it that depicts youthful-looking performers, the quantity of child pornography, and the quantity of private sexually explicit expression shared by mature adults. App. at XX-XX, XX-XX, XX-XX.

Rather than addressing the documentary evidence showing the extent of expression burdened by the statutes, the Government focuses its argument on criticizing Plaintiffs' experts' testimony.  It contends the evidentiary value of the testimony of Dr. Daniel Linz, regarding the quantity of sexually explicit material depicting performers who might be confused as minors is "slight," Appellee's Brief at 30, while asserting that the testimony of Plaintiffs' experts, Dr. Michelle Drouin and Dr. Zimmerman, regarding the prevalence of sexting fails to provide "meaningful" or "relevant" evidence of the statutes' application to private expression.

---

[8] The Government's own expert acknowledged that Plaintiffs' expert, Daniel Linz, was a recognized authority on the primary effects of sexually explicit media. App. at XX.

Appellee's Brief at 56, 58.

The Government faults Dr. Linz's use of Google searches in his evaluation of the quantity of sexually explicit expression depicting youthful performers who might be confused as minors. In doing so, it overlooks his testimony that his conclusions are based–not simply on the quantitative results yielded by the Google searches–but on his own experience in researching sexually explicit material over the course of more than 30 years. App. at XX-XX, XX. The Google search data confirmed Linz's own experience and research that only a very small percentage of commercially produced sexually explicit material depicted persons who might be confused as minors and provided relevant information about sexually explicit material in the "vast library including millions of readily available and indexed publications" on the internet. *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 853 (1997).

The Government also takes issue with the value of Dr. Drouin's and Dr. Zimmerman's testimony on the prevalence of sexting–contending the district court properly concluded their testimony gave it no basis for determining how many sexts contained images subject to the statutes. Appellee's Brief at 57-58. In making that argument, the Government ignores the breadth of the statutes' reach, which captures "any frontal nude image of a person in what might otherwise be called an 'erotic'

22

pose." *Amer. Lib. Ass'n v. Thornburgh,* 713 F.Supp. 469, 474 (D.D.C. 1989), *vacated sub nom., Amer. Lib. Ass'n v. Barr*, 956 F.2d 1178 (D.C.Cir. 1992) and even certain non-nude images. *United States v. Knox*, 32 F.3d 733, 737(3rd Cir. 1994); 73 Fed. Reg. 77440-41 ("A depiction of scantily clad women in a strip club or bedroom can appear in limitless permutations, and the Department cannot state that all or none would constitute lascivious exhibition of the genitals without consideration of the *Dost* factors."); 73 Fed. Reg. 77436 (simulated sexual conduct does not require nudity).

Dr. Drouin's and Dr. Zimmerman's research–conducted using acceptable methodology in the field of social science and published in peer-reviewed journals–evidences that millions of Americans produce intimate sexual photos and send them to one another on their cell phones or computers. While not all of these sext messages contain content that triggers the statutes' requirements, a substantial number of them do. *See* App. at 986 (one in five respondents in Drouin's study had sent a nude photo of themselves; one in ten had sent a photo of a solo sex act). The Government's criticisms cannot erase that fact. Added to the other evidence of the prevalence of private expression that depicts sexual imagery discussed above, Drouin's and Zimmerman's testimony provides solid evidence that the quantity of private expression falling within the statutes' regulation is not "marginal," *Aiello v.*

23

*City of Wilmington, Del.*, 623 F.3d 845, 854 (3rd Cir. 1980), or the product of "fanciful" hypotheticals, *United States v. Williams*, 553 U.S. 285, 301-02 (2008), but is, in fact, substantial.

Faced with the enormous quantity of expression regulated by the statutes that has no relation to the production of child pornography, the Government switches gears and points to this expression as evidence showing that the statutes have not "effectively 'prohibited or chilled' a significant amount of protected expression," and therefore, should be not be struck down as overbroad. Appellee's Brief at 50.

First, the Government is wrong; Plaintiffs have demonstrated that the statutes have prohibited and burdened a substantial amount of expression. *Supra* at 5-8. But more importantly, that a substantial amount of protected expression subject to the statutes' regulation continues to be produced and distributed cannot save an unconstitutional overbroad law. *United States v. Stevens*, 559 U.S. 460 (2010)–which the Government neither cites nor discusses in its brief–makes that clear.

In *Stevens*, the Court struck down a law criminalizing depictions of animal cruelty as overbroad because it impermissibly ensnared a substantial body of protected speech in its prohibitions. 559 U.S. at 478-79. The Court pointed to the statute's application to hunting magazines with circulations in "the hundreds of

thousands or millions" and annual retail sales of $135 million, "equally popular" hunting videos, and Spanish bullfighting films as evidence of its overbreadth. *Id.* at 476. Nowhere in *Stevens* did the Court suggest, as the Government argues here, that the existence of these sizeable hunting magazine and video markets demonstrated that the law had not "effectively ...chilled" expression, and therefore, warranted upholding it. To the contrary, the Court reached the opposite conclusion and determined the statute's application to this large body of expression rendered it unconstitutionally overbroad, and struck it down. *Id.* at 481-82.

The fact that millions of Americans continue to produce private sexually explicit expression–no doubt unaware they are violating a federal criminal statute–serves as no reason to uphold the unconstitutionally overbroad laws here at issue. Nor does the government's lack of enforcement of them. *Id.* at 480. *See supra* at 11.

## III.  THE STATUTORY AND REGULATORY INSPECTION REGIME IS UNCONSTITUTIONAL UNDER THE FOURTH AMENDMENT.

### A.  PLAINTIFFS' FOURTH AMENDMENT CLAIM IS JUSTICIABLE.

The evidence established that 29 record inspections were conducted by teams of FBI agents, who spent hours upon hours in homes, conference rooms, and private offices, searching through business records containing personal information about the

performers depicted in expression produced by the subjects of the searches–all without probable cause or a warrant.  App. at 5021-24.

And while the Government represents it has "dismantled the inspections program," the statutes and regulations remain the same. 73 Fed. Reg. 77445. They require the Government to adhere to the same procedure followed by the FBI in conducting the 29 prior inspections–entering homes, offices, and studios where records are maintained, "without delay" and without advance notice for the purpose searching through them.

Title 18 U.S.C. §§ 2257 (c), 2257A (c), require Plaintiffs to maintain their records and make them available to the Attorney General for inspection; it is a violation of the statutes, punishable by term of imprisonment, to refuse to do so.  18 U.S.C. §§ 2257 (f)(5); 2257A (f)(5). The regulations further require Plaintiffs to be available for inspections performed without advance notice at least 20 hours per week. 28 C.F.R. § 75.5 (b), (c)(1).

Plaintiffs have no choice but to comply with these provisions–regardless of the Government's past, current, or future intention with respect to an inspection program–or face the risk of criminal prosecution.  As the district court wrote in denying the Government's motion to dismiss on standing and ripeness grounds:

As long as the statutes are in force, Plaintiffs, all of whom are

26

'producers,' stand in danger of being subjected to intrusive and allegedly unconstitutional searches at virtually any hour of the work-day.

Moreover, the fact that no searches have been conducted since 2007 is not consequential because as long as Section 2257 is in force, the searches could be resumed at any moment. *See Chamber of Commerce v. FEC*, 69 F.3d 600, 603 (D.C. Cir. 1995)

DDE 117, Memorandum re: Motion to Dismiss in Part at 5-6 (footnote omitted). The court emphasized that the Government's suspension of inspections had no effect on the obligations imposed on Plaintiffs by the challenged laws "to be near their records–or to have a custodian near them–for substantial periods of time during the work week." *Id.* at 8-9.

Significantly, the Government has, at no point, represented Plaintiffs no longer must maintain the records and be prepared to make them available for inspection by the Government. The statutes and regulations continue to impose ongoing obligations on them.

And while the Government tells us it voluntarily suspended the inspection program, that voluntary cessation has no effect on the justiciability of Plaintiffs' Fourth Amendment claim when, as the district court observed, it may resume such inspections at any time. The Government has not satisfied the "heavy burden" of establishing that "it [is] absolutely clear" inspections "cannot reasonably be expected

27

to start up again." *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*,528 U.S. 167, 189 (2000). *See also, United States v. Grape*, 549 F.3d 591, 597 (3rd Cir. 2008); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287-88 (2000).

Recent Supreme Court authority–which again, the Government has not cited or discussed–fortifies Plaintiffs' standing to challenge the constitutionality of the inspection regime. *Susan B. Anthony List v. Driehaus*, 134 S.Ct. 2334 (2014); *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).

In *Susan B. Anthony,* the Court reversed the lower courts' rulings that Plaintiffs did not have standing to challenge the constitutionality of an Ohio election law because proceedings against Plaintiffs under that law had been terminated and the threat of future prosecution was speculative. 134 S.Ct. at 2340-41. The Court found otherwise–noting that plaintiffs intended to continue engaging in future conduct "arguably proscribed by the statute they wish to challenge" and that the threat of future prosecution was not simply "chimerical." *Id.* at 2343-44. It emphasized: "[R]espondents have not disavowed enforcement if petitioners make similar statements in the future." *Id. See also, Humanitarian Law Project*, 561 U.S. at 16 (finding plaintiffs' challenge justiciable, noting: "The Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do.").

The same holds true here.  Plaintiffs produce sexually explicit expression, and therefore, they must keep the requisite records, make them available for inspection by the Attorney General or his designee at least 20-hours per week, and when the Attorney General or his designee knocks on their door to perform an inspection–just as the FBI did in 29 prior inspections–they must let the agents in or face criminal prosecution.

The Government may resume inspections at any time. In fact, Congress expressed its expectation that they would be conducted with regularity. *See* 18 U.S.C. § 2257A (k)(2)(A) (requiring Attorney General to submit annual reports to Congress reporting the number of inspections undertaken under the statutes).

Plaintiffs, therefore, have standing to challenge the inspection provisions of the statutes and regulations under the Fourth Amendment, and their claim is ripe for review.

### B.    THE ADMINISTRATIVE SEARCH EXCEPTION DOES NOT APPLY.

The Government's response to Plaintiffs' Fourth Amendment argument on the merits is terse.  They contend that because all persons who produce sexually explicit expression, including the millions of Americans who are not commercial producers, are "subject to a comprehensive framework of laws that prohibit child pornography,"

such persons are "participants in a highly regulated industry." Appellee's Brief at 72.[9] From this they argue, the warrantless searches authorized by the statutes–in which teams of FBI agents, without advance notice, entered homes, private offices, conference rooms, locked files rooms, and storage areas and spent hours combing through business records containing personal information about models and performers depicted in producers' expression–are "reasonable." *Id.* at 72-73.[10]

But the Court in *Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978) rejected that reasoning. It stressed that designation of an industry as one that is "closely" or "pervasively" regulated for purposes of allowing warrantless searches is reserved for those having a "history of government oversight" and that have been "long subject to close supervision and inspection." *Id.* at 313. It rebuffed the Government's contention that the Occupational Safety and Health Act's general regulation of working conditions constituted pervasive and close regulation such that businesses subject to its provisions had a diminished expectation of privacy, permitting warrantless searches of their premises. *Id.* The Court noted that following the

---

[9] Because targets of the inspections are engaged in the production of expression, the First Amendment itself precludes a finding that the government could closely regulate their protected activity. *See* Appellants' Brief at 57-58.

[10] At no point does the Government explain why it cannot simply get a warrant to search 2257 records–a requisite showing under the administrative search exception. *Free Speech Coalition,* 677 F.3d at 549 (Rendell, J., concurring).

Government's logic, warrantless searches would become the rule, rather than the exception–a result inconsistent with its precedent. *Id.* at 313-14.

The Court in *New York v. Burger*, 482 U.S. 691, 701 (1987) likewise made clear the administrative search exception was limited to businesses that are "pervasively regulated"–not because they have to comply with the general laws as all businesses do, but because they are subject to pervasive governmental regulations imposing specific requirements on the industry in which they operate, which has sufficiently diminished their expectation of privacy.

Nor can the inspections be regarded as "extremely limited" in nature, Appellee's Brief at 72, given the evidence showing how the searches were conducted. Rather, they fit the definition of unreasonable warrantless searches–requiring those being inspected to permit federal agents appearing at their doors to enter their premises "without delay" or advance notice and to physically occupy private property and intrude into areas in which the owners have a legitimate expectation of privacy. No neutral arbiter reviews the reasonableness of the search; to the contrary, if the subject of the inspection refuses to permit it, he faces prosecution for commission of a felony.  18 U.S.C. §§ 2257 (f)(5); 2257A (f)(5). *See* App. at 79.

These deficiencies are particularly intolerable where, as here, the searches target records kept in connection with the production of speech, and the expression

31

itself, which brings into play the well-established precedent imposing rigorous standards on searches involving constitutionally protected expression and requiring that the Fourth Amendment be meticulously applied so as to invoke the utmost solicitude for protected expression. *Marcus v. Search Warrant,* 367 U.S. 717, 724 (1961). *See also, A Quantity of Copies of Books v. Kansas,* 378 U.S. 205, 213 (1964); *Stanford v. Texas,* 379 U.S. 476, 484-85 (1976).

## CONCLUSION

Plaintiffs-Appellants, therefore, request that this Court reverse the judgment of the Court below and remand with instructions to enter a judgment declaring 18 U.S.C. §§ 2257, 2257A and their implementing regulations unconstitutional under the First and Fourth Amendments and permanently enjoining their enforcement.

Respectfully submitted,

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
jmmurray@bgmdlaw.com
LORRAINE R. BAUMGARDNER (0019642)
lbaumgardner@bgmdlaw.com
BERKMAN, GORDON, MURRAY &DEVAN
55 Public Square, Suite 2200
Cleveland, Ohio 44113
Telephone: 216-781-5245
Fax: 216-781-8207

Counsel for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE WITH RULES
## 32 (a) (7)(B), FEDERAL RULES OF APPELLATE
## PROCEDURE AND RULES 28.3 AND 31.1 3RD CIRCUIT
## LOCAL APPELLATE RULES AND SERVICE

Pursuant to Fed. R. App. P. 32 (a)(7)(C) and Third Cir. R. 28.3 and 31.1, the undersigned certifies:

1.     THE UNDERSIGNED IS A MEMBER OF THE BAR OF THIS COURT;

2.     EXCLUSIVE OF THE EXEMPTED PORTIONS IN FED. R. APP. P. 32(a)(7)(B)(iii), THE BRIEF CONTAINS: 6,931words.

THE BRIEF HAS BEEN PREPARED:

In proportionally spaced typeface using:

Software Name and Version:  Corel WordPerfect 10

In:  Times New Roman, 14 font

3.     I HEREBY CERTIFY THAT ON JULY 31, 2014, THE FOREGOING APPELLANTS' BRIEF WAS FILED ELECTRONICALLY. NOTICE OF THIS FILING WILL BE SENT TO ALL PARTIES BY OPERATION OF THE COURT'S ELECTRONIC FILING SYSTEM.  L.R. 113.4. PARTIES MAY ACCESS THIS FILING THROUGH THE COURT'S SYSTEM.

5.     THE FINAL VERSION OF THE BRIEF WITH CITES TO THE APPENDIX, WHICH HAS BEEN DEFERRED, WILL BE FILED IN ACCORDANCE WITH THE COURT'S ORDER OF MARCH 27, 2014 AND JULY 16, 2014;

6.     SYMANTEC ENDPOINT PROTECTION HAS BEEN RUN ON THE FILE AND NO VIRUS WAS DETECTED.

/s/ J. Michael Murray
J. MICHAEL MURRAY (0019626)
LORRAINE R. BAUMGARDNER (0019642)
BERKMAN, GORDON, MURRAY & DEVAN

Counsel for Plaintiffs-Appellants